UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

**CORNELL UNIVERSITY, a nonprofit New York corporation, and CORNELL RESEARCH FOUNDATION, INC., a nonprofit New York corporation,**

                                     **Plaintiffs,**

                    -v-                                    **01-CV-1974**

**HEWLETT-PACKARD COMPANY, a Delaware corporation,**

                                     **Defendant.**

_____

**HEWLETT-PACKARD COMPANY, a Delaware corporation,**

                                   **Counterclaimant,**

                    -v-

**CORNELL UNIVERSITY, a nonprofit New York corporation, and CORNELL RESEARCH FOUNDATION, INC., a nonprofit New York corporation,**

                                   **Counterdefendants.**

_____

APPEARANCES:

Sidley Austin Brown & Wood
Bryan K. Anderson, Esq., of Counsel
David T. Miyamoto, Esq., of Counsel
Denise L. McKenzie, Esq., of Counsel
Edward G. Poplawski, Esq., of Counsel
Olivia M. Kim, Esq., of Counsel
Sandra S. Fujiyama, Esq., of Counsel
555 W. Fifth Street, 40th Floor
Los Angeles, California 90013

and
Cornell University, Office of Counsel
James J. Mingle, Esq., of Counsel
Nelson E. Roth, Esq., of Counsel
Valerie L. Cross, Esq., of Counsel
300 CCC Building, Garden Avenue
Ithaca, New York 14853
Attorneys for Plaintiffs/Counterdefendants

DLA Piper, Rudnick, Gray Cary US LLP
Erin P. Penning, Esq., of Counsel
John Allcock, Esq., of Counsel
Sean C. Cunningham, Esq., of Counsel
Arthur A. Wellman, Esq., of Counsel
Licia E. Vaughn, Esq., of Counsel
Stewart M. Brown, Esq., of Counsel
401 B Street, Suite 1700
San Diego, California 92101-4297
and
Harter, Secrest & Emery LP
Jerauld E. Brydges, Esq.
1600 Bausch and Lomb Plaza
Rochester, New York 14604-2711
and
Fish, Richardson Law Firm
Barry K. Shelton, Esq., of Counsel
111 Congress Avenue
Suite 810
Austin, Texas 78701
Attorneys for Defendant/Counterclaimant

**Hon. Randall R. Rader, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation:**

### ORDER

Presently before the court are eight motions in limine by plaintiffs Cornell University and Cornell Research Foundation, Inc. (collectively, "Cornell") and five motions in limine by defendant Hewlett-Packard Company ("Hewlett-Packard") to exclude various submissions and testimony from trial. After oral argument on May 6, 2008, this court ruled as follows:

I.

CORNELL MOTION IN LIMINE NO. 1: Cornell moves in limine to exclude evidence involving its negotiations with Intel and Hewlett-Packard regarding U.S. Patent No. 4,807,115 (the '115 patent), as well as evidence about the two licenses that matured from the Intel negotiations. Cornell invokes Federal Rules of Evidence 402, 403, and or 408 for this motion. Cornell seeks to exclude those portions of these documents that refer to the dollar amounts of negotiation offers and of the Intel license. Cornell also seeks to exclude the amount of the royalty base. This court grants Cornell's motion in part.

A.

For many years before this lawsuit, Cornell negotiated with Intel and Hewlett-Packard over the '115 patent. As early as May 1988, before issuance of the '115 patent, Cornell sent a letter to Intel stating that introduction of Intel's 80960 processor led Cornell to believe Intel may want to license the '115 patent. Cornell attached to that letter a copy of the patent application (without claims). Several years later, in August 1993, Cornell sent a similar letter to Intel notifying Intel that the introduction of Intel's Pentium processor led Cornell to believe Intel may want to license the '115 patent. Intel first answered in January 1994. In that letter, Intel asserted, "After reviewing the '115 patent, we have determined that none of Intel's current microprocessors use the claimed invention, and that our future microprocessors are unlikely to use it."

Later Cornell strengthened the tone of its communications with Intel. On August 30, 1996, Cornell sent claim charts to Intel along with a letter proclaiming its opinion "that the Intel Pentium Pro microprocessor infringes" the '115 patent. Two months later, not having heard back from Intel, Cornell wrote again, emphasizing "the serious nature of our allegations that Intel infringes our patent." In February 1997, Intel responded with a denial of infringement and questions about the validity of the '115 patent:

> We conclude that Intel's Pentium Pro processors do not infringe the valid and enforceable scope, if any, of any claim of the '115 patent…. [Intel] would very much like to resolve our disagreement regarding the '115 patent and also reach an

2

understanding on how we will deal with future intellectual property related issues….

Having staked out their positions, Intel and Cornell entered in to licensing negotiations. After months of counter proposals back-and-forth, Intel and Cornell came to agreement in August 1997, when they agreed to the "Patent License Agreement." In September, Intel and Cornell entered into a second agreement, the "Intellectual Property Agreement," an umbrella agreement granting Intel licenses for technology arising from any Intel-funded university research and mandating binding arbitration for future intellectual property disputes between the parties.

Cornell's interactions with Hewlett-Packard follow a similar pattern. In December 1994, Cornell sent a letter to Hewlett-Packard's managing council stating that Hewlett-Packard's PA-8000 processor "uses a central issuing facility that look [sic] reasonably similar to the subject matter of Cornell Research Foundation's ['115 patent]." Cornell directly accused Hewlett-Packard of infringing the '115 patent in a letter dated August, 30 1996. Subsequently, in February 1998 and March 1999, Cornell offered to license Hewlett-Packard to the '115 patent on the same terms as the Intel agreement.

B.

Rule 408 of the Federal Rules of Evidence, provides, in pertinent part:

> Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount ...:
>
> (1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

Fed.R.Evid. 408(a). The rule "does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)." Fed.R.Evid. 408(b).

"Bottomed upon notions of public policy and fundamental fairness, Rule 408… enshrouds settlement discussions conducted in the context of actual or threatened litigation with a privilege, precluding their admission into evidence for purposes of proving either liability or the value of the claim…" Cornell Research Found., Inc. v. Hewlett-Packard Co., 5:01-CV-1974, 2007 WL 4349135, *15 (N.D.N.Y., Jan. 31, 2007) (citing Commodity Futures Trading Comm'n v. Rosenberg, 85 F.Supp.2d 424, 433-34 (D.N.J. 2000)). To facilitate settlement, Rule 408 protects negotiations between one of the parties to a case and a third party. United States v. Am. Soc. of Composers, Authors & Publishers, Civ. No. 13-95, 1989 WL 222654, at *8 (S.D.N.Y. Oct. 12, 1989), aff'd, 912 F.2d 563, 580 (2d Cir.1990).

Hewlett-Packard contends that "[o]ffers to license and license agreements are highly probative of a reasonable royalty and are admissible, except for those negotiated after an explicit threat of litigation." Hewlett-Packard both overstates the law and errs in its application.

The Supreme Court opined on the dangers of considering license fees negotiated in the shadow of a litigation threat more than one hundred years ago, noting that "[t]he avoidance of the risk and expense of litigation will always be a potential motive for a settlement." Rude v. Westcott, 130 U.S. 152, 164 (1888). Relying on that motivation, the Court determined that a license negotiated under threat of litigation "cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement." Id.

Relying on Rude, the Sixth Circuit stated, "[l]icense fees negotiated in the face of a threat of high litigation costs 'may be strongly influenced by a desire to avoid full litigation.'" Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1164 n. 11 (6th Cir. 1978). Several district courts have elaborated on the admissibility of third party license agreements negotiated against a backdrop of litigation. In Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc., the Iowa District Court held that Rule 408 precludes agreements "specifically entered into under the threat of litigation or against the backdrop of continuing litigation, with the intention of avoiding

4

the risks and expenses of that litigation." 898 F.Supp. 1334, 1340 (N.D. Iowa 1995) (citations omitted).  More recently, the court in PharmaStem Therapeutics, Inc. v. Viacell Inc., held that when offered to support a reasonable royalty analysis, license agreements with third parties arising" in a context where litigation was threatened or at least probable" are properly excludable under Rule 408.  No. C.A. 02-148, 2003 WL 22387038, at *2-*4 (D.Del. Oct.7, 2003).

Cornell's negotiations with both Intel and Hewlett-Packard occurred in the shadow of threatened litigation.  While Cornell initiated licensing negotiations with Intel before any dispute arose as to the infringement or validity of the '115 patent, Intel and Cornell did not commence discussion of a potential license until after such a dispute emerged.  Intel's statement in January 1994 that "none of Intel's current microprocessors use the claimed invention, and that our future microprocessors are unlikely to use it" established Intel's non-infringement position.  Cornell responded to this denial by asserting outright that "the Intel Pentium Pro microprocessor infringes" the '115 patent, and providing Intel with claim charts of the type used to show infringement in litigation.  Further cementing its allegations in later correspondence, Cornell characterized its infringement charge against Intel as "serious."  Intel again denied and suggested that the "valid and enforceable scope" of the '115 patent might be nil.  These escalating threats show a dispute between the parties regarding the infringement and validity of the '115 patent.  Later Intel and Cornell began negotiations.

Hewlett-Packard's only support for the proposition that Cornell did not threaten Intel with litigation comes in the form of deposition testimony from Cornell's President and Director of Patents and Technology Marketing, H. Walter Haeussler.  (Hewlett-Packard does not offer any support for the proposition that Cornell had not threatened it with suit.)  During his deposition, Mr. Haeussler stated that Cornell would not "under any circumstances ever file an action for infringement of the '115 patent against Intel."  However, Cornell's internal business decision that it would not execute suit against Intel has no bearing on the threats it made against Intel or the fact that Intel and Cornell disputed the validity and infringement of the '115 patent.  In the poker

game of license negotiations, the nature of the exchange between the players, not the cards each is holding, sets the tenor of the game. In this case, the record shows that the parties entered into licensing negotiations in the midst of threats of litigation that tainted the nature of their settlement discussions. These negotiations show few signs of an arms-length transaction between willing bargainers, but instead show an effort to avoid the expense and adverse publicity of litigation.

Hewlett-Packard also contends that Cornell should not be allowed to use the Intel license agreements to rebut Hewlett-Packard's defenses while simultaneously keeping "the most probative fact" from the jury. However, Hewlett-Packard does not explain the relevance of these license fees to any of its defenses, but instead simply returns to the refrain that the license is critical to the valuation of the '115 patent and the market for that patent.

Finally, Hewlett-Packard attempts an end run around Rule 408 by suggesting that the Intel negotiations disprove objective recklessness under <u>Seagate</u>. Even taking for granted that Intel's conduct is somehow relevant to Hewlett-Packard's willfulness defense, Hewlett-Packard has not demonstrated the relevance of Intel's negotiation offers and license amounts. The amount by which Cornell changed its license offers throughout the course of its negotiations with Intel is not in anyway probative of Hewlett-Packard's objective recklessness. Accordingly, this court excludes the amounts of negotiation offers in Cornell's negotiations with Intel and Hewlett-Packard, as well as the amount of the Intel license fees under Rule 408.

C.

Independent of exclusion under Rule 408, this court also excludes these amounts under Rule 402. Rule 402 provides that:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. <u>Evidence which is not relevant is not admissible.</u>

Fed.R.Evid. 402 (emphasis supplied). Rule 401 explains that:

6

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401.

The Federal Circuit has established a body of case law excluding license agreements "eroded by litigation" as irrelevant to the Georgia-Pacific reasonable royalty analysis. See, e.g., Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc., 862 F.2d 1564 (Fed.Cir. 1988); Deere & Co. v. Int'l. Harvester Co., 710 F.2d 1551 (Fed.Cir.1983). The predicate for this rule is simple: Georgia-Pacific reasonable royalty factor 15 assumes a voluntary agreement amongst willing parties:

> The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970). Where, as here, a license agreement arises under the threat of litigation, it has little relevance to the hypothetical reasonable royalty situation.

For example, in Dart Industries, the Federal Circuit focused on the question of relevance rather that Rule 408 and the likelihood that a license rate paid in settlement of a claim had been sufficiently "eroded by litigation" to preclude relevance to the question of a reasonable royalty. 862 F.2d at 1571-72. Likewise, in Deere & Company the license in question, though found by the Federal Circuit not to be excludable under Rule 408, was nonetheless determined to lack probative value on the question of reasonable royalty, and thus its exclusion by the court under Rule 408 was deemed to constitute harmless error. 710 F.2d at 1557-58.

In this case, the Intel licenses and predicate negotiations, as well as the Hewlett-Packard negotiations were "eroded by litigation" and therefore lack relevance under Rule 402. Indeed, Hewlett-Packard does not even attempt to rebut Cornell's charge that the license and offer

amounts are irrelevant under Rule 402. The same reasoning set forth above with respect to Rule 408 applies even more forcefully here. The correspondence between Cornell and Intel on the one hand, and Cornell and Hewlett-Packard on the other, demonstrates that Cornell threatened to sue both parties prior to any license negotiations. Cornell unambiguously accused both Intel and Hewlett-Packard of infringement and those parties disputed Cornell's claims. Because the offers were made and licenses signed under threat of litigation, the offer and license amounts do not speak to "the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty." Georgia-Pacific, 318 F.Supp. at 1120. Accordingly, the offer and license amounts were eroded by litigation and are therefore irrelevant and inadmissible.

D.

Because Cornell requests redaction of content beyond the negotiation offers and license amounts in some instances, this court examines each of the exclusions independently. Cornell's proposed redactions of Exhibit 1: June 26, 1997 letter from Cornell to Intel and all other substantially similar versions are granted, with the exception of the phrase "$500 million per year," which refers to Intel's market size. Cornell's proposed redactions of Exhibit 2: '115 patent License to Intel and all other substantially similar versions are granted. Cornell's proposed redactions of Exhibit 3: Intellectual Property Agreement Between Cornell University and Intel Corporation and all other substantially similar versions are granted. Cornell's proposed redactions of Exhibit 4: July 23, 1997 Cornell e-mail and all other substantially similar versions are denied. Cornell's proposed redactions of Exhibit 5: September 19, 1997 Cornell letter to Torng and all other substantially similar versions are granted. Cornell's proposed redactions of Exhibit 6: February 13, 1998 letter from Cornell to Hewlett-Packard and all other substantially similar versions are granted. Cornell's proposed redactions of Exhibit 7: March 10, 1999 letter from Cornell to Hewlett-Packard and all other substantially similar versions are granted.

II.

CORNELL MOTION IN LIMINE NO. 2: Cornell moves in limine to exclude the use of four documents at trial: the Tjaden Master's thesis; the Tjaden Ph.D. thesis; the Wedig dissertation; and the Torng report. Cornell contends that these documents do not qualify as "printed publications" under 35 U.S.C. § 102(b), and are therefore inadmissible to show invalidity of the '115 patent. Hewlett-Packard concedes that the Tjaden Ph.D. thesis, Wedig dissertation, and Torng report do not constitute prior art for this case. Accordingly, the only question remaining before the court involves the Tjaden Master's thesis and its status as a printed publication under 35 U.S.C. § 102(b). This court determines that this scholarly work qualifies for admission.

A.

The Tjaden Master's thesis—dated 1969—is an unpublished thesis submitted by Garold Tjaden in partial fulfillment of the requirements for a Master of Science degree in electrical engineering at Northwestern University. In the 1982 timeframe (October 7, 1982 is the critical date for the '115), Northwestern University Library indexed these unpublished graduate theses by author and year, not by subject or title. In addition, the library gave access to anyone requesting a specific thesis. The library stored these theses in a non-public area of the library.

The second page of the Tjaden Master's thesis proclaims that, like all other unpublished graduate theses in the Northwestern University Library, it is "open for inspection." That page also states:

> This thesis by Garold Stephen Tjaden has been used by the following persons, whose signatures attest their acceptance of the above restrictions.
>
> A library which borrows this thesis for use by its patrons is expected to secure the signature of each user.

Four signatures appear below this statement; three of which are dated prior to the critical date for the '115 patent—June 2, 1971, November 22, 1971, and October 22, 1975. Although the signors are unidentified, the addresses accompanying the three pre-critical date signatures include Santa

9

Monica, California; Culver City, California; and Milwaukee, Wisconsin. These signatures verify actual public access to the Tjaden Master's thesis.

Perhaps even more important than this evidence of actual access was a citation to this master's thesis in a prominent publication. That citation appeared in an article co-authored by Tjaden and Michael Flynn. That article, "Detection and Parallel Execution of Independent Instructions," was published in the October, 1970 edition of IEEE Transactions on Computers, Vol. C-19, No. 10—an influential publication circulated to many of the researchers in this field.

The Tjaden-Flynn article discusses a mechanism for analyzing dependencies in instructions to achieve "maximum instruction issuance." The Tjaden-Flynn article refers readers to the Tjaden Master's thesis in a passage discussing the processing speed enhancements achieved through implementation of the algorithm described in the paper:

> For example, if the algorithm is implemented to test instructions in a stack of size ten, we would expect to find 1.86 independent instructions each time the stack is checked on the average. Assuming that the algorithm adds negligible time to the decoding process, we would then be able to execute 1.86 instructions in the same time as it would normally take to execute only one instruction. We have thus increased the efficiency (average instruction execution rate) by 86 percent. <u>This must be discounted somewhat due to increased decoding time (see [13] for a specific illustration of this.).</u>
> \*   \*   \*
> [13] G. S. Tjaden, "Independent instructions in digital computers." M.S. thesis. Dept. of Elec. Engrg., Northwestern University, Evanston, Ill., May 1969.

(emphasis supplied).

B.

The Patent Act specifies the content of prior art in 35 U.S.C. § 102:

> A person shall be entitled to a patent unless-
> \*   \*   \*
> (b) the invention was patented or described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States....

This statutory passage prevents any exclusive right to technology already in the public domain. See In re Hall, 781 F.2d 897, 898 (Fed. Cir. 1986). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the

touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." Id. at 898-899; see also Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1568 (Fed. Cir. 1988).

The test for sufficient public accessibility to qualify as prior art is a legal determination based on underlying fact issues, subject to a case-by-case analysis. See In re Wyer, 655 F.2d 221, 224 (C.C.P.A.1981). Without facts in dispute, as here, the question collapses into a legal conclusion. In re Klopfenstein, 380 F.3d 1345, 1347 (Fed. Cir. 2004) (citing In re Cronyn, 890 F.2d 1158, 1159 (Fed.Cir.1989)).

Cornell contends that "[a] thesis must be cataloged or indexed in a 'meaningful way' to qualify as a printed publication," citing Cronyn. 890 F.2d at 1161. While an important factor, indexing is not the sole test for public accessibility. This court agrees that the Northwestern University Library practices of indexing theses by author name and submission date alone do not, on their own, satisfy the requirements for public accessibility. However, the accessibility inquiry does not end with consideration of library indexing practices. As the Federal Circuit stated in In re Klopfenstein,

> [T]hroughout our case law, public accessibility has been the criterion by which a prior art reference will be judged for the purposes of § 102(b). Oftentimes courts have found it helpful to rely on distribution and indexing as proxies for public accessibility. But when they have done so, it has not been to the exclusion of all other measures of public accessibility. In other words, <u>distribution and indexing are not the only factors to be considered in a § 102(b) "printed publication" inquiry.</u>

380 F.3d 1345, 1350 (Fed. Cir. 2004) (emphasis supplied).

After weighing all the circumstances of accessibility, this court views as vitally important the citation of this scholarly work in the Tjaden-Flynn article. IEEE Transactions on Computers is a seminal publication in the field of electrical engineering. The public—in this case those concerned with the field of electrical engineering—had and has broad access to this IEEE publication, and by extension the Tjaden-Flynn article. See Garrett Corp. v. United States, 422 F.2d 874, 877-878 (Ct. Cl. 1970) ("The public, for purposes of the statute, constitutes that class

of persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents."). In addition, the Tjaden-Flynn article refers readers to the thesis for a "specific illustration" of how implementation of the algorithm that increases processing speed by identifying and executing independent instructions also somewhat increases the decode time, thereby slightly reducing the overall benefit achieved with the algorithm. Finally, the article cites the Tjaden thesis in such a way as to make it accessible to any reader interested in its subject matter. The thesis title, author name, institution, department, and even geographic location are provided, giving any reader the tools he would need to access the thesis. Thus, the Tjaden-Flynn article served as a "research aid," guiding those of skill in the field to the Tjaden Master's thesis. See Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1379 (Fed. Cir. 2006); In re Wyer, 655 F.2d 221, 226-27 (C.C.P.A. 1981).

The question of whether a reference was "meaningfully catalogued or indexed" falls to the side when a "research aid" enables one of skill in the art to locate the sought-after reference. See Bruckelmyer, 445 F.3d at 1379; Wyer, 655 F.2d at 226-27. In Wyer, the Federal Circuit explained that a variety of factors are involved in the public accessibility determination, including intent to publicize and dissemination activities. In re Wyer, 655 F.2d at 226-27. Looking beyond mere cataloguing and indexing, the Wyer Court found that an Australian patent application was a printed publication where an abstract of that application had been published and the application itself was classified and indexed in the patent office. See id. at 226.

More recently, the Federal Circuit expounded on this reasoning in Bruckelmyer. In that case, the Federal Circuit found that an issued Canadian patent served as a "research aid" for guiding one of skill in the art to two figures contained in the Canadian patent application that were deleted from the issued patent. 445 F.3d at 1379. The court explained:

> The significance of whether these theses were meaningfully catalogued or indexed was whether one skilled in the art could locate them. In this case, however, it does not matter whether the '119 application was catalogued or indexed "in a meaningful way" because the '119 patent was indexed and could serve as a "research aid." And, as we explained above, no reasonable trier of fact

could find that the '119 patent did not contain sufficient disclosure to serve that purpose.

Id. (internal citations omitted).

Akin to the "research aids" in Bruckelmyer and Wyer, the Tjaden-Flynn article undisputedly qualifies as a printed publication. By analogy, this citation to the Tjaden Master's thesis provides a better roadmap to that thesis than an issued patent provides for two figures present in the corresponding patent application but entirely absent from and unmentioned in the issued patent. See id. ("Because no reasonable trier of fact could have found that the '119 patent did not provide sufficient information to allow a person of ordinary skill in the art to locate the '119 application, including the figures contained therein, we agree with the district court and conclude that that application was 'publicly accessible,' and hence an invalidating § 102(b) prior art reference.").

Furthermore, the Tjaden-Flynn article sufficiently sets forth the common subject matter between the '115 patent and the Tjaden Master's thesis—a way to analyze instruction dependencies and use that information to increase processing speed. These indicators would also guide a person of ordinary skill interested in the subject matter to the Tjaden Master's thesis. See id. ("As Ground Heaters observed, the '119 patent states that a possible use of the claimed invention is to thaw frozen ground by circulating heated liquid through flexible hoses-the same use contemplated by the methods claimed in the patents in suit. Given such a pertinent disclosure, we conclude that no reasonable trier of fact could find that a person of ordinary skill in the art interested in the subject matter of the patents in suit and exercising reasonable diligence could not locate the '119 application, including figures 3 and 4 contained therein.").

Because the Tjaden-Flynn article serves as a roadmap guiding readers to the Tjaden Master's thesis, citation to Application of Bayer and its ilk is inapposite. This case does not feature an "uncatalogued, unshelved thesis." Application of Bayer, 568 F.2d 1357, 1359 (C.C.P.A. 1978). This case also does not bear any similarity to an undergraduate thesis presented to a small group of faculty advisors and then simply filed away in the college library,

without publication or publicity, indexed by author name only.  See In re Cronyn, 890 F.2d 1158, 1160 (Fed. Cir. 1988).  Thus, weighing all indicia of public accessibility, this court denies Cornell's motion.

III.

The court's disposition of the remaining motions in limine was provided during the pretrial conference, and does not require further explication.  For convenience, the court's determinations are recorded below.

CORNELL MOTION IN LIMINE NO. 3 to exclude Mr. Osterndorf's testimony on the existence of a license between Cornell and IBM and industry licensing practices is deferred to trial, with the understanding that Hewlett-Packard has committed not to offer Mr. Osterndorf to testify regarding the existence of a license agreement to the '115 patent between Cornell and IBM.

CORNELL MOTION IN LIMINE NO. 4 to preclude Hewlett-Packard from using its patents as evidence at trial is denied-in-part, with the understanding that Hewlett-Packard has committed not to offer its patents to prove infringement.  Hewlett-Packard may present evidence of its patents in its damages case, provided that Hewlett-Packard submits a list of the patents it will use and their specific relationship to the accused Hewlett-Packard products by Friday, May 9, 2008.

CORNELL MOTION IN LIMINE NO. 5 to preclude Hewlett-Packard from proffering evidence or arguments inconsistent with the trial court's orders is denied-in-part, with the understanding that Hewlett-Packard will not offer arguments or evidence contrary to the court's claim construction.

CORNELL MOTION IN LIMINE NO. 6 to exclude the testimony of Mr. McQueeny regarding the existence of an alleged IBM license and related matters is denied.

CORNELL MOTION IN LIMINE NO. 7 to exclude evidence and argument related to Hewlett-Packard's legal theories on royalty base is denied, except to the extent that this court

agrees with Cornell that Hewlett-Packard cannot reargue its legal theories on exhaustion rejected by Magistrate Judge Peebles as adopted by Judge Mordue.

CORNELL MOTION IN LIMINE NO. 8 to exclude Hewlett-Packard's patent exhaustion arguments is denied.

HEWLETT-PACKARD MOTION IN LIMINE NO. 1 to exclude evidence regarding Hewlett-Packard's discovery conduct is granted with respect to Cornell's willful infringement arguments, but denied as such evidence pertains to Cornell's damages case.

HEWLETT-PACKARD MOTION IN LIMINE NO. 2 to exclude evidence of the April 2000 meeting between Cornell and Hewlett-Packard is denied.

HEWLETT-PACKARD MOTION IN LIMINE NO. 3 to exclude references to Hewlett-Packard's other litigations is granted with respect to the dollar amounts of Hewlett-Packard's other litigation settlements and awards. Ruling on the admissibility of reference to all other aspects of those litigations is deferred to trial.

HEWLETT-PACKARD MOTION IN LIMINE NO. 4 to exclude expert testimony regarding "forward citation analysis" is deferred to trial.

HEWLETT-PACKARD MOTION IN LIMINE NO. 5 to exclude expert testimony regarding RoyaltySource abstracts is deferred to trial.

IT IS SO ORDERED.

May 8, 2008  /s/ Randall R. Rader
Washington, District of Columbia  Randall R. Rader
  Circuit Judge