VOLUME V P.M. SESSION

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
CORNELL UNIVERSITY, a non-profit
New York corporation, and CORNELL
RESEARCH FOUNDATION, INC., a non-
profit New York Corporation,

                              Plaintiffs,

vs.                                01-CV-1974

HEWLETT-PACKARD COMPANY, a
Delaware corporation,

                              Defendant.

-------------------------------------------x

HEWLETT-PACKARD COMPANY, a
Delaware corporation,
                    Counterclaimant,

vs.
CORNELL UNIVERSITY, a non-profit
New York corporation, and CORNELL
RESEARCH FOUNDATION, INC., a non-
profit New York corporation,

                              Counterdefendants.

-------------------------------------------x

        Transcript of a Jury Trial held on May 23,

2008, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York,

the HONORABLE RANDALL R. RADER, United States

Circuit Judge, Presiding.

                    JODI L. HIBBARD, RPR, CRR, CSR
                         (315) 234-8547

A P P E A R A N C E S

For Plaintiff:        SIDLEY AUSTIN, LLP
                      Attorneys at Law
                      555 West Fifth Street
                      Los Angeles, California  90013-1010
                         BY:  EDWARD G. POPLAWSKI, ESQ.
                              BRYAN K. ANDERSON, ESQ.
                              OLIVIA M. KIM, ESQ.
                              DENISE L. McKENZIE, ESQ.
                              SANDRA S. FUJIYAMA, ESQ.
                              DAVID T. MIYAMOTO, ESQ.


For Defendant:        DLA PIPER US LLP
                      Attorneys at Law
                      401 B Street, Suite 1700
                      San Diego, California  92101-4297
                         BY:  JOHN ALLCOCK, ESQ.
                              SEAN C. CUNNINGHAM, ESQ.
                              ERIN P. PENNING, ESQ.

                      FISH RICHARDSON LAW FIRM
                      Attorneys at Law
                      111 Congress Avenue
                      Suite 810
                      Austin, Texas  78701
                         BY:  BARRY K. SHELTON, ESQ.

1          (Open Court, Jury Out, 1:12 p.m.)

2          MR. CUNNINGHAM:  Your Honor, before we bring

3    in the jury could we address one issue real quick.

4          THE COURT:  Sure.

5          MR. CUNNINGHAM:  Sorry, your Honor.  I just

6    didn't want to do this in the presence of the jury.  So this

7    is for their expert Rappaport, they're not going to show this

8    slide but my understanding is they are going to elicit

9    testimony on point one there, and we think that's within the

10   scope of the court's order this morning, so we would like

11   some sort of guidance on how --

12         THE COURT:  They're not going to show this?

13         MR. CUNNINGHAM:  They're not going to show the

14   slide itself but they're going to elicit testimony on the

15   topic.

16         MR. ANDERSON:  Well, the issue is, and I tried

17   to address it earlier with describing Mr. Rappaport's

18   testimony, and he's going to be from a licensing perspective,

19   and a licensing professional looking at circumstances of this

20   case based on his experience, what would he use as the base,

21   the royalty base in this case and his opinion is it would be

22   servers and workstations and that's what I was trying to

23   clarify earlier this morning as to which side of the line it

24   fell on your Honor's decision, because your Honor's decision

25   went to economic perspective, but I don't want to run afoul

1    of it, and if the decision is that goes for --

2                    THE COURT:  I don't suppose I have any problem

3    with him offering his opinion as to what he'd do which is

4    separate from what Cornell, with a little guidance from the

5    court, has chosen to do.

6                    MR. CUNNINGHAM:  All right, your Honor, I

7    understand.

8                    THE COURT:  The record should note that I

9    elicited a smile with my characterization, not a very

10   pleasant smile.

11                   MR. CUNNINGHAM:  My smile was pleasant.

12                   THE COURT:  Well, yours was fine.  So you're

13   fine, Mr. Anderson.

14                   MR. ANDERSON:  Thank you, your Honor.

15                   MR. CUNNINGHAM:  Thank you.

16                   THE COURT:  And Mike, can you bring in our

17   jury.

18                   (Jury Present, 1:14 p.m.)

19                   THE COURT:  Mr. Poplawski, or Mr. Anderson,

20   who am I acknowledging here?

21                   MR. POPLAWSKI:  Yes, good afternoon, your

22   Honor.  I believe what we have in mind next is to play the

23   deposition testimony, at least some of the experts --

24   excerpts of HP's at least then director of university

25   worldwide relations, Wayne Johnson.

1              THE COURT:  Let's do it.

2              (Video Played, 1:16 p.m. to 1:49 p.m.)

3              THE COURT:  Okay, Mr. Poplawski, where do we

4    go from here?

5              MR. POPLAWSKI:  Your Honor, we would now like

6    to call a live witness, Robert Swieringa.

7              MR. MIYAMOTO:  Your Honor, David Miyamoto,

8    I'll be conducting Mr. Swieringa's examination.

9              THE CLERK:  You can step right over here,

10   please.  Please state your name for the record.

11             THE WITNESS:  Robert Swieringa,

12   S-w-i-e-r-i-n-g-a.

13             THE CLERK:  Thank you.  Please raise your

14   right hand.

15

16             R O B E R T   S W I E R I N G A , called as a

17   witness and being duly sworn, testifies as follows:

18             THE COURT:  Are you ready to proceed,

19   Mr. Miyamoto?

20             MR. MIYAMOTO:  Yes, I am.

21             DIRECT EXAMINATION BY MR. MIYAMOTO:

22        Q    Please tell me your name.

23        A    My name is Robert or Bob Swieringa.

24        Q    Where do you live?

25        A    I live in Ithaca, New York.

Robert Swieringa - Direct by Mr. Miyamoto                123

1          Q    How long have you lived in Ithaca?

2          A    I've lived in Ithaca off and on since 1974.  I

3    moved there in '74, I moved away in '86 and moved back in

4    '97.

5          Q    What brought you back?

6          A    I was recruited by Cornell University to

7    become associate professor of accounting in the Johnson

8    School.  I chose early in my career to be an academic, earned

9    a PhD at the University of Illinois in 1969.  My first job

10   was assistant professor of accounting at the Stanford

11   Graduate School of Business where I was there from 1968

12   through 1974.  I then was recruited by the Johnson School as

13   an associate professor.  I was tenured, 1977, became a full

14   professor in 1981.

15         Q    Now you mentioned that you moved away from

16   Ithaca in the mid 1980s.  What took you away from Ithaca?

17         A    I became an accounting professor who had a

18   real passion for accounting and I wrote a series of

19   accounting issues that became quite popular, and these

20   articles were picked up by an organization called the

21   Financial Accounting Standards Board which is the

22   organization that writes the accounting standards for the

23   United States.  And in 1985 they recruited me, and I came

24   there as a member of a seven-member board and I was a member

25   of that board from 1986 to 1996.

Robert Swieringa - Direct by Mr. Miyamoto                    124

1            Q    Did you return to teaching at some point?

2            A    I did.  The term that I had it at the FASB was

3    limited to two five-year terms.  I left in 1996 and became a

4    professor of accounting at the Yale School of Management.  I

5    then left from there, was recruited to go back to Cornell as

6    dean of the business school in 1997, and I was dean from 1997

7    through 2007, and also am professor of accounting and back to

8    teaching accounting.

9            Q    So is it correct that currently you're no

10   longer the dean of the Johnson Graduate School of Management?

11           A    That's correct.

12           Q    Are you what is known as a dean emeritus?

13           A    Yes, I am.

14           Q    Could you give the jury a little background on

15   the Johnson Graduate School of Management at Cornell, please?

16           A    The Johnson Graduate School of Management is

17   the graduate business school at Cornell University.  Cornell

18   has about a dozen colleges and schools and this is the school

19   that issues the MBA degree, the master of business

20   administration degree.  Our students have undergraduate

21   degrees, they have an average of about five years of

22   experience and they come to the Johnson School often because

23   they're making a major change in their career, either to try

24   to extend their career or to change careers.  And in doing

25   that we have a very powerful faculty, research faculty, we

Robert Swieringa - Direct by Mr. Miyamoto          125

1   have a very innovative educational program and we also have

2   very successful graduates and the Johnson School has been

3   considered one of the best business schools in the world over

4   the last 10 to 12 years.

5          Q     Could you briefly describe what your role was

6   while you were the dean of the Graduate School of Management

7   at Cornell between 1997 and 2007?

8          A     The dean of the business school is the chief

9   academic and administrative officer of the school.  And I

10  reported to the provost who is the chief operating officer

11  and to the president of the university.  And the role of a

12  dean is to be concerned with and have responsibility for

13  strategic planning, for budgeting, for personnel decisions,

14  for initiatives, academic initiatives and other programs and

15  so forth and then also to basically be the general

16  administrator of the school.

17         Q     Is the position of dean of the Johnson

18  Graduate School of Management a senior position in the

19  administration at Cornell?

20         A     It is.  In fact the dean of the school will be

21  on the platform for commencement on Sunday.

22         Q     How many deans are there at the Johnson

23  Graduate School of Management?

24         A     Well, there's one but there are a number of

25  associate deans who report to the dean, but there's only one

Robert Swieringa - Direct by Mr. Miyamoto          126

1    dean.

2              Q    I'd like you to now focus back in time in

3    2002, if you could, and specifically April 2002.  Did you

4    know an individual who worked at Hewlett-Packard by the name

5    of Jim Cooper as of April 2002?

6              A    Yes, I know Jim Cooper.

7              Q    And how do you know Mr. Cooper?

8              A    I know him from his activities as the

9    on-campus recruiting director for HP, and he interacted

10   mostly with the Johnson School and other colleges and units

11   at Cornell.  Jim's a Cornellian, he spent a lot of time in

12   the school helping recruit students and Hewlett-Packard was

13   very successful in recruiting students.

14             Q    Now as of April 2002 you'd talked with

15   Mr. Cooper before?

16             A    Yes, I did.  I talked with him on April 16th

17   of 2002.

18             Q    Well, I'm going back before April 16th.

19             A    I knew him in a lot of instances, he would

20   come to campus, they would come several times a year to make

21   the plans for the recruiting season with presentations, with

22   various kinds of interviews and office hours and other ways

23   to interact with students and then there would be an

24   interview season that usually would take place in the

25   springtime.  And so there was a lot of preparation work, a

Robert Swieringa - Direct by Mr. Miyamoto                127

1    lot of interactions with people in the school and so I knew

2    Jim very well.

3              Q    Now you mention April 16th, 2002.  Do you

4    recall talking with Mr. Cooper from Hewlett-Packard on

5    April 16th, 2002?

6              A    I do.

7              Q    Did the subject of this lawsuit between

8    Cornell and Hewlett-Packard come up in that conversation?

9              A    Yes, it did.

10             Q    Can you tell me the circumstances under which

11   you had the conversation with Jim Cooper from Hewlett-Packard

12   on April 16th, 2002?

13             A    Jim and I happened to be on the same flight

14   from Syracuse to Chicago on the 16th, and we had a chance

15   meeting, we ran into each other as we departed from the plane

16   in the gate area and had a conversation as we walked through

17   the concourse.

18             Q    Who brought up the subject of this lawsuit

19   between Cornell and Hewlett-Packard?

20             A    Jim did.

21             Q    And was the discussion with Mr. Cooper

22   memorable to you?

23             A    It is, I remember it well.  Jim was supposed

24   to meet with me the previous day on the Monday and in fact

25   Jim Cooper and a Wayne Johnson had come to the Johnson School

Robert Swieringa - Direct by Mr. Miyamoto                128

1   and to other units at Cornell, ostensibly to meet with us, to

2   meet Wayne Johnson who was becoming the new head of

3   university relations and then also to talk about strategies

4   going forward.  And I was not able to meet with him on that

5   day, and so what happened was that when Jim saw me at the

6   airport we had this chance meeting, he used it as an

7   opportunity to bring up the lawsuit and to talk with me.

8           Q    What did he say about the lawsuit?

9           A    He indicated that the lawsuit was going to

10  have a devastating impact on recruiting relationships with

11  the Johnson School, with corporate relationships that we had,

12  HP had been a major corporate partner of ours, and that he

13  persuaded -- wanted me to intervene with President Hunter

14  Rawlings to ask him to drop the lawsuit.

15          Q    Who was the president of Cornell in April

16  2002?

17          A    It was Hunter Rawlings.

18          Q    And that was a person to whom you reported as

19  dean of the Johnson School?

20          A    Yes, it was.

21          Q    Were you surprised Mr. Cooper raised these

22  things with you in the airport at O'Hare?

23          A    No, I actually wasn't surprised.

24          Q    Why not?

25          A    And the reason is that the night before I had

Robert Swieringa - Direct by Mr. Miyamoto                    129

1    a phone call from Dick Shafer who was my associate dean for

2    corporate relations and who had attended the meetings that

3    took place on Monday, and he wanted me to know that the

4    agenda that originally was in place, that we would be meeting

5    with Wayne Johnson and having a discussion of strategies that

6    the actual discussion in that meeting focused on the lawsuit,

7    on the potential effects of the lawsuit, on both recruiting

8    and on the corporate relationship.

9              THE COURT:  Mr. Miyamoto, could you suspend

10   for a second, could I talk just a second with counsel.

11             (A discussion was held off the record at side

12              bar.)

13             THE COURT:  Excuse my interruption,

14   Mr. Miyamoto, you may inquire.

15             MR. MIYAMOTO:  Thank you, your Honor.

16        Q    You mentioned you weren't surprised,

17   Mr. Swieringa.  Did you have any other reaction when

18   Mr. Cooper raised the issue of a lawsuit in O'Hare Airport?

19        A    Well, yes, I was very concerned about the

20   issues that he was discussing, and therefore I listened very

21   intently as we walked down the concourse talking about these

22   issues.

23        Q    At that time, April 2002, were you involved in

24   any way with this lawsuit?

25        A    Not at all.

Robert Swieringa - Cross by Mr. Cunningham                     130

1             Q     Did you have any responsibility for the

2     lawsuit on behalf of the university?

3             A     Not at all.

4             Q     Have you ever had any involvement with this

5     lawsuit?

6             A     No.

7                   MR. MIYAMOTO:  I have no further questions.

8                   THE COURT:  Thank you.  Would you care to

9     inquire, Mr. Cunningham.

10                  MR. CUNNINGHAM:  Just a couple of questions,

11    your Honor.

12                  CROSS-EXAMINATION BY MR. CUNNINGHAM:

13            Q     Good afternoon, sir, my name is Sean

14    Cunningham, we haven't met before.  You would agree with me,

15    wouldn't you, sir, that Hewlett-Packard's been a significant

16    donor to Cornell University over the years?

17            A     Yes.

18            Q     And in fact in between the years 1980 through

19    2001, they gave the university over $25 million in donations

20    and equipment?

21            A     I do not know that number, but they have been

22    a significant contributor.

23            Q     And in fact as of spring 2006, Hewlett-Packard

24    was listed as a principal partner of the Johnson Business

25    School, correct?

Robert Swieringa - Cross by Mr. Cunningham                    131

1           A    That could be.  I do not know that as a fact,
2     but it could be.
3           Q    Let's actually confirm that.  Why don't we
4     pull up tab 2, please.  This is a corporate connections
5     publication from your business school?
6           A    Mm-hmm.
7           Q    That's your picture at the bottom?
8           A    Yes, it is.
9           Q    Would you blow up the corporate partners part
10    of that.  And you'll see at the top there it says principal
11    partners, $1 million up cumulative, and Hewlett-Packard is
12    listed there, do you see that?
13          A    Yes, I do.
14          Q    Okay.  And Hewlett-Packard to this day
15    continues to actively recruit Cornell graduates, does it not?
16          A    It is active on campus, yes.
17               MR. CUNNINGHAM:  Thank you.
18          A    On this, I believe the cumulative amount is,
19    means, it's over -- cumulative over an extended period of
20    time.
21               MR. CUNNINGHAM:  Okay, that's fine, thank you.
22    No further questions.
23               THE COURT:  Anything further, Mr. Miyamoto?
24               MR. MIYAMOTO:  Nothing further of this
25    witness, your Honor.

Hunter Rawlings - Direct by Mr. Poplawski          132

1          THE COURT:  Thank you, you may step down.

2          THE WITNESS:  Thank you.

3          (Whereupon the witness was excused,

4          2:02 p.m.)

5          THE COURT:  Yes.

6          MR. POPLAWSKI:  With the court's permission we

7     would like to call our next live witness, Dr. Hunter

8     Rawlings.

9          THE CLERK:  Good afternoon.  Please state your

10    name for the court reporter and spell it.

11         THE WITNESS:  Hunter Rawlings, H-u-n-t-e-r,

12    R-a-w-l-i-n-g-s.

13         THE CLERK:  Please raise your right hand.

14

15         H U N T E R  R A W L I N G S , called as a

16    witness and being duly sworn, testifies as follows:

17         (A discussion was held off the record at side

18          bar, 2:04 p.m.)

19         THE COURT:  Excuse my interruption.  Excuse my

20    interruption, Mr. Poplawski.  I believe you were going to

21    inquire.

22         MR. POPLAWSKI:  Thank you, your Honor.

23         DIRECT EXAMINATION BY MR. POPLAWSKI:

24    Q    Please tell the jury your name.

25    A    My name is Hunter Rawlings.

Hunter Rawlings - Direct by Mr. Poplawski                      133

1          Q     And where is your home?

2          A     I live just outside of Ithaca, New York.

3          Q     How long have you lived in Upstate New York?

4          A     Since 1995.

5          Q     What brought you to Ithaca?

6          A     I came as the president of Cornell in the

7    summer of 1995.

8          Q     How did that come about?

9          A     Well, before that I was the president of the

10   University of Iowa in Iowa City, Iowa and I was recruited to

11   come to Cornell as president in 1995.

12         Q     You have any working relationship with Cornell

13   today?

14         A     Yes.  I'm a professor of classics and history

15   at Cornell, I'm happy to say.

16         Q     When did you obtain your degree?

17         A     I obtained my bachelor's degree in 1966 from

18   Haverford College and I got a PhD from Princeton in 1970.

19         Q     Would you please summarize your work

20   experience after leaving Princeton and prior to coming to

21   Cornell?

22         A     Yes, I'll be brief.  I was an assistant

23   professor at the University of Colorado, and then was

24   promoted to associate professor and then full professor at

25   Colorado, and then at Colorado I also began to work in

Hunter Rawlings - Direct by Mr. Poplawski          134

1    administration, academic administration, as associate

2    provost, and then I became vice president for academic

3    affairs and research at the University of Colorado in 1984.

4         Q    Now would you briefly explain to the jury what

5    you meant by the administrative side at the university?

6         A    Yes.  Academic administrators such as deans,

7    you just met Dean Swieringa, and provosts and vice provosts

8    work with faculty members in order to try to enhance their

9    work.  They also work with students to try to improve work in

10   the classroom, and they manage different departments or

11   colleges such as the College of Business at Cornell or the

12   College of Arts and Sciences.  So an academic administrator

13   then works in many dimensions at a university within a

14   college or above the college level.

15        Q    At some point in time did you leave the

16   University of Colorado?

17        A    Yes.  I left the University of Colorado in

18   1988 to become the president of the University of Iowa.

19        Q    Now, let's go back to the time that you were

20   president of Cornell.  Did you have occasion to familiarize

21   yourself with how Cornell handled ownership of intellectual

22   properties such as patents and technology transfers such as

23   licenses of patents?

24        A    Yes, occasionally, I did.  Not very often

25   because Cornell's a very large university, there are many

Hunter Rawlings - Direct by Mr. Poplawski                135

1  dimensions to it so it was certainly not an area where I

2  spent much of my time but occasionally I would work with the

3  Cornell Research Foundation, for example, on issues involving

4  licensing of patents and such.

5          Q     What did Cornell Research Foundation do at

6  that time?

7          A     It was the job of the Cornell Research

8  Foundation to manage the intellectual property at Cornell,

9  that is to try to help faculty members when they develop new

10  discoveries, make sure that those discoveries would be

11  properly patented if they deserved to patent and that those

12  patents could be properly licensed to companies if companies

13  wanted to use some of the ideas that were inherent in those

14  patents.

15          Q     During the time that you were the president of

16  Cornell University, did you undertake any efforts to license

17  any Cornell patent?

18          A     Personally that was not something that I spent

19  time on, but certainly the university did because it's a very

20  important part of the university's mission.

21          Q     Are you familiar with a patent known as the

22  Torng patent?

23          A     Yes, I am.

24          Q     Did you ever undertake any effort to license

25  the Cornell patent during the time that you were president at

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Hunter Rawlings - Direct by Mr. Poplawski                136

1   Cornell?

2        A    Not personally.  As I said earlier that was

3   something that the research foundation mostly did, but I

4   became involved somewhat with this particular patent because

5   it was regarded as a very important one.

6        Q    At some point in time, did you have any

7   discussion with anybody at HP concerning the Torng patent?

8        A    Yes, I did.

9        Q    You recall when that occurred?

10       A    It occurred in the fall of 1996.

11       Q    With whom at HP did you have the discussion of

12   the Torng patent in the fall of 1996?

13       A    Had a discussion with Mr. Lew Platt who at

14   that time was the CEO of Hewlett-Packard, was a Cornell

15   alumnus, and I met with Mr. Platt in California to discuss

16   the Torng patent.

17       Q    All right.  Please give the jury some further

18   details concerning what you recall of your discussion with

19   Mr. Platt about Dr. Torng's patent in the fall of 1996.

20       A    Sure.  I felt it was important since this was

21   such an important patent and we were concerned about HP's

22   possible use of it, I thought it was important for me to

23   discuss that with Mr. Platt personally if possible in order

24   to, at the highest level of our two institutions, ensure that

25   we could have a road towards some kind of agreement.  And so

Hunter Rawlings - Direct by Mr. Poplawski                    137

 1    I thought it would be opportune when I was in California to

 2    meet with Mr. Platt in order to emphasize for him how

 3    important this patent was to Cornell.

 4                Q    Do you recall giving Mr. Platt any document at

 5    this fall 1996 meeting?

 6                A    I think I gave him a courtesy copy of a letter

 7    that Cornell had written to HP very recently concerning

 8    possible infringement of Cornell's patent.

 9                Q    May we have Plaintiff's Exhibit 948, please.

10    Dr. Rawlings, this is an August 30th, 1996 letter to the

11    general counsel of HP, do you recognize it?

12                A    I do.

13                Q    And what is it, sir?

14                A    It's a letter from the Cornell Research

15    Foundation to HP's vice president of corporate affairs, in

16    which we convey the strong view that Dr. Torng's patent is

17    essentially an important one and we want HP to recognize that

18    we believe they are infringing the patent.

19                Q    And is this August 30th, 1996 letter to the

20    best of your knowledge the document that you gave to

21    Mr. Platt at the fall 1996 meeting that you had with him?

22                A    Yes.  It's what I called a courtesy copy

23    because we had already sent a copy and I just wanted to

24    personally give it to him so that he would see exactly what I

25    was talking about.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Hunter Rawlings - Direct by Mr. Poplawski                 138

1          Q    Now, what was Mr. Platt's reaction to what you

2    discussed with him at this fall 1996 meeting concerning

3    Dr. Torng's patent?

4          A    Well, it was a very friendly meeting, I recall

5    it rather well, we talked about a number of different things

6    and this was among those things, and he was grateful to me or

7    at least he said he was grateful to me for bringing this

8    particular issue to his attention because he said that the

9    processor that this letter concerned was an especially

10   important product for HP, so he seemed grateful.

11         Q    Did you then have another discussion with

12   Mr. Platt?

13         A    Well, at the end of our discussion in

14   California, I asked Mr. Platt if he would check into this and

15   get back to me to let me know what his view was so that we

16   could possibly proceed toward some kind of agreement and he

17   said he would.  But I didn't hear back from him.  So a number

18   of weeks went by, it could have been several months, I'm not

19   sure of the exact amount of time, but quite a bit of time

20   went by, and when I didn't get a reply to what I thought was

21   an important matter, I phoned him.

22         Q    And do you recall that discussion?

23         A    Yes.  I phoned him, he was good enough to take

24   my call, and I said Lew, remember that patent matter that I

25   raised with you when I came to see you in your offices at HP,

Hunter Rawlings - Direct by Mr. Poplawski                    139

1    and he said yes, Hunter, I do remember that.  And I said,

2    well, do you have a view now about how HP would like to

3    discuss it with us and possibly make progress toward some

4    agreement.  And he said, you know, Hunter, our people don't

5    think we've infringed that patent.  And I said, well, we

6    think that you are infringing that patent and we see it as a

7    very serious issue, and I hope you will rethink this because

8    we see it as so serious that it's something that we might

9    pursue if we don't come to some kind of an agreement.  And

10   Lew said then that he would check with his people again to

11   see if they wanted to take a different response and so I said

12   thank you very much.

13           Q    Now, as of 1996, was Carly Fiorina to your

14   knowledge a president of HP?

15           A    Not in 1996, as I recall.

16           Q    Now, let me put up Plaintiff's Exhibit 960.

17   Did you ever write any letter to Carly Fiorina of HP

18   concerning this lawsuit?

19           A    Yes, I did.

20           Q    And under what circumstances did you write

21   that letter?

22           A    Well, the letter that you've put up on the

23   screen which is dated April 30th, 2002 is a letter that I

24   sent to Ms. Fiorina following the visit to the Cornell campus

25   of the three representatives that are listed there in the

1    first paragraph, and which was the subject of this recent

2    discussion here in the court.

3                    MR. POPLAWSKI:  All right.  Mr. Hoy, may we

4    have paragraph 3, please.

5                    MR. ALLCOCK:  Objection, relevance.

6                    MR. POPLAWSKI:  I can move on, your Honor.

7                    THE COURT:  Thank you.

8            Q    Now, why as president of Cornell were you

9    involved in an attempt to license the Torng invention to HP?

10           A    Well, for a couple of reasons.  One is that

11   Mr. Platt was a Cornell alumnus and so he was someone whom I

12   got to know and it was helpful then to be able to discuss

13   something from the president of the university to the CEO of

14   the corporation.  The second reason was that the Cornell

15   Research Foundation made it very clear to me that this was a

16   critically important patent which had very large potential

17   applications in processors, and all of us were aware, even

18   humanities professors like me, that speed in processors was

19   tremendously important.

20           Q    Did any of your efforts with HP help at all in

21   terms of resolving this issue that Cornell had with HP

22   concerning Dr. Torng's patent?

23           A    I don't think so.  I certainly tried to bring

24   it to their attention, and in the letter to Ms. Fiorina I

25   expressed my profound regret and shock that her employees had

Hunter Rawlings - Direct by Mr. Poplawski                    141

1    used language such as nuclear winter with Cornell deans and

2    faculty members.

3              Q    Is this lawsuit important to Cornell,

4    Dr. Rawlings?

5              A    It's extremely important to Cornell.

6              Q    Why is that, sir?

7              A    Well, just for two or three reasons.  I can be

8    brief but these are very important to Cornell.  First of all,

9    Cornell is a university that teaches students, conducts

10   research, and serves the public.  It's the land grant

11   university for New York State.  We offer education in fields

12   like agriculture and veterinary medicine on behalf of the

13   citizens of New York State and we do research in order to

14   provide new ideas --

15             THE COURT:  Excuse me, Mr. --

16             MR. ALLCOCK:  I apologize, your Honor, Rule

17   403.

18             MR. POPLAWSKI:  This is the last question,

19   your Honor.

20             THE COURT:  Please complete this question

21   then.

22             A    So it is essential for us that in the basic

23   business we do, namely teaching and research, we protect the

24   ideas of our professors.  Those professors depend on us to

25   protect their ideas.  For one thing, if we don't protect

Hunter Rawlings - Direct by Mr. Poplawski                    142

1    their ideas, they'll go somewhere else, to another university

2    that will protect their ideas.  Their ideas are their own

3    property, they're vital to them.  So it's essential to

4    Cornell as it is to every other research university to

5    protect the ideas that are generated by Cornell faculty

6    members and students.  It's a basic part of our business.

7                    Secondly, because of our mission, which is

8    aimed at helping the people of New York State as the land

9    grant university for New York State, we're supposed to do

10   research that serves the public.  Research that's going to

11   help in agriculture, research that's going to help in

12   computing, research that's going to help in hotel management,

13   and we're supposed to take those ideas and make them

14   available to the public so that the public can use them.

15   That's what we're here for.  That's the basic part of our

16   business.  And so this lawsuit, it seems to me, gets to the

17   heart of what Cornell does.

18                    MR. POPLAWSKI:  I have no further questions on

19   direct.

20                    THE COURT:  Thank you.  You have any

21   questions, Mr. Allcock?

22                    MR. ALLCOCK:  I do, your Honor.

23                    (2:19 p.m.)

24                    CROSS-EXAMINATION BY MR. ALLCOCK:

25        Q    Good afternoon, Dr. Rawlings.

Hunter Rawlings - Cross by Mr. Allcock                   143

1          A    Good afternoon.

2          Q    My name's John Allcock, I'm here representing

3   Hewlett-Packard.  You mentioned that this was an important

4   patent to Cornell?

5          A    Yes.

6          Q    And because it was an important patent, you

7   got involved a little in the licensing of it, right?

8          A    Yes.

9          Q    But mostly the licensing of it was handled by

10  the competent professionals at the Cornell Research

11  Foundation, is that right?

12         A    Yes, it is.

13         Q    And you're aware that those professionals have

14  tried to license the patent since even before it was granted,

15  right?

16         A    I'm aware that they always do that with all of

17  our patents that seem licensable.

18         Q    Right.  And you're aware that in the 20 years

19  since they've tried to license it, with the exception of the

20  IBM license which arose from the initial grant, they've only

21  been able to get one license?

22         A    Well, as you know from discussion earlier,

23  there's a dispute about whether there's a license to IBM.

24         Q    Take that aside, other than that, they've only

25  been able, in 20 years, to get one license, right?

Hunter Rawlings - Cross by Mr. Allcock                144

1           A    I don't know the number of licenses they've

2    had for that.

3           Q    Now, you met with Mr. Platt on -- was it

4    September 6th of 1996?

5           A    I don't recall the date exactly, I know it was

6    early in the fall of '96.

7           Q    Okay.  And where was the meeting?

8           A    The meeting was at his offices at

9    Hewlett-Packard.

10          Q    I see.  And you brought the patent to his

11   attention?

12          A    I did.

13          Q    You have a liberal arts background?

14          A    I do.

15          Q    I see.  And Mr. Platt, who I think has passed

16   away now?

17          A    Yes.

18          Q    Mr. Platt had an electrical engineering

19   background?

20          A    I think that's right.

21          Q    Right.  And then what happened was around that

22   time, a formal letter went to the general counsel at HP

23   saying here's this patent?

24          A    I think that's the one that was up on the

25   screen.

1          Q    Right.  And then do you know, and then you had

2     another conversation with Mr. Platt subsequent to that?

3          A    Yes, I phoned him.

4          Q    Right.  And do you know in the intervening

5     time period, actually within a couple weeks of your meeting,

6     Mr. Platt asked one of the senior PhD electrical engineers at

7     HP, also a Cornell grad, to look at the Cornell '115 patent

8     to see what he thought about whether HP infringed it?

9          A    I didn't know whom he might have talked to.

10          Q    Would you agree with me that that would be a

11     prudent thing to do, asking a PhD EE to look at the patent?

12          A    I think it would be prudent to ask one's

13     engineers who were working on that processor to look at that.

14          Q    So then he told you a few weeks later that it

15     was his belief based on the research he conducted that the

16     patent wasn't infringed, that they didn't use it; is that

17     what he told you?

18          A    He did.  He said, my people tell me they don't

19     think we've infringed the patent.

20          Q    Right.  And then shortly thereafter in the

21     early part of '97, you all got a very detailed letter from an

22     HP in-house lawyer spelling out the reasons why they didn't

23     infringe, is that correct?

24          A    That, I don't know, I don't remember that.

25          Q    May I have Exhibit D130, please.  Let me see

1    the first paragraph.  Mr. Haeussler, is the -- was the head

2    of licensing at CRF at the time, at that point?

3              A    I believe so.

4              Q    Right.  Now, at this time, did you do anything

5    to satisfy yourself that the Cornell claim had merit?  Did

6    you talk to a EE engineer?

7              A    I talked with representatives from the Cornell

8    Research Foundation and also some scientists at Cornell.

9              Q    I see.  Do you know that after Cornell got

10   this letter, they didn't do anything for two years and three

11   months?

12             A    I don't believe that's correct.  We had a

13   number of different discussions at different levels of the

14   university with HP about this patent in the ensuing months,

15   at different levels.

16             Q    There was no communication, written

17   communication, to HP on this patent for two years and three

18   months?

19             A    That, I can't at all be sure of.  I do know

20   that we had meetings and phone discussions with HP, through

21   the legal office, and through the Cornell Research

22   Foundation.

23             MR. ALLCOCK:  I have no further questions of

24   the witness, your Honor.

25             THE COURT:  Thank you.  Anything further?

Hunter Rawlings - Cross by Mr. Allcock                147

1              MR. POPLAWSKI:  No, your Honor.

2              THE COURT:  You may step down.  Let's take a

3      10-minute break.

4                   (Whereupon a recess was taken from 2:25 p.m.

5                    to 2:29 p.m.)

6                   (Open Court, Jury Out, 2:29 p.m.)

7              THE COURT:  As you know, I took this break to

8      take the opportunity to admonish the parties, I'd like to

9      move a little more quickly than we've been moving,

10     Mr. Anderson.

11             MR. ANDERSON:  Yes, your Honor.  We're not

12     going to call Mr. Elliot on marketing of servers, we'll save

13     that for any rebuttal we may have and we'll just call

14     Mr. Rappaport on licensing practices relevant to reasonable

15     royalty.

16             THE COURT:  And will he be your last witness?

17             MR. ANDERSON:  He will be.

18             THE COURT:  How long do you think he'll take?

19             MR. ANDERSON:  I would hope I can complete his

20     direct in half hour or so, your Honor.

21             THE COURT:  Very good.  And then you'll get

22     your opportunity and they we'll move to the -- to your case.

23             MR. ALLCOCK:  We'll have Mr. Lesartre but

24     that's it, that's all we have for today.

25             THE COURT:  How long do you need with

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Hunter Rawlings - Cross by Mr. Allcock                148

1    Mr. Lesartre?

2                    MR. ALLCOCK:  We can play some video if we run

3    out.

4                    THE COURT:  To work until 5?

5                    MR. ALLCOCK:  Absolutely.

6                    THE COURT:  And thank you, Mr. Anderson.

7    Thank you for sensing my desire to streamline our

8    proceedings.

9                    (Pause in Proceedings.)

10                   MR. ALLCOCK:  Your Honor, may I inquire of

11   counsel how long they're going to take on cross of

12   Mr. Lesartre.  Thirty minutes, okay.

13                   (Pause in Proceedings.)

14                   (Jury Present, 2:36 p.m.)

15                   THE COURT:  Mr. Anderson.

16                   MR. ANDERSON:  Yes, your Honor, Cornell calls

17   Irving Rappaport.

18                   THE CLERK:  Good afternoon.  Please state your

19   name for the court reporter and spell it.

20                   THE WITNESS:  Irving Rappaport, I-r-v-i-n-g,

21   R-a-p-p-a-p-o-r-t.

22                   THE CLERK:  Please raise your right hand.

23

24                   I R V I N G   R A P P A P O R T , called as a

25   witness and being duly sworn, testifies as follows:

Irving Rappaport - Direct by Mr. Anderson                    149

1                  DIRECT EXAMINATION BY MR. ANDERSON:

2          Q     Would you please tell the jury your name.

3          A     Irving Rappaport.

4          Q     Would you give the jury an overview of your

5     educational background.  Slide 2, please.

6          A     In 1962, I obtained a Bachelor of Science in

7     electrical engineering from Washington University in

8     St. Louis.  Following that, I went to law school and obtained

9     a JD with honors in 1966 from George Washington University

10    Law School, and then in 1969 I obtained a Masters of Business

11    Administration degree from the Boston University Graduate

12    School of Management.

13         Q     Mr. Rappaport, could you give the jury a brief

14    overview of your work experience.  Slide 3, please.

15         A     Yes.  Well, right after graduating engineering

16    school, I went to work at the United States Patent &

17    Trademark Office as a patent examiner.  As a patent examiner,

18    I had responsibilities in our unit having to do with

19    electrical components and my job was to examine and art on

20    new patent applications filed in the art unit I was assigned

21    to.

22               Following the patent office, I had a two-year

23    commitment through ROTC to serve in the U.S. Army.  I was

24    assigned to work for a U.S. government patent lawyer.  My

25    branch was Army Security Agency, I was stationed at National

Irving Rappaport - Direct by Mr. Anderson          150

1    Security Agency at Fort Meade, Maryland, where I worked as

2    patent agent for the U.S. government patent attorney.  Prior

3    to my finishing law school, I worked for approximately a year

4    for RCA Corporation in Washington, D.C. office, again as a

5    patent agent.

6                When I finished law school, I then took a

7    full-time position as patent and trademark attorney with

8    Raytheon Corporation at their headquarters in Lexington,

9    Massachusetts.

10               And now I will skip to the part of my career

11   that I think is most relevant to this case, which is the

12   primary focus of my efforts as a licensing professional.  I

13   joined Medtronic as assistant general counsel and assistant

14   secretary responsible for their worldwide intellectual

15   property matters, that included their patent program of

16   obtaining patents, licensing patents, and related litigation.

17   Medtronic is in the business of manufacturing medical

18   devices, and particularly they're the world's largest

19   manufacturer of implantable cardiac pacemakers.

20               Following my experience at Medtronic, I spent

21   roughly four years as chief patent counsel at a company

22   called Data General Corporation.  Data General at that time

23   was the world's second largest manufacturer of minicomputers.

24   My responsibilities there as chief patent counsel included

25   their worldwide patent acquisition program, including the

Irving Rappaport - Direct by Mr. Anderson                    151

1    licensing of patents and related to litigation.  I entered

2    into negotiations for license agreements with companies such

3    as IBM, AT&T, RCA Corporation.

4                    I was recruited in 1982 by Bally Manufacturing

5    to chase Pac-Man clones, they were in the business of making

6    the arcade-based video games that you probably have heard of,

7    Pac-Man, Ms. Pac-Man, Space Invaders.  My responsibility as

8    associate general counsel for intellectual property and

9    licensing included the oversight of their patent acquisition

10   program, patent licensing matters that would come up, as well

11   as the licensing of all of their characters relating to their

12   merchandise licensing.

13                   I was, in 1984, I joined Apple Computer to

14   really develop their intellectual property program.  I became

15   associate general counsel for intellectual property and

16   licensing there, built a department of approximately 25

17   lawyers and paralegals and support staff to carry out their

18   worldwide program of intellectual property that included the

19   acquisition of patents, the licensing of patents, and related

20   litigation.  Of course Apple's business at the time I joined

21   them was in computer systems, computer peripheral equipment,

22   printers, hard drives and screens, all related types of

23   equipment in the computer business.

24                   I left Apple roughly six years later in 1990

25   to work on a project for Intel Corporation.  I was asked to

Irving Rappaport - Direct by Mr. Anderson            152

1    work on a project that had to do with problems Intel was

2    having with counterfeiting of some of its math coprocessor

3    chips.  What was happening was people were buying their

4    6-megahertz math coprocessors, another form of

5    microprocessor, sanding off the 6-megahertz and Intel

6    markings and remarking them as 10-megahertz parts with the

7    Intel trademarks and there's a price differential in the

8    market of $150.  So I was asked to come in and pursue those

9    companies through litigation and eventually we were able to

10   resolve that and get most of those companies out of that

11   counterfeiting business.

12              During my stay in that project for Intel,

13   Intel was in a dispute with a company that you've heard

14   mentioned here a few days ago called Advanced Micro Devices

15   and they were in a dispute over some model designations

16   called, referred to as 386 and 486.  And since I was advising

17   the company on trademark matters, it occurred to me that it

18   might be very useful for Intel to really make a very

19   important branding move in the market, and so one of the

20   things that I did is I prepared a memorandum to the general,

21   vice president general counsel at Intel suggesting that maybe

22   Intel should approach its customers that made personal

23   computers that used Intel microprocessors such as Compaq,

24   Hewlett-Packard and other companies that made personal

25   computers, to require that they put Intel on the outside of

Irving Rappaport - Direct by Mr. Anderson          153

1    their boxes so that the customer would know that when they

2    were buying a Compaq or Hewlett-Packard personal computer

3    that it had a genuine Intel chip inside.  About six months

4    after I finished the project, in fact Intel adopted the

5    notion of branding their customers' products with their logo.

6              I, about the time I was finishing the project

7    at Intel, I was approached by National Semiconductor, they

8    were very interested in licensing their patent portfolio.

9    They owned a portfolio that comprised about 1500 issued

10   United States patents and they had never entered into license

11   agreements with any of the Korean or Japanese large

12   semiconductor manufacturers.  So I joined them and as vice

13   president and associate general counsel for intellectual

14   property and licensing, and they had already been discussing

15   licensing with several companies but had not gotten very far.

16   During my tenure there, we were able to conclude license

17   agreements on their patents with most of the major Japanese

18   and Korean semiconductor companies and were able to bring in

19   roughly 200 million -- $250 million in licensing royalties

20   under those license agreements.  And of course that was back

21   in 1991, '92 time frame.

22             Following National, I've continued to be

23   involved in licensing business.  I founded a software company

24   that I comanaged for approximately nine years in which we

25   were involved in the acquisition of patents, licensing of

Irving Rappaport - Direct by Mr. Anderson                    154

1    patents, and licensing of large software systems to -- ended

2    up with about 100 Fortune 1000 customers.

3                Following that, I was asked to set up a

4    licensing business unit for a company called Symyx

5    Technologies.  Symyx is in the business of making

6    high-throughput technical experimentation system.  These are

7    very large computerized systems that conduct, can conduct a

8    thousand experiments in a day compared to a bench scientist's

9    ability to conduct one experiment in an eight-hour day.  And

10   so I did join them and set up their licensing business unit.

11               And then following my period with them, I set

12   up my own consulting practice and around 19 -- 2003, and have

13   been involved in advising companies on their intellectual

14   property strategies, licensing of patents and litigation

15   support, what I'm doing here today.

16        Q    Mr. Rappaport, other than the positions you've

17   held, various licensing jobs at companies, do you have other

18   licensing experience?  Slide 4, please.

19        A    Yes, I do.  I, in -- during the time I was at

20   Apple Computer, I was appointed by three United States

21   secretaries of commerce and two United States trade

22   representatives to serve on a U.S. government advisory

23   committee, advising our government on trade-related aspects

24   of intellectual property rights, and I served on that

25   committee from 1987 through 1985 -- 1995.  And that led to

Irving Rappaport - Direct by Mr. Anderson       155

1    the U.S. entering into several international treaties that

2    included provisions related to intellectual property rights

3    and licensing of intellectual property rights.

4              I've also been certified as a licensing

5    professional by an independent organization known as

6    Certified Licensing Professionals, Inc.

7              I also, during my time with Aurigin Systems, a

8    company I cofounded, am a coinventor on 18 issued United

9    States patents.

10             And finally, during the course of my career

11   I've published and presented roughly 60 papers relating to

12   patents and licensing.

13        Q    Mr. Rappaport, could you briefly summarize for

14   the jury the types of technologies in which you've been

15   involved in licensing capacity?

16        A    Yes.

17             THE COURT:  I think we've seen a lot of his

18   work with the semiconductor industry.

19             MR. ANDERSON:  Sure, your Honor.

20             THE COURT:  So maybe we can move on to

21   Mr. Rappaport's contribution to our trial here.

22             MR. ANDERSON:  All right.

23        Q    Mr. Rappaport, without telling the jury any of

24   the opinions you may have formed, have you asked, been asked

25   to provide opinions in this matter?

1           A     Yes, I have.

2           Q     And have you formed opinions in this matter?

3           A     Yes, I have.

4           Q     And what are the materials that you have

5     analyzed in forming your opinions in this matter?

6           A     I was provided a significant number of

7     documents that Hewlett-Packard has produced in this case as

8     well as publicly available documents.  I have conducted my

9     own research in looking at these matters, and again,

10    understanding that I have been asked to look at some of these

11    issues from the perspective of a licensing professional

12    involved in setting up a hypothetical licensing negotiation

13    that would have taken place between Cornell and

14    Hewlett-Packard to determine a reasonable royalty.

15                MR. ANDERSON:  Your Honor, we would move to

16    qualify Mr. Rappaport as an expert on the practices, customs

17    and standards of intellectual property licensing.

18                THE COURT:  Is -- do you have a need for voir

19    dire, Mr. Cunningham?

20                MR. CUNNINGHAM:  No objection, your Honor.

21                THE COURT:  Mr. Rappaport is welcome to give

22    his opinions.

23          Q     Could you briefly summarize for the jury your

24    opinions in this matter.  If we could have slide 7, please.

25          A     Yes.  I'd like to point out again that I'm

Irving Rappaport - Direct by Mr. Anderson                157

1   approaching this from the perspective of a licensing

2   professional, customs, standards, and practices used in a

3   hypothetical licensing negotiation that would have occurred

4   between Cornell and HP to arrive at reasonable royalty.  And

5   I have looked at two fundamental areas in arriving at my

6   opinions.  One of those relates to what the appropriate

7   royalty base should be from a licensing professional's

8   perspective, as well as how the prominence of Dr. Torng's

9   breakthrough invention would have played a significant role

10  in the hypothetical licensing negotiation.

11       Q    Why don't we turn to that first opinion,

12  slide 9, please.  Could you explain further the opinions you

13  formed concerning the royalty base?

14       A    Yes.  There are two aspects that I looked at

15  from a broad perspective, as a licensing professional.  The

16  first one is that it's clear from the evidence that I've

17  reviewed, that you've all heard here, that HP has clearly

18  used Dr. Torng's invention to sell servers and workstations.

19  And the second overview is again from a licensing

20  professional's viewpoint, in my opinion, Hewlett-Packard

21  needed a license under Dr. Torng's patent in order to be able

22  to sell servers and workstations.

23       Q    Let's talk about that first, use.  Go to the

24  next slide.  Why would you as a licensing professional look

25  at the use of the invention?

Irving Rappaport - Direct by Mr. Anderson                158

1          A    Generally in this kind of negotiation, have

2    you to look to a real world transaction as to how the

3    invention is being utilized.  In this case we've all heard a

4    lot of testimony about the fact that Dr. Torng's invention

5    was used with the sale by Hewlett-Packard of its servers and

6    workstations.

7               Now, you've also heard some discussion that

8    there could be a view of looking at other -- parsing, so to

9    speak, the system down into other parts.  The difficulty when

10   you begin to do that is in a hypothetical licensing

11   negotiation, the parties may have a very difficult time on

12   agreeing on what the value or pricing of that particular

13   component should be.  Example, the company may sell the

14   component inside its own organization, have transfer pricing,

15   and it may do so and set a given price for a number of

16   reasons, not necessarily having to do with the true value of

17   that particular item or component, but because it's trying to

18   take profitability in one country, or another country.

19               So it's most practical in a licensing

20   negotiation such as the one we're considering here to look at

21   a real world transaction.  In this case, Hewlett-Packard,

22   being a public company, reports on its sales of the products

23   it sells, which in this case are predominantly servers and

24   workstations, and those are public record numbers.  And so

25   from a licensing professional's perspective, the item that

Irving Rappaport - Direct by Mr. Anderson          159

1    would provide the least area of dispute in determining a

2    royalty base would be to look at the fact that

3    Hewlett-Packard is using the invention in the sale of the

4    servers and workstations, and those numbers are readily

5    available and there's really no basis for disagreement among

6    the parties for licensing negotiation over those numbers.

7              Q    Other than your review of the documentation

8    that we've seen in this case so far on HP's use of

9    Dr. Torng's invention, have you reviewed any other materials

10   that would indicate to you that the parties would look to

11   systems as opposed to components in the royalty base?

12             A    Yes, I have.

13             Q    Next slide.

14             A    Although it appears that Hewlett-Packard did

15   not produce many of its license agreements, there is one that

16   was produced, we see on this slide, that came to my

17   attention, and I think this agreement is particularly

18   relevant to our current situation, because this is an

19   agreement, a license agreement entered into 2006 by

20   Hewlett-Packard, with a company that owned a handful of

21   patents covering microprocessors of technology.  And as you

22   see in this agreement, it was agreed that HP would pay a

23   running royalty on the sale, and I'll refer you to the last

24   highlighted section of this slide, it says that, "The

25   licensed product shall be a complete, ready to use, final,

Irving Rappaport - Direct by Mr. Anderson                    160

1   end-user product," and we know in this case what HP's

2   products that they have sold using Dr. Torng's invention are.

3               So this agreement, seems to me, is very

4   relevant to the kind of situation we're dealing with here.

5        Q    Why is it relevant?

6        A    Well, because here we're faced with

7   Dr. Torng's invention relating to improving performance in a

8   microprocessor which is employed to run a complete server and

9   workstation system.  And in this license agreement with,

10  involving what was referred to as the MMP patents, these were

11  also patents that related specifically to microprocessors,

12  but the parties agreed that the license, royalty base would

13  be based on the sale of the end user products being sold by

14  Hewlett-Packard.

15       Q    Now did HP actually pay the running royalty

16  set forth here?

17       A    As it turns out, they did not.  This agreement

18  included an appendix that provided Hewlett-Packard with an

19  option to opt out of the running royalty and to pay a fixed

20  payment to the licensor.

21       Q    Is that uncommon in licensing?

22       A    No, that's not uncommon, that is something

23  that is done and --

24       Q    Why is something like that made available by

25  licensors and licensees in your experience?

Irving Rappaport - Direct by Mr. Anderson                161

1          A     Well, one of the things that happens when a

2     licensor approaches a company such as Hewlett-Packard, big

3     company, and you're looking to establish a foothold in the

4     market with your licensing program, HP being a large company,

5     there's a great incentive to find a way to reach agreement

6     with a company like Hewlett-Packard, and come away with this

7     kind of agreement that we're going to pay them 7.2 percent

8     royalty on the sale of computers.  But at the same time to,

9     on the back end, through this option, give HP a right to buy

10    out and pay a paid-up lump sum for the license.  And the

11    reason that's of such significance to the licensor is the

12    licensor then goes out to the other companies that may be

13    infringing or that require licenses under its patents and

14    says, look, Hewlett-Packard has agreed to pay me 7.2 percent

15    running royalties on the sale of their computers.  And so I'm

16    looking for you to pay me on the sale of your computers.  So

17    this is a real leveraging tool for the licensor and they're

18    generally willing to give the first licensee in the door a

19    significant break on the royalties being paid.  So this is

20    commonly done in this kind of circumstance.

21          Q     If we could turn to the second factor you've

22    listed.

23          A     Yes.

24          Q     Could you please describe to the jury why, as

25    the licensing professional, you're looking at this factor?

Irving Rappaport - Direct by Mr. Anderson                162

1          A     Well, I think we've seen a lot of evidence

2    presented by Dr. Smith, Dr. Stewart, about the fact that

3    Hewlett-Packard was in fact using Dr. Torng's invention in

4    conjunction with their sale of servers and workstations.  And

5    so from a licensing professional's perspective, it seems very

6    apparent to me that Hewlett-Packard needed a license under

7    Dr. Torng's patent, from a perspective of you wouldn't want

8    to have your product in the market without having the

9    greatest possible performance capabilities.  And so this

10   would have been a serious consideration, of wanting to be

11   licensed and not have an infringement problem when you're

12   selling a product that's going to continue to give you a

13   competitive advantage of the sort that we've heard testimony

14   about in the last few days.

15         Q     Other than the testimony by Dr. Smith and

16   Dr. Stewart, without going into great detail, have you relied

17   on other materials reviewed in this case?

18         A     Yes, there are other materials, there's one I

19   wanted to call to your attention, there is an article

20   published, well, yeah, this is an article that appeared in a

21   publication called *Business Wire*, it's a trade magazine, and

22   I want to point out there that here's this publication making

23   the statement that the Hewlett-Packard PA-8000-based systems

24   have 40 percent faster capability than the nearest

25   competitor.  And then it goes on to say that intelligent

Irving Rappaport - Direct by Mr. Anderson          163

1    execution, and the other feature allowed superscalar

2    performance levels unmatched by other vendors.  And if you

3    recall the superscalar performance, meaning the ability to

4    push through four instructions per clock cycle, and certainly

5    the performance issue is one that you've heard a lot about,

6    and from a licensing professional's perspective in the

7    licensing hypothetical negotiation, this would be a very

8    significant factor to look at.

9              Q    Mr. Rappaport, I'd like to move on to your

10   final opinion in this matter.  Slide 25, please.  Can you

11   please describe this opinion to the jury.

12             A    Yes.  This is again part of the second part of

13   my opinion which is the prominence and technological

14   achievement of Dr. Torng's breakthrough invention in my

15   opinion would have played a very significant role in the

16   hypothetical licensing negotiation.

17             Q    In this next slide, put in fundamental patent,

18   what is the significance of this in your opinion?

19             A    Well, let me say that typically what's done in

20   an organization, and we did this, for example, at National

21   Semiconductor and other companies I worked for, we would

22   create what's called the proud list of patents.  And the

23   reason for calling it a proud list is that you cull through

24   your patent portfolio, for National it was 1500 issued U.S.

25   patents, and usually you find that, and in National's case we

Irving Rappaport - Direct by Mr. Anderson                    164

1    found about 10 to 12 of the whole 1500 patents that we

2    believed had real economic value.  And the licensing program

3    we carried out in which we were able to bring in $250 million

4    in licensing royalties was really centered around those 10 to

5    12 patents so, creating a proud list.  And Cornell, look to

6    their website, has its own proud list of patents that it's

7    obtained over the years.  I think they own somewhere in the

8    vicinity of 1100 patents, as I recall, and Dr. Torng's patent

9    is one of the few handful of patents that appears on their

10   proud list.

11          Q    So how did you go about, how do you go about

12   as a licensing professional identifying those patents that

13   will go into your licensing portfolio?

14          A    Well, first thing as a licensing professional

15   is I would want to know is is the patented invention being

16   used in commercially valuable products.  And I think clearly

17   we've seen the testimony from Dr. Smith, from Dr. Stewart,

18   that we have that situation here.  Dr. Torng's invention has

19   been used in HP's servers and workstations.

20          Q    What's the next fact you consider?

21          A    The next item that the licensing professional

22   would look to would be the importance and the success of

23   those commercially valuable products.  And again, we have

24   seen I think in this case from what has been presented and

25   certainly the evidence that I've reviewed, that from a

Irving Rappaport - Direct by Mr. Anderson                    165

1    licensing perspective, Dr. Torng's invention that helped

2    create the performance capabilities that HP was able to

3    deliver in their servers and workstations is where the rubber

4    really meets the road in this case.

5           Q    Are you offering an opinion that the Torng

6    patent is infringed by HP's systems and processors?

7           A    Well, one of the things about a hypothetical

8    negotiation, and I think this got mentioned, but the parties

9    must assume that the patent is valid, enforceable, and being

10   infringed, so in the hypothetical negotiation that the

11   licensing professional must address, those issues are off the

12   table for discussion.  They're assumed that those things are

13   all there, and so we're assuming for purposes of this

14   discussion that HP is indeed infringing upon Dr. Torng's

15   patent.

16          Q    Mr. Rappaport, I'd like to move to the third

17   thing you've listed here, is the patent recognized within the

18   industry.  Can you give us an example of such information

19   that you would rely on as a licensing professional?

20          A    Well, for example, I may be looking at a

21   patent that someone has asked me to look at from the point of

22   view, we're interested in licensing this patent out to

23   people, companies that we believe are using this patent,

24   infringing this patent, need a license.  And in looking at

25   that question, one of the things that I look to is who is

Irving Rappaport - Direct by Mr. Anderson          166

1    citing this patent.  And by citing a patent, it was a

2    question of is the organization that owns the patent citing

3    its own patent, meaning is it filing improvements which are

4    citing its own fundamental invention.  And then I would want

5    to look at, well, who else is citing this patent in their

6    work, and how many others are citing this patent in their

7    work.  And having the ability to look at this information

8    becomes very valuable in conducting the licensing

9    negotiation.

10         Q    Have you examined whether there's any

11   citations to Dr. Torng's patents?

12              MR. CUNNINGHAM:  Your Honor.

13              THE COURT:  Yes.

14              MR. CUNNINGHAM:  At this point we renew our

15   objection as we stated in our motion in limine with regard to

16   this topic, the citations.

17              THE COURT:  You may proceed, Mr. Anderson.

18              MR. ANDERSON:  Thank you.

19         Q    Have you done any investigation as to the

20   citation of Dr. Torng's patent?

21         A    Yes, I have.

22         Q    And in particular, could we have the next

23   slide, can you briefly describe what you found?

24         A    This was a published article that I found, it

25   was an international study that was published in 2005, I

Irving Rappaport - Direct by Mr. Anderson                167

1    believe you saw this slide in a more abbreviated form

2    yesterday, and what this is is a study that was done of

3    almost 77,000 issued United States patents, all related to

4    the computer field, and the reason that you see the number 7

5    highlighted is that that item, it says Cornell University and

6    it lists patent 48,071,115 which is the very '115 patent that

7    we're considering in this case, was considered by the people

8    that did this study, their findings by mathematical

9    calculations show that Dr. Torng's patent was the seventh

10   most cited patent of the 77,000 patents in the study.

11            Q     Do you know where the data comes from to do a

12   study?

13            A     Yes.

14            Q     What kind of data is it?

15            A     This information is readily available on

16   databases you find online, number, patent office, there's a

17   website called Free Patents Online and you look up a

18   particular patent and there's a area that you click on and it

19   brings up the complete citation list of all the patents

20   relating to that particular patent.

21            Q     So this is based on publicly available

22   information?

23            A     Oh, absolutely.

24            MR. ANDERSON:  No further questions, your

25   Honor.

Irving Rappaport - Cross by Mr. Cunningham          168

1          THE COURT:  Thank you.  Mr. Cunningham, care

2   to inquire?

3          MR. CUNNINGHAM:  Thank you, your Honor.

4          <u>CROSS-EXAMINATION BY MR. CUNNINGHAM:</u>

5      Q    Good afternoon, sir.  We've met before, I

6   think.

7      A    Yes, we have.

8      Q    Hope you're still well.  Just have a couple of

9   topics here.  First of all, the -- you said that one of your

10  opinions was that the prominence ask and technical

11  achievement of Dr. Torng's breakthrough invention would have

12  significantly influenced the hypothetical negotiation,

13  remember that, sir?

14     A    Yes.

15     Q    As to the technical importance of the '115

16  patent, you're relying solely on Dr. Smith's opinions, right?

17     A    And all the other materials that we've seen

18  and I've reviewed, all the internal documents that we've seen

19  from Hewlett-Packard, press releases, publications, such as

20  the *Business Wire*, yes, all of those materials.

21     Q    But you're not relying on your own experience

22  as a technical person in giving that opinion, correct?

23     A    No, I'm not here for that purpose.

24     Q    Thank you.  Now let's talk briefly about this

25  MMP portfolio license that you mentioned.  You first said HP

Irving Rappaport - Cross by Mr. Cunningham          169

1   agreed in the MMP portfolio license to pay a 7.2 percent

2   running royalty, right?

3          A    That's -- as I recall in the agreement, yes.

4          Q    Okay.  And then we talked about an addendum

5   that actually HP paid a lump sum payment, right?

6          A    That's correct.

7          Q    How much was that?

8          A    As I best recollect, I believe the lump sum

9   that was agreed to was somewhere around $69 million.

10         Q    Why don't we pull up that exhibit, it's P523,

11  please.  All right.  First of all, let's just stop there.

12  It's called MMP portfolio license agreement, do you see that?

13  Right at the top.  You probably have a binder, too.

14         A    Yes, I do see that.

15         Q    We'll get you a binder, too, I apologize, sir.

16         A    Is this -- oh, okay.

17         Q    It's coming.

18              MS. PENNING:  May I approach the witness, your

19  Honor.

20              THE COURT:  You may.

21         A    What page, sir?

22         Q    It's the very front, oh, it's P523, it should

23  be towards the back.  First page.

24         A    First page I have is my deposition.

25         Q    Just look for the tab P523.

Irving Rappaport - Cross by Mr. Cunningham          170

```
 1          A    E5, did you say?

 2          Q    P, P as in Peter.

 3          A    I don't seem to have it, that tab, I've got

 4    all -- oh, wait a minute, there's a P98.  That's the only P

 5    tab I've got there.

 6          Q    Is there a D228 in there?  Both sides have got

 7    the exhibit on their list, so look for D228.

 8          A    No, I don't see that tab either.  Maybe this

 9    isn't the right book.

10          Q    It's in the binder that you were given first,

11    sorry about that.  The one Cornell gave to you.

12          A    This one over here?

13          Q    Yes.

14          A    Okay.  Give me that tab again.

15          Q    P523.

16          A    Well, this is Marion Stewart's binder.

17          Q    You want to just look at it on the screen,

18    sir, would that be --

19          A    Sure, I mean I don't see that tab here.

20          Q    Do you know what MMP stands for?

21          A    Yes.  As I recall, it's the Moore

22    Microprocessor Patents, I think the inventor is a gentleman

23    by the name of Moore.

24          Q    Charles Moore, right?

25          A    Yes.
```

Irving Rappaport - Cross by Mr. Cunningham                171

1          Q     You've heard of this set of patents before, I

2     assume?

3          A     Yes, I actually have.

4          Q     It's a fairly significant set of patents in

5     the licensing industry?

6          A     I don't know that I've looked at them to that

7     extent.

8          Q     Do you know approximately how many companies

9     have taken a license to this set of patents, sir?

10         A     No, I don't at this point.

11         Q     Do you understand that Intel and AMD have both

12    taken licenses to this set of patents?

13         A     The only company that I'm aware of is

14    Hewlett-Packard because I looked and reviewed this particular

15    agreement of Hewlett-Packard's.  I haven't reviewed other

16    agreements that involve this set of patents.

17         Q     Okay.  So in trying to gauge the relative

18    value of this particular set of patents to Hewlett-Packard,

19    you didn't investigate what other companies might have taken

20    licenses?

21         A     No, I did not.

22         Q     All right.  If I told you that more than 20

23    companies had taken licenses to the MMP portfolio, would that

24    surprise you?

25               MR. ANDERSON:  Objection, your Honor, that's

Irving Rappaport - Cross by Mr. Cunningham                172

1    not in evidence.

2              A    Actually --

3                   THE COURT:  You can explain.

4              A    -- it would.

5              Q    Okay.  How many companies have taken licenses

6    to the '115 patent, sir?

7              A    Well, the only license that I'm aware of is

8    the Intel agreement.

9              Q    Okay.  And that's in 20 years since the patent

10   issued, correct, nearly 20 years?

11             A    As far as I'm aware.

12             Q    So there's one license to Intel, correct?

13             A    That's all I'm aware of.

14             Q    And that's not something, that's not a license

15   that you're considering in your analysis, that's right?

16             A    No, I did not.

17             Q    And you're aware that HP at least contends

18   that there's a license to IBM to the '115 patent?

19             A    I'm aware of that.

20             Q    You're not considering that license either,

21   are you?

22             A    No.

23             Q    Okay.  But you are considering MMP license so

24   let's talk about that.  You read this license?

25             A    Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1          Q     And you understood the terms?

2          A     Yes.

3          Q     Did you understand what types of HP products

4    might be covered by the MMP portfolio?

5          A     Yes.  As I recall under the license product

6    provision, it talked about consumer end products and

7    commercial end products and I think in the slide I refer to

8    it talked about the license product as being an end user

9    final product.

10         Q     Okay.  So it wasn't just servers and

11   workstations, because those are commercial products, right?

12         A     That's right.

13         Q     So it was also desktops, notebooks, printers,

14   cameras, right?

15         A     I mean it didn't specify those, but I would

16   assume that it included those products as well.

17         Q     Right.  So nearly every product HP sells are

18   covered by, potentially covered by the Moore microprocessor

19   patent portfolio, correct?

20         A     If you say so, I would take your word, again,

21   I haven't looked at that issue specifically.

22         Q     All right.  Well, let's try and figure out

23   what HP actually paid for this portfolio of patents.  Why

24   don't we turn to page 19, addendum G, please.  Now if you'll

25   focus on paragraph 1 and 1.1, please.  It says purchase price

Irving Rappaport - Cross by Mr. Cunningham                174

1    for this lump sum addendum shall be $66,320,000, correct?

2           A    I stand corrected on the 69 million, somehow

3    that number --

4           Q    But that's what you meant, all right, I

5    understand.

6           A    That's the total number.

7           Q    And it says payable in the form of cash and

8    credits as follows.  $26,400,000 in the form of cash, do you

9    see that?

10          A    Yes, I do.

11          Q    That's the amount of money that HP actually

12   paid for the Moore processor portfolio, correct?

13          A    At the time of signing this option, yes.

14          Q    Why don't we go to paragraph 2 down below

15   that.  Payment of cash portion of the purchase price and

16   receipt thereof shall constitute complete and full

17   satisfaction of all obligations under section 4.  You see

18   that, sir?

19          A    Yes, I do.

20          Q    Does that help you to understand that the

21   $26.4 million payment was the only payment HP made under this

22   agreement?

23          A    Well, that's not the case.  It turns out

24   there's another provision on the same page, I believe, or

25   maybe the next page, that talks about earned credits that HP

Irving Rappaport - Cross by Mr. Cunningham                175

1   would earn, and I think that was a number somewhere around

2   $39 million that as the Moore owner licensed other parties,

3   to the extent that they recovered $39 million,

4   Hewlett-Packard would obtain a credit for that $39 million.

5   To the extent that they were unable to recover the total

6   $39 million, it's my understanding that Hewlett-Packard would

7   have then been required to pay those moneys in the absence of

8   fully earning those credits.

9          Q    So where it says complete and full

10  satisfaction of all obligations, all payment obligations,

11  your understanding is that's not right, that's not what that

12  means?

13         A    Well, that means at the time of signing, the

14  $26 million, but there is additional language which if you

15  would bring up, we can let everybody see, that talks about

16  the earned credit of an additional $39 million.

17         Q    Sir, are you aware of any additional moneys

18  changing hands between the owners of the MMP portfolio and HP

19  under this agreement?

20         A    I have no way of knowing that.  It would be

21  private information, but there is a clause that calls for

22  this -- these earned credits, which if you bring up, we could

23  allow everybody to see.

24         Q    Sir, your counsel will have a chance to

25  question you.  Let's look at addendum B on page 13, please.

Irving Rappaport - Cross by Mr. Cunningham                176

1    See what HP paid for.  Sir, this is a portfolio license, is

2    it not?

3              A    That's correct.

4              Q    It is not a single patent license of the type

5    we'd be talking about between Cornell and HP for the '115,

6    correct?

7              A    They're -- this agreement includes, it looks

8    like, a total of seven U.S. patents.  However, I don't

9    believe that any of these patents rise to the level of the

10   breakthrough nature of Dr. Torng's invention.

11             Q    I understand that's your opinion, sir, I'm

12   simply asking is it a portfolio license.

13             A    Yes, of the seven patents.

14             Q    So there are seven U.S. patents, right?

15             A    Yes.

16             Q    There's one pending application listed here?

17             A    That's right.

18             Q    There are at least three European patents that

19   I see, correct?

20             A    Yes, those would correspond to the

21   corresponding U.S. patents.

22             Q    And two Japanese applications, correct?

23             A    Again, corresponding to the same U.S. patents.

24             Q    Did you confirm that?

25             A    Not in detail, but usually, that would be the

Irving Rappaport - Cross by Mr. Cunningham          177

1   case.  It would be surprising if these patents were unrelated
2   to the U.S. patents.
3            Q    Well, did you review these patents, sir?
4            A    No, I did not.
5            Q    Did you review the applications?
6            A    No.
7            Q    So by my count there are at least 12 or 13
8   different pieces of intellectual property licensed to HP
9   under these -- under this license.  Do you agree?
10           A    Yes.
11           Q    So by rough math, that's about $2 million per
12  piece of intellectual property, you just divide the 26 by 12
13  or 13?
14           A    Well, what about the other $39 million?
15           Q    Well --
16           A    You tell me the math.  I mean, my position is
17  the total fee payable by cash and credits was $69 million, so
18  if you want to divide the 13 into that, then I would probably
19  agree with your math, but I don't necessarily agree with
20  dividing that number into 26 million.
21           Q    We can agree, however, sir, that HP is under
22  no obligation to pay any running royalty under this
23  agreement, correct?
24           A    No, I don't agree with that.  What we have is
25  an agreement in which Hewlett-Packard did agree in writing

Irving Rappaport - Cross by Mr. Cunningham                178

1    and execute an agreement in which they agreed to pay

2    7.2 percent running royalty on the sale of their commercial

3    products.

4           Q    Let's go back to addendum G then.  Just blow

5    up the top paragraph please.  G.  Just the top paragraph.

6    Now you understand that this was an attachment to the

7    agreement, right?

8           A    I would characterize this as an option that

9    Hewlett-Packard had four days in which to exercise after the

10   original document was signed specifying the running royalty

11   agreement.

12          Q    Okay.  And this was separately executed

13   between the parties, correct?

14          A    Well, I believe it was part of the agreement,

15   it's an addendum to the agreement, but as I recall there's a

16   four-day window in which Hewlett-Packard was allowed to

17   exercise its option to turn the running royalty into a lump

18   sum payment as provided in this addendum.

19          Q    And the addendum G says, "Further, to the

20   extent that it is determined that there's a conflict between

21   this addendum and the license agreement, this addendum

22   supersedes the license agreement," do you see that?

23          A    Yes, I do.

24          Q    You understand what supersedes means?

25          A    Yes, in other words, four days later, they

1    changed the agreement.

2             Q    It replaced the agreement, did it not?

3             A    Yes, it did, but that would not necessarily

4    be --

5                  MR. CUNNINGHAM:  I have nothing further.

6             A    -- be known by other parties.

7                  MR. CUNNINGHAM:  Nothing further, thank you.

8                  (3:26 p.m.)

9                  THE COURT:  Mr. Anderson.

10                 REDIRECT EXAMINATION BY MR. ANDERSON:

11            Q    Mr. Rappaport, just a question following up

12   regarding the MMP situation.  Is the circumstances you find

13   yourself in hypothetical negotiation in this case one in

14   which you would think that the lump sum which would be

15   available as an option to the licensee?

16            A    No, I don't think that's applicable at all in

17   this case.

18            Q    Why is it?

19            A    Well, again, this lump sum option was agreed

20   upon and it was a benefit to both parties.  The licensor, the

21   owners of the MMP patents, saw this as beneficial to sign

22   this agreement with Hewlett-Packard that allowed them to go

23   out and say to other potential licensees, Hewlett-Packard

24   signed this agreement, look at this agreement, they're

25   agreeing to pay us 7.2 percent running royalties on the sale

1    of their commercial products.  It's not likely that any

2    licensees would have the benefit of seeing the addendum that

3    was an option exercised by Hewlett-Packard a few days after

4    the full agreement was signed.

5         Q    Mr. Rappaport, so that's why Hewlett-Packard

6    and MMP may have agreed or in your experience why parties may

7    agree to such agreements in licensing agreements; why

8    wouldn't it be applicable here in the hypothetical

9    negotiation?

10        A    Well, Cornell would have not been interested

11   in this kind of an agreement, they would be looking for a

12   running royalty on the use of Dr. Torng's invention.

13        Q    Well, in the benefits, you discussed benefits,

14   Mr. Rappaport.  Would Cornell have received a benefit of

15   having an early license in the hypothetical negotiation?

16        A    It -- are you suggesting that the agreement

17   would have been drafted this way between Cornell --

18        Q    That's my question.

19        A    -- and Hewlett-Packard?

20        Q    That's my question.

21        A    I suppose if the lump sum was large enough to

22   satisfy Cornell, and they had a belief that they could based

23   on that then bootstrap such an agreement into licensing other

24   companies, then possibly they might have considered it.  As

25   far as I know, there was no such negotiation, no such offer

Irving Rappaport - Redirect by Mr. Anderson          181

1    ever made by either side as far as I'm aware, in the

2    discussions between Cornell and Hewlett-Packard.

3              MR. ANDERSON:  No further questions, your

4    Honor.

5              THE COURT:  Anything further, Mr. Cunningham?

6              MR. CUNNINGHAM:  Your Honor, I think we may

7    want to go to side bar before I question the witness further.

8              (A discussion was held at side bar off the

9               record.)

10             MR. CUNNINGHAM:  Your Honor, we have no

11   further questions.

12             THE COURT:  No further, you may step down.

13             (Whereupon the witness was excused, 3:30 p.m.)

14             THE COURT:  Mr. Poplawski.

15             MR. POPLAWSKI:  Your Honor, I believe that

16   that concludes plaintiff's direct case in chief.

17             THE COURT:  With the exception that I may

18   allow you to bring somebody back if you decide to later on.

19             MR. POPLAWSKI:  That's correct, and also that

20   we had talked about earlier yesterday.

21             THE COURT:  Yes.

22             MR. POPLAWSKI:  And as a housekeeping point,

23   we don't need to waste the jury's time with this but we have

24   exhibits to formally get into the record.

25             THE COURT:  We'll do all of that, so with the

Irving Rappaport - Redirect by Mr. Anderson                    182

1    close subject to certain agreements with the court of

2    Mr. Poplawski's case, we can turn to Mr. Allcock's case.

3                    MR. ALLCOCK:  We're ready to start, your

4    Honor.

5                    THE COURT:  Then let me do one thing.  Let's

6    let my jury stand up for a second while we're calling the

7    witness so we can all stretch.  And then you can meantime be

8    bringing your witness in.

9                    MR. ALLCOCK:  We are, and your Honor, I take

10   it that we'll reserve motions.

11                   THE COURT:  Let's do that at the end of the

12   day, shall we?

13                   MR. ALLCOCK:  At the end of the day is fine.

14                   THE COURT:  While we've got a little time,

15   let's spend it with our witness and we'll hear motions --

16                   MR. ALLCOCK:  Or even at the charge conference

17   would be fine, too.

18                   THE COURT:  However we want to do it.  Are we

19   ready, Mr. Allcock?

20                   MR. ALLCOCK:  We are, the witness is making

21   his way.

22                   THE COURT:  Then let's call him forward.

23                   (Pause in Proceedings.)

24                   MR. ALLCOCK:  Your Honor, we call Mr. Lesartre

25   to the stand.

1          THE CLERK:  Mr. Lesartre, could you please

2     state your name for the court reporter and spell it.

3          THE WITNESS:  Yes.  Gregg Bernard Lesartre.

4     L-e-s-a-r-t-r-e.

5          THE CLERK:  Please raise your right hand.

6

7          G R E G G   L E S A R T R E , called as a

8     witness and being duly sworn, testifies as follows:

9          MR. ALLCOCK:  Ready, your Honor?

10          THE COURT:  You may proceed.

11          (3:35 p.m.)

12          DIRECT EXAMINATION BY MR. ALLCOCK:

13     Q    Good afternoon.

14     A    Good afternoon.

15     Q    Where do you live?

16     A    I live in Fort Collins, Colorado.

17     Q    Where do you currently work, sir?

18     A    Yes, I work at HP in Fort Collins.

19     Q    Can you give the ladies and gentlemen of the

20     jury a brief rundown of your educational background, sir?

21     A    So I went to college at Texas A&M University

22     in College Station, Texas, receiving both a undergraduate

23     degree there and a masters.

24     Q    What are your degrees in?

25     A    Electrical engineering, both undergraduate and

Gregg Lesartre - Direct by Mr. Allcock                184

1    graduate.

2              Q    Have you ever testified in court before?

3              A    No.

4              Q    What did you do after you graduated from

5    school?

6              A    After graduating from school, I interviewed

7    and was hired by Hewlett-Packard up in Fort Collins where I

8    am today.

9              Q    Why did you consider HP as a place to work?

10             A    Well, I actually interviewed in a number of

11   places and aside from the opportunity to live in Colorado

12   which was certainly a factor, I was also drawn there by the

13   level of innovation and the opportunity I saw there to

14   participate in the kind of work that I enjoy doing and to do

15   useful work.

16             Q    When did you start at HP about?

17             A    1984 in the summer.

18             Q    What was your first job there?

19             A    When I first started working for HP, I was

20   working more as a circuit designer at the time, designing

21   circuits that went on to the NS1 chipset, which was the first

22   integrated precision architecture design that HP was doing.

23             Q    I see.  How long did you work as a circuit

24   designer?

25             A    I worked as a circuit designer, actually even

Gregg Lesartre - Direct by Mr. Allcock                185

1    today I occasionally do, but as a primary role, I guess about

2    the first five years or so of my career was in that field.

3              Q    What did you do after that?

4              A    So after we finished the NS1 chipset and

5    started looking onward to other programs, I actually had the

6    opportunity to work on the floating point controller for what

7    was called the PCX processor which was actually a set of

8    chips, and to develop the architectural mechanisms that

9    allowed that to work as it needed to for that design.

10             Q    You said the word architecture.  With respect

11   to computer chips, what is architecture?

12             A    So we refer to both architecture and

13   microarchitecture.  Architecture usually means kind of a

14   higher level architecture of the overall system, including

15   things like what kind of instruction set that we use to feed

16   the actual hardware in that it executes to generate

17   responses, and then microarchitecture is more kind of the

18   same idea but more the level of what actually goes into a

19   particular chip design, usually to implement the higher level

20   architecture.  So really I said architecture but really my

21   job function at that time was more the microarchitecture.

22             Q    Okay.  And how long did you spend on that

23   task?

24             A    So that was a good I guess two to three years

25   worth of design on that program.

1          Q    Okay.  Do you know a gentleman named John

2    Lotz?

3          A    Yes.  John is actually, we hired in the same

4    year, and his career at HP has been very similar to mine.  So

5    for years working together, you know, fresh out of school, he

6    was actually part of the group of us that started together,

7    came in as single engineers, worked hard together, went out

8    after work to play together, and ultimately watched each

9    other start to build a family.

10         Q    Okay.  After the last job, what did you do

11   next at HP?

12         A    So the work on the floating point controller

13   basically led up until about the beginning of 1990, which is

14   when I started working on the PA-8000, or what became the

15   PA-8000 processor, PCX-U, and --

16         Q    Okay.

17         A    Yeah.

18         Q    What was the existing processor, the PA-8000

19   was going to replace something, right?

20         A    Yes.  So the processor was the PA-7200 as it

21   was called externally, we had completely different names

22   internally, but the PA-7200 was actually derived from --

23   well, ultimately it came from PCX as well, it had some, some

24   of the designs of that that was carried forward into that

25   design which was actually done in California.

Gregg Lesartre - Direct by Mr. Allcock          187

1          Q     Okay.  What was the state of the PA-8000

2     design when you started, how far along was it?

3          A     So as I understood it, John had been active

4     along with Darius Tanksalvala as a manager for a period of I

5     think three or four months before the point I actually came

6     on board the program.

7          Q     So you got involved pretty much at the

8     beginning of the project?

9          A     Pretty much at the beginning, John and I joke,

10    at the point I started he actually got pulled off for a brief

11    stint, so in some sense we've each started, spent the same

12    total amount of time on it.

13         Q     How many people were involved with the project

14    at the very start?

15         A     At the very start it was a relatively small

16    team, I think I mentioned John and myself and Darius.  Not

17    too long thereafter, we had Doug Hunt, Don Kipp, couple

18    others that got involved as well as we had folks looking

19    specifically at the processor technology and such but a small

20    team overall.

21         Q     Okay.  What were you trying to do, what were

22    you trying to design?

23         A     So the nature of the business, at least at

24    that time, was that the processor technology, clean room

25    folks who were constantly improving their process, kept us

Gregg Lesartre - Direct by Mr. Allcock                188

1    moving forward to try to take advantage of their

2    capabilities.  So it was necessary to refresh our designs on

3    a regular basis, because the circuits would get faster,

4    because they allow us more transistors on each design that we

5    wanted to take advantage of to make, you know, produce the

6    best product that we could.  So at that point, we knew we had

7    new technology coming, we knew we had been reusing previous

8    designs long enough that it was time to start a fresh design

9    from a blank sheet of paper.

10          Q    So was it a, you guys, engineers use the clean

11   sheet design, was it that kind of a thing?

12          A    Yes, it was clean sheet.  We went back and

13   considered all options rather than limiting ourselves to

14   taking an existing design and looking for modifications we

15   could make to improve that design.

16          Q    And was one of the things you did, the design

17   team, review some papers to get some ideas?

18          A    Certainly.  It is common to review published

19   papers to just help generate thoughts on different ways you

20   could approach problems.

21          Q    Now we've heard a lot in this court, you

22   haven't been here, about this Johnson thesis.  Do you

23   remember reviewing the Johnson thesis?

24          A    I do not remember reviewing the Johnson thesis

25   at that time, no.

Gregg Lesartre - Direct by Mr. Allcock          189

1          Q    Now you know we're here because HP is being

2     sued by Cornell on the '115 patent.  In the course of your

3     work on the PA-8000, designing it, do you remember becoming

4     ever aware of the '115 patent?

5          A    No, not while we were working on the design.

6          Q    Later on when Cornell raised claims, did you

7     become aware of it?

8          A    Yes, of course at the point I knew there was a

9     claim against us, I was aware of the patent.

10         Q    So what parts of the design of the PA-8000 did

11    you work on at the beginning?

12         A    So at the beginning, I and John, we, and some

13    of the other folks, we looked at specifically how we could

14    control the issue of instructions, the intent being to re --

15    well, to improve the overall performance and capability of

16    the machine, using some of these techniques that we saw.  The

17    work I had done before in the floating point coprocessor, the

18    controller for that, actually did have some aspects of

19    allowing instructions to execute in their own time if you

20    will, and so part of I guess my involvement was because I had

21    some familiarity with that, looking for ways to apply that to

22    the new design.

23         Q    So did you start work on this IRB, we've heard

24    a lot about the IRB in here, did you start work on that?

25         A    I started work on that.  Of course that's not

Gregg Lesartre - Direct by Mr. Allcock                    190

1    what we called it at the time, it was something that

2    developed over time as we considered options that we had

3    available to us for implementation of our design.

4              Q    And when you say we, who were the main folks

5    on this project at that point, on that part of the project?

6              A    At that point in time like I mentioned we had

7    myself, John Lotz who you know not only helped with the ideas

8    on how we could implement the logic but also did a lot of

9    work on simulation to characterize some of the options we

10   were considering as far as their relative merit.  We had Doug

11   Hunt who was looking at the fetch engine end primarily in

12   terms of how we bring instructions into what ultimately

13   became the IRB.

14             Q    Okay.  What were the problems you confronted

15   with this new project?

16             A    Well, so for the processor we were designing,

17   what we realized is the processor was continuing to speed up

18   relative to memory, and so it became critical to be able to

19   feed data to the processor in the most efficient manner that

20   we could.  So we had caches, okay, the notion that the cache

21   is you can pull memory, pull data from memory --

22             Q    Let me stop you for a minute.  We've heard

23   that word cache used in here.  Can you give us some common

24   example of what a cache is with respect to computers?

25             A    Yes.  So perhaps an easy way to kind of

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Gregg Lesartre - Direct by Mr. Allcock                191

1    visualize it, you know, you might go to the library to get

2    data, right, you'd like to bring it home, you put it on your

3    bookshelf so it's accessible to you.  Well, that bookshelf is

4    kind of like a cache, it's a place where the processor can

5    put data where it's accessible, and then you can reference it

6    frequently while you're using it and then when you're done,

7    you'll eventually take it back to the library.

8         Q    Okay.  So I interrupted you, so you were in

9    the middle of confronting some problems with respect to this

10   IRB.

11        A    Yes, so much of the challenge of maintaining a

12   performance level with the designs that we were considering

13   was that we needed to keep the processor fed with data

14   because any time the data wasn't accessible and you had to

15   wait, you're basically not making, not doing useful work.

16        Q    Okay.  So how long did you work on this before

17   you came up with a design?

18        A    Oh, before we came up with the design?  I'm

19   thinking before we really settled on what we were going to

20   do, it was probably something on the order of a year and a

21   half.

22        Q    Did you do simulations?

23        A    Yes, we did quite a number of simulations,

24   looking at various schemes where we would schedule, build

25   hardware, different structures that would attempt to solve

Gregg Lesartre - Direct by Mr. Allcock          192

1    these problems and through simulation evaluate which ones

2    worked best.

3          Q    And so you actually built some test chips or

4    circuits to simulate?

5          A    Well, we didn't physically build them, but we

6    described them in a simulation language such that we could

7    characterize how they would perform.

8          Q    Was one of the problems you confronted

9    something we've heard a lot about in here, dependencies?

10         A    Yes.

11         Q    Go ahead.

12         A    I was just going to say dependencies is

13   something pretty basic in terms of what you need to track

14   when you're trying to execute multiple instructions.

15         Q    We've heard a lot about dependencies in here.

16   Let me show you DDX17, just so that everyone's on the same

17   page for this conversation.  Is that a simplified example of

18   a dependency?

19         A    Yes, I think this does demonstrate it.  So

20   what this is showing here is a sequence of four instructions,

21   and if we look at the first two, for instance, we see that we

22   have an add instruction adding two registers and putting it

23   into register 3, and then the second instruction being

24   another add that's using that result to generate its result.

25   And so we would say then that the second instruction is

Gregg Lesartre - Direct by Mr. Allcock                    193

1    dependent on the result of the first.  It needs to wait

2    basically until that first instruction has provided that

3    result before it can proceed and calculate its own result.

4    And then if we look further down this sequence we see the

5    same kind of relationship between instruction 3 and

6    instruction 4.  Instruction 4 needs to wait for instruction 3

7    to complete before it can calculate a result.

8         Q    Okay.  Now was this one of many problems that

9    you were confronting with the IRB?

10        A    Oh, yes.  So operand dependencies is only one

11   type of dependency, for instance.  We were designing a

12   processor for an existing architecture, and it came with

13   requirements that other dependencies be tracked and so each

14   of those kinds of issues had to be solved as well.

15        Q    Okay.  Now, were there a number of ways to

16   deal with these dependencies that you were aware of?

17        A    Yeah, there are different ways suggested in

18   the literature, different ways that we came up with for

19   handling the different dependency types in our own creative

20   process.

21        Q    Okay.  Was one way that you were aware of that

22   was commonly used was something called register renaming?

23        A    Yes.  Register renaming is something that

24   was -- had been presented before in the literature, had been

25   used before in some older machines before the day of

Gregg Lesartre - Direct by Mr. Allcock                    194

1    processor integration.

2            Q    So can you explain to the ladies and gentlemen

3    of the jury in words what register renaming is as you

4    understood it?

5            A    So register renaming, so going back to the

6    example you have up on the screen there, that particular

7    sequence, if you notice, you're using R3 in both the top two

8    instructions and in the third and fourth instruction.  But

9    the fourth instruction really is not dependent on the first

10   instruction for its result.  It's replaced by instruction 3

11   in the meantime and it really doesn't need to wait for that

12   first one.  So register renaming provides a way to separate

13   those two cases so that the hardware can recognize that it's

14   free to execute the third and fourth instructions without a

15   dependency on the first and second.

16           Q    Okay.  Let's go to DDX18.  Now DDX18 -- there

17   it is.

18           A    Okay.  So this shows the simple sequence once

19   again.

20           Q    Okay.

21           A    And here we see, just highlighting the fact

22   that it's register 3, we recognize the dependencies.

23           Q    And now what do you mean by renaming?

24           A    So renaming is the notion that instead of

25   referring to R3 in all of these cases, that gets confusing

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Gregg Lesartre - Direct by Mr. Allcock                195

1    because it's the same R3, you rename your alternate register
2    to something different, you allocate a resource on the
3    processor that is an alternate register to put the result in.
4    So register rename 3 as we put it here for the first two
5    instructions and then register rename 4 can be used instead
6    for instruction 3 producing result that instruction 4 will
7    consume.
8              Q    So if we think of these things like mailboxes
9    that you can hold something in, is that a way that we can
10   think about it?
11             A    Yeah, that would be a reasonable way to think
12   about it.
13             Q    What you've just done is you've changed the
14   mailbox?
15             A    Yes.  Yes.
16             Q    And what does changing the address of the
17   mailbox do to the dependency?
18             A    Well, using the mailbox analogy you
19   effectively avoid mixing mail, right, I mean you keep them
20   separate.
21             Q    And so what happens to the dependency?
22             A    The dependency is isolated down now to the
23   dependency that matters, the producer to the consumer.
24             Q    Okay.  So is that example that we just gave
25   kind of the common renaming technique that you knew about?

Gregg Lesartre - Direct by Mr. Allcock                    196

1          A    That is, yes, that is a common mechanism that

2    I was aware of.

3          Q    Not new or anything?

4          A    Not new to the industry.

5          Q    So what did you and Mr. Lotz do then, what did

6    you come up with?

7          A    So what we implemented is essentially a way to

8    use this kind of capability in our design so if these four

9    instructions are inserted into our IRB, the IRB then can

10   discover these kinds of dependencies and as it does that,

11   it's basically, it's looking at the result register related

12   to the operand registers required and at the point, it

13   recognizes a dependency, it will set a flag for

14   instruction 2, for instance, so that instruction 2 knows it

15   has a dependency on instruction 1.  And furthermore, it will

16   capture the pointer, the slot number or the entry in the IRB

17   that will ultimately provide it with its data.

18         Q    Okay.  That was a little complicated.  Let's

19   go to DDX47.  Okay.  So can we use this graphic to explain a

20   new idea that you guys came up with?

21         A    Yes.  So actually this can be used to explain

22   essentially what I was just trying to convey.  You start with

23   apparent dependency on register 3 throughout.  But in the

24   process of inserting into the IRB, you recognize the

25   dependencies that are the critical dependencies here.

Gregg Lesartre - Direct by Mr. Allcock                197

1        Q    Let me stop you there for a minute.  I see

2   we -- I see some orange or red things over on the right.

3   What are those things?

4        A    Okay.  So those orange boxes labeled here as

5   slot numbers represents the location in which we will, we put

6   our result in to make it available to subsequent

7   instructions.  So it's our equivalent to the rename register.

8        Q    I see.  Was that a little different than the

9   way it had been done previously?

10       A    It was slightly different in that the slot

11  number is a fixed relationship to the IRB entry that is used

12  for the instruction producing the result.

13       Q    I see.  And so then what did you do with these

14  dependencies?

15       A    So when we recognize these dependencies, we

16  provide a pointer to the dependent instruction.  So we

17  recognize the dependency there, we set a flag, then that

18  indicates there is a dependency.

19       Q    So added there, I need the result from slot 1?

20       A    We recognize we need the results from slot 1,

21  we capture the fact that it is only slot 1 we care about, we

22  set the flag so we know that we are dependent, and we'll do

23  the same thing for instructions 3 and 4, we'll point

24  instruction 4 to slot 3, and we'll set a flag there so it

25  knows it's dependent on slot 3.

Gregg Lesartre - Direct by Mr. Allcock                198

1              Q    I see.  So now what have we just done to the

2    dependencies in this first little step of the process?

3              A    Well, we've separated them out, so we now can

4    recognize easily that slot, or instruction 2 cares about the

5    instruction in slot 1, and instruction 4 cares about the

6    result in slot 3, and only for that result.

7              Q    Okay.  Let's go to the next slide.  Let me ask

8    you a couple of more questions on how your particular

9    renaming operation works.  You indicated those orange blocks

10   were a little different than the way it had been done before.

11   Can you explain that?

12             A    So the primary difference is that rather than

13   assigning an arbitrary register number as the rename

14   register, as has been done in the past, it's directly

15   associated instead with a given entry in the IRB.  It does

16   not have to be assigned, it's just understood that that's

17   where you will put the result.

18             Q    And so how does that help, I'm showing the

19   arrow going up to the slot you just referred to, how does

20   that help the process?

21             A    Well, so it simplifies the allocation, we

22   don't have to take extra time to do that, we're running this

23   design at a very high frequency and so making things work at

24   full speed is a challenge, so it helps in that sense.  It

25   also helps in the sense that now all we need to do is watch

1    for the instruction in the slot we're dependent on to launch.

2    And at the point we see it launch, we know then that the

3    dependent instruction can launch in the next cycle.

4         Q    Okay.  You mentioned launch.  Let's go to

5    DDX50.  Actually, move back.  Pick one up.  There we go.  So

6    what controls the launch of these instructions?

7         A    So in our implementation, each one of these

8    dependencies is tracked by a block we call Opfield6, just

9    probably the row we ended up on, but at any rate it's the

10   logic that performs much of this function that I've been

11   describing.  It produces as its primary output a signal that

12   tells the rest of the slot whether there is a dependency that

13   prevents it from considering launch or not.

14        Q    Okay.  And so is this flag a common

15   engineering term?

16        A    So the output is derived from a flag that we

17   have within the block, and yeah, flag is a common term that

18   you'll hear in parlance as, you know, among engineers talking

19   about when you need to monitor a status.

20        Q    What does it mean?

21        A    Well, so in this case it indicates the fact

22   that a condition has been observed and, you know, you set the

23   flag as a way of remembering that that condition exists.

24        Q    Okay.  Let's go to the next.  And so does that

25   process kind of continue for whenever there's dependencies?

Gregg Lesartre - Direct by Mr. Allcock                    200

1          A    Yes.  We're constantly inserting new

2     instructions into our IRB, the example here is four, but we

3     can hold up to 56, so every cycle we can insert up to four

4     more, and we're constantly doing this evaluation as new

5     instructions come in to look for their dependencies.

6          Q    I see.  Is a flag a counter?

7          A    No.

8          Q    Why not?

9          A    A flag indicates a status, a simple yes/no.  A

10    counter counts a number of events.

11         Q    Could I go to DDX51.  So now can you kind of

12    explain -- so by the way, did this design find its way into

13    the IRB that you actually built?

14         A    Yeah, this is -- this is the -- what we

15    implemented.

16         Q    How long did it take you to figure this out?

17         A    To figure this particular issue out, like I

18    said, it took about a year and a half overall, we went

19    through a number of iterations and ideas, and that was at the

20    point that we understood I think the general overall design.

21    But even after we had the architectural or the

22    microarchitectural understanding of how this was going to

23    work, you know, it took the physical teams working on how to

24    actually implement the circuits and how to coerce the

25    circuits to run at the speed we needed them to run.  I'm

Gregg Lesartre - Direct by Mr. Allcock                    201

1   thinking that was another year's worth of total effort to

2   develop that part of the design.

3          Q    Okay.  I notice that there's a PA-8700 CPU or

4   chip down there, and if you have good eyes you can see it

5   says IRB in that little square.  Is that where the IRB is on

6   that chip?

7          A    Yes.  On the 8700, the IRB represented the

8   portion of the control logic that performs this function that

9   we're describing as well as the tracking of the other

10  dependencies and other launch control that we needed to

11  implement.

12         Q    I see.  Now, were there other issues that you

13  needed to address in order to build, I'm not talking about

14  the chip yet, were there other issues you needed to address

15  to build just the IRB part of the chip?

16         A    Oh, absolutely.  So our architecture as

17  originally designed was intended to optimize for a single

18  issue in-order machine.  You know, the architecture had been

19  put together several years before and it didn't fully

20  visualize what we'd be wanting to do in this time frame that

21  we were implementing the PA-8000.  So we needed to find

22  solutions for the architecture to work with the aggressive

23  approach that we wanted to take and still generate the

24  correct answer.

25         Q    Okay.  Let's go to DDX45.  Now this is the

Gregg Lesartre - Direct by Mr. Allcock                    202

1    8700, did the PA-8000 look a little different than this?

2         A    It looked different.  So as I mentioned,

3    process technology is constantly moving forward.  The PA-8000

4    was our first fresh design, our first blank sheet design, and

5    then once we spent, you know, the five years it took to

6    complete that design, we didn't want to just throw it away

7    and start all over again, so we used that design and carried

8    it forward and added capability to it based on what the

9    process technology could provide for us over time.

10        Q    You mentioned five years.  How long did you

11   work on the project to get the PA-8000 from conception to a

12   chip?

13        A    Well, so I mentioned I started in basically

14   the beginning of 1990, taped release I think was in '95 and

15   that's the point that we actually send the chip to a

16   processing fab to make the part.  And even beyond that

17   there's time spent after we get the part back turning it on,

18   making sure it works as expected, going back and debugging

19   some things that maybe didn't work as we expected.

20        Q    I see.  And then how about on the follow-on,

21   the 8100, 200, 300, 400, 500, 600, 700, how long did you work

22   on those?

23        A    So I continued to work on the PA-8000 family

24   processors I believe until 2001.

25        Q    A decade?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Gregg Lesartre - Direct by Mr. Allcock                    203

1        A    A decade.

2        Q    Part time?

3        A    No, not part time.  Now I sometimes still work

4    on it part time, but in that time frame, no.  It was full

5    time.

6        Q    Okay.  Now let's look at the IRB and let's

7    look at the circuit that embodies what we just saw.  Are you

8    okay up there?

9        A    I'm okay.  Small spill.  You provided towels.

10       Q    You okay?

11       A    I'm fine.

12       Q    Let's go to -- well, how did the -- I'll just

13   show you the exhibit.  DDX78.  We've heard about schematics

14   in this case.  Did you create schematics?

15       A    Generally speaking, I did not personally

16   create schematics.  We tended to do our early design in a

17   simulation environment, what we describe as MADL, really just

18   a coding language, especially for what we needed to do, but

19   we could describe our major blocks, our major pieces of the

20   design through this language and then simulate it together to

21   show that it worked properly.

22       Q    I see.  Is this a schematic of the actual

23   chip?

24       A    This is a schematic of specifically a part of

25   the op field we've mentioned.

Gregg Lesartre - Direct by Mr. Allcock                204

1        Q    Op field, I think we've seen that here before.
2   Can you explain what op field is?
3        A    Well, so of course op as in op code field as
4   in the portion of the IRB entry that was responsible for
5   tracking the operand dependencies, and I think we mentioned
6   it before, that this is the block that produces the go/no go
7   signal for launch, as far as this particular kind of
8   dependency is concerned.
9        Q    Can you tell us what part of this circuitry
10  does that go/no go?
11       A    So if you look in the most upper right portion
12  there, you'll see, yes, the box up there, produces what we
13  call VALDEP signal.
14       Q    Can you zoom in on that.  Okay.  So first let
15  me ask you, what are we looking at?  It looks like a square
16  box on the -- well, kind of like, says VDB and then like a
17  half open box and then I can't read it and then a half open
18  box on the bottom; what is that thing that we're looking at?
19       A    Okay, so those, that's actually showing you
20  the transistors, it's really a way to perform NOR function in
21  that.
22            THE COURT:  Do you want to give him a pointer
23  so -- I'm not sure I know where you're at.
24            MR. ALLCOCK:  We'll give it a try.
25       A    Actually that's good right there.  So we have

Gregg Lesartre - Direct by Mr. Allcock                    205

1    a clock that pulls up this signal every cycle, you have a

2    clock here that's pulling up this every cycle, and then on

3    the cycle, on the half of the cycle when the clock is not

4    pulling it up, we can pull it down with this input here, and

5    what this is really doing is just a way of communicating to

6    the central block logic that's collecting up all these

7    dependencies from the op fields as well as other blocks that

8    track different dependencies to recognize when all of them

9    say it's okay to launch.

10            Q    I see.  What is VALDEP, what is that?

11            A    Valid dependency.

12            Q    I see.  Is this like a flag?

13            A    Well, this is, yes, this does match what the

14   internal flag is inside this block of logic, so if we can

15   zoom out a little bit, I can show you where the flag is.

16            Q    Okay, where do you want us to go?

17            A    So -- I guess I have this pointer, I'm going

18   to use it.  So right here if you could capture from here up

19   to the corner in a zoom.

20            Q    So capture the --

21            A    From here up to the corner here.

22            Q    The other way.

23            A    Okay.  So what's shown there, well, what's

24   showing up is lat_04 although if you see, sclat_04, so this

25   is the latch that holds the flag.

Gregg Lesartre - Direct by Mr. Allcock                    206

1          Q     Sclat_04 is the latch?

2          A     Yes.

3          Q     What's a latch?

4          A     A latch is a memory storage element, you know,

5    there's, there's probably a hundred thousand of them on even

6    the first of these designs.  It's just a common building

7    block that's used throughout a design like this, it's what

8    holds the 1s and 0s that, you know, if you characterize a

9    digital processor as functioning with.

10         Q     Does it hold more than a 1 or a 0?

11         A     It just -- it holds, logically or electrically

12   it just holds a 1 or a 0.

13         Q     Is it a counter?

14         A     No, it's not a counter.  You can build a

15   counter out of multiple latches, but, and other logic but

16   it's not a counter in and of itself.

17         Q     Okay.  So you were explaining to us the flag?

18         A     Yeah.  So the flag, so the way this works is,

19   when we're putting instructions into the IRB, we check for

20   dependencies in the way we described previously.  If there is

21   a dependency, we will set a 1 on that flag, put a 1 into that

22   register, that's how we know we have a dependency.  It stays

23   there and prevents us from launching this instruction until

24   sometime later, when we see the instruction we're dependent

25   on launch, a comparator recognizes that, and then in response

Gregg Lesartre - Direct by Mr. Allcock                    207

1    to that we will clear that flag, thus allowing the

2    instruction to launch.

3            Q    Now, let me just briefly go back to DDX51.

4    Now you've described for us the flag concept with that latch,

5    right?

6            A    Yes.

7            Q    Now, how is it that you don't have to count

8    all the instructions and dependencies from top to bottom?

9            A    Well, so we compare, when we insert

10   instructions into the IRB, we compare the register number,

11   and we use that in conjunction with knowledge of who most

12   recently wrote that register, and from that we can identify

13   exactly which instruction is the instruction that we're truly

14   dependent on for the operand that we need.

15           Q    And so you get it so there's only one

16   dependency per instruction?

17           A    There's only the one dependency that is truly

18   important.

19           Q    Would counting be a good idea?

20           A    I don't believe so.  I think it means you have

21   to wait for all instructions that wrote to that result to

22   launch before you consider launching.

23           Q    So did you and Mr. Lotz think that you came up

24   with some new ideas in connection with building this IRB?

25           A    Oh, I don't think there's any doubt that we

Gregg Lesartre - Direct by Mr. Allcock                208

1    came up with many new ideas.

2              Q    What was new?

3              A    Well, so you know, I think we were among the

4    first to be trying to build a four-way superscalar

5    out-of-order single chip implementation of a microprocessor.

6    That meant there were lots of new issues that we had to

7    figure out how to solve.  Some that were common to anyone who

8    might be doing something like this, others that perhaps were

9    unique to HP's implementation because as I had stated, we

10   had -- one of the objectives of the design is that we

11   maintained compatibility with the precision architecture so

12   that instruction code that ran on previous HP designs would

13   also run on this one.

14             Q    Did you file for any patent applications?

15             A    We filed for several.

16             Q    How many patents do you hold, sir?

17             A    I've lost count to be honest, I think it's

18   currently, granted is somewhere between 25 and 30, with more

19   pending.

20             Q    I'm going to ask you about a few of them.  Can

21   I see D318, please.  Is this one of your patents that you

22   have with Mr. Lotz?

23             A    Yes.  If you could please zoom in on the title

24   section, thank you.  Yes.  This is one of several that we

25   have together.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Gregg Lesartre - Direct by Mr. Allcock                209

1          Q     In general, what is this patent about?

2          A     So this patent deals with specifically

3    attributes of our operand dependency, as we were looking at

4    but specifically for tracking instructions that can take

5    longer than one cycle to execute.

6          Q     I see.  Let's take a look at figure 6.  Okay.

7    Can you zoom in -- oh, wait a minute, that's not the right

8    one.  Let me look at figure 7.  Yeah.  What is figure 7

9    showing?

10         A     So figure 7 is essentially showing the logic

11   that we were talking about just previously looking at the

12   schematic.  If you look down in this case in the lower right

13   you'll see VALDEP as an output of this block of logic that is

14   essentially the same signal we were considering before,

15   you'll see something labeled there as M/S, master/slave, just

16   a different way to label a latch basically, that is the latch

17   we were referring to that holds the flag.  Around that you'll

18   see some of the other logic that performs the function of

19   compare and such for recognizing dependency and clearing

20   dependencies.

21         Q     So is this a patent on one feature of the IRB?

22         A     This is a patent on one specific aspect of

23   functionality in the IRB, yes.

24         Q     Let me look, ask you to look at D304.  Can you

25   tell us what this is, sir?

Gregg Lesartre - Direct by Mr. Allcock                    210

1          A     Okay.  So this is actually a patent that we

2     filed later.  This was a patent that covered some added

3     functionality so as we reused our core design and added cache

4     and such onto the chip to expand its capability, we also in

5     some cases modified slightly certain parts of the

6     functionality.  This is covering one aspect of that where we

7     made a change to allow for improved management of accesses to

8     memory, just as an enhancement, that we had the opportunity

9     to make in that time frame.

10         Q     Okay.  D305.  Can you just briefly describe

11    what D305 relates to, a patent to you and Mr. Kumar and

12    Quarnstrom?

13         A     So yes, this has to do with a different

14    aspect, complication that we needed to support in order to

15    work with the existing code.  Again, for operand dependency,

16    the architecture that we were working with allows us to reuse

17    registers for floating point to use each half separately, as

18    different targets, or to use them as one larger target.  And

19    so that added some complications, that required some

20    additional creativity to generate a mechanism for handling

21    that correctly, because you know, again, this machine doesn't

22    do much good unless it generates a correct answer.

23         Q     Okay.  D311.  My favorite, panic trap system

24    and method.

25         A     So panic trap, so I had mentioned, kind of

Gregg Lesartre - Direct by Mr. Allcock                  211

1   alluded to there were other dependencies that we also had to
2   track and we do that for some others but there are other
3   types of dependencies that are so rare you don't really want
4   to have to dedicate any circuitry to being able to track
5   those correctly, or in some cases they're just rather
6   difficult to track.  So what this is covering is the notion
7   that for those rarer cases, instead of trying to track the
8   dependencies correctly, we can recognize whether something
9   has happened that basically says we blew it, that we were
10  executing out of order and we figured out we're getting the
11  wrong answer but we can't figure out what the right answer
12  is, this provides a mechanism to recognize that and to
13  basically throw everything away in the IRB and start
14  reexecuting at the point that we went afoul.
15          Q    D312.  What does this patent relate to?
16          A    I'm waiting for the title.  Okay.  So so far
17  we've just been discussing operand dependencies between
18  simple add type instructions.  The IRB also has to manage
19  accesses that have to go access memory or data from memory,
20  and it has to do all that and keep ordering straight in that
21  case as well.  So what this is looking at is the case that
22  your dependency is actually through a memory location.  You
23  may write a memory location, you may choose to read it again
24  shortly thereafter, and you sure better find the data that
25  you just wrote, not the data that came from before you wrote

Gregg Lesartre - Direct by Mr. Allcock                    212

1    that data.  So this provides a mechanism to recognize when

2    you have that type of dependency and it actually either then

3    forces the load to wait until that data that you -- you're

4    writing is in memory, or because we want to be aggressive and

5    do this stuff out of order, it may instead discover you

6    already read that data, it has the wrong data, and in that

7    case, we actually then use the panic trap mechanism I was

8    describing as a way to clear everything out, start again, and

9    make sure we get the right answer.

10          Q    D313.  What is this one about, sir?

11          A    Okay.  So another attribute of our

12   architecture, again designed originally for when we had, we

13   were thinking in terms of in-order execution of instructions,

14   there's a feature in the architecture that allows and

15   actually in other architectures too I believe that allows one

16   instruction to determine whether the next instruction should

17   actually be executed or not, refer to it as nullification.

18   In general, our fetch engine can predict whether we're going

19   to be nullified or not, but they're -- you know, it's a

20   prediction, it may not be correct.  So this patent deals with

21   logic that allows us to recognize when we have a

22   nullification, manage the status of the -- the dependency

23   basically for launch in those special cases and prevent

24   launch until we know whether we're nullified or not.  All to

25   ensure, again, that in these cases we get the right answers.

1        Q    D314.  The '997 patent.  Is this on a similar

2   concept to the one you -- or related concept to the one you

3   last described?

4        A    It is.  It is.  It's, it provides a different

5   mechanism, so the one that I just described will get you the

6   right answer but it's not the most efficient from a

7   performance point of view.  It's expected to be rare so we

8   consider that to be okay.  This is the case that maybe is a

9   bit more common and matters more for performance.  And what

10  we do in this case is we can transform an instruction as we

11  bring it into the IRB and recognize this is a potentially

12  nullified instruction.  I'm going to read both a data that I

13  need to calculate the result, and what the previous contents

14  of that register would have been if it is nullified.  So

15  either way, it can pass along the correct information to any

16  subsequent instruction that is dependent on that result.

17       Q    Okay.  Last one I'm going to ask you about,

18  D316, the '474 patent.  Does this relate to the overall

19  system of the IRB?

20       A    It -- it is addressing another set of

21  dependency types, the op field as we presented it here, it

22  does have the drawback that it is a physically large block,

23  and we have to have that field for each of the main operands

24  that we're tracking, but for other dependencies that are not

25  as critical, that don't change as often, we were looking for

Gregg Lesartre - Direct by Mr. Allcock                    214

1    a different solution that didn't require as large an

2    investment in chip area, and that's actually what this one is

3    covering is, is a mechanism that allows us to do that in much

4    more area efficient although slightly lower performance

5    application.

6              Q     You mentioned performance.  Did each of these

7    patents relate to the IRB's performance?

8              A     Yes.  So to get the performance out of the

9    machine that we needed, we arrived at the IRB structure as

10   the way to achieve that, and each of these allows that to

11   occur, either by enhancing performance in these particular

12   cases, or by guaranteeing correctness so that the overall

13   design is even -- is even worthwhile.

14             Q     You have other patents in addition to these?

15             A     Yes.

16             Q     So let me have DDX445.  And I've alluded to

17   the overall chip before, I just want you to briefly explain

18   to the ladies and gentlemen of the jury the other portions of

19   this little city of transistors that you built, kind of what

20   each block does, in general.

21             A     Okay.  So we of course have been talking about

22   the IRB, I think we have a fair understanding, to feed the

23   IRB, we have what we refer to as instruction fetch engine.

24   This is the part of the machine that's responsible for

25   sending addresses into our I-cache, the instruction cache, to

Gregg Lesartre - Direct by Mr. Allcock                    215

 1    pull four instructions out at a time, to sift through them

 2    for branches.  Branches is something we haven't talked about,

 3    but all instruction, all computer code will have branches in,

 4    that determines which way you proceed.  Because we want to

 5    insert four instructions at a time, we need to have a way of

 6    predicting which way branches are going to go, otherwise we

 7    will quickly run into a roadblock and not be able to feed the

 8    IRB.

 9                Q    That has a lot to do with performance, dudn't

10    it?

11                A    Oh, yeah, that's critical for performance.  So

12    the fetch engine is responsible for sending addresses,

13    looking for branches, predicting where the next fetch should

14    be, bringing that in, and ultimately sending all of this into

15    the IRB sort block which is something else we haven't talked

16    about that's figuring out where exactly in the IRB you should

17    put each of these instructions, and then ultimately doing

18    that insert.

19                Q    Okay.  What about that thing to the right, FP,

20    what's that?

21                A    Well, so the FP to the right is for floating

22    point so that is the data path that actually is responsible

23    for reading a register and performing floating point

24    operations.  So multiplies, adds with decimals that are

25    actually in the format, producing a result, and being able to

Gregg Lesartre - Direct by Mr. Allcock                216

1    put it back into the floating point registers to implement

2    those kinds of instructions.

3              Q    That has something to do with performance?

4              A    Oh, absolutely.

5              Q    Okay.  And then I notice some caches on the

6    left, you mentioned caches before, those are large sections

7    of the chip, what do they do?

8              A    So I mentioned the I-cache which is a local

9    repository for instructions that we need to execute.  As long

10   as we're hitting in that I-cache, we can feed the machine at

11   the rate we need to.  The D-cache or data cache refers to

12   memory locations that have their data collected for purposes

13   of loads or stores that can then pull that data into the

14   register file and make it available for instructions to

15   operate on, or one concluded, it's where you put the data to

16   make it available for, ultimately for purpose of the whole

17   computer which is to generate output.

18             Q    Last couple of sections.  What's that thing in

19   the middle going up and down, D-cache DP?

20             A    Okay.  So D-cache DP is a whole set of logic

21   that is just orchestrating accesses into and out of the data

22   cache.

23             Q    Okay.

24             A    It's where the logic is actually interpreting

25   the results that are coming from the physical storage.

Gregg Lesartre - Direct by Mr. Allcock                    217

1          Q    And I think you mentioned this in connection

2     with one of your patents, underneath the IRB is something

3     called an ARB, do you see that?

4          A    Oh, the ARQ actually is I believe what that --

5     ARB, you're right, it's labeled ARB here.  ARB is the portion

6     of logic that is tracking all the load/store dependencies so

7     I mentioned that as you said in the patent, there's a bit

8     more than just that that's going on in there but it is --

9     well, I personally spent a couple of years developing that

10    portion of the design.  It was quite a challenge to get it to

11    all work and to work at speed again because it was -- it was

12    a timing challenge to get everything to work as fast as it

13    should.

14         Q    Does that have to do with performance?

15         A    Well, yeah, I mean if we couldn't meet our

16    speed objectives and we -- the whole clock rate, rate of the

17    design would have slowed down, proportionately impacted the

18    overall performance of the design.

19         Q    How many engineers worked designing what we're

20    looking at here, the PA-8000?  This is an 8700 but the

21    PA-8000, how many?

22         A    The PA-8000, I believe the number of engineers

23    working on this physical design, not including the folks who

24    were doing compilers which we haven't talked about yet and

25    the other aspects of the overall system delivery, I believe

Gregg Lesartre - Direct by Mr. Allcock                    218

1    peaked at about 150 engineers, with most of those working

2    over probably a span of most of those five years, and that's

3    just tape release, that's not really even including the work

4    after we had received silicon back from it.

5              Q    How about the balance of the years for the

6    upgrade project for all the upgrades?

7              A    Well, actually, because this design was a

8    little bit later than we wanted to, we actually ended up

9    growing a fair amount in subsequent years, so I believe

10   probably more in the 200 range for the second five years all

11   working on various derivatives over the years, less than that

12   at the very end, but for the bulk of that period.

13             Q    Okay.  Last couple of questions.  Let me show

14   you, we've seen, it seems like 150 documents in this case

15   talking about this chip that you guys designed.  Let me show

16   you one of them.  This is P436, and let me ask you if you

17   recognize this.  Do you recognize this?

18             A    I believe I've seen it before.

19             Q    Let me see 49719.  And I want to go down to

20   the part that talks about microprocessor architecture, I

21   think it's the -- right there, yeah, right there, that's what

22   I want.  You haven't been here but we've seen this many,

23   many, many times.  It talks about a completely new

24   microarchitecture, do you see that?

25             A    Yes.

Gregg Lesartre - Direct by Mr. Allcock                219

1          Q    Who did that?

2          A    Well, we did that.  The completely new is, you

3    know, what we did starting with a blank sheet of paper.

4                    MR. ALLCOCK:  I don't have any more questions

5    for the witness at this time, your Honor.

6                    THE COURT:  Thank you, Mr. Allcock.

7    Mr. Poplawski.

8                    MR. POPLAWSKI:  Your Honor, would it be time

9    for a brief break or --

10                    THE COURT:  Let's take a break and we'll come

11    back for 10 or 15 minutes and we'll be done for the day, so

12    let's take a 10-minute break, and then --

13                    THE CLERK:  Court stands in recess, 10

14    minutes.

15                    (Jury Excused, 4:37 p.m.)

16                    THE COURT:  We'll finish up around 5.  You

17    need me or you just want a break?

18                    MR. POPLAWSKI:  Just a break.

19                    THE COURT:  Okay.

20                    MR. POPLAWSKI:  Well, we do need you, just not

21    at this moment.

22                    THE COURT:  I can understand that.

23                    (Whereupon a recess was taken from 4:37 p.m.)

24                     to 4:47 p.m.)

25                    (Open Court, Jury Out.)

Gregg Lesartre - Cross by Ms. McKenzie                220

1              THE COURT:  Are we ready, Mr. Anderson?  Yes,

2     we're ready, bring them in, Mike.

3              (Jury Present.)

4              THE COURT:  Mr. Poplawski.  I'm convinced that

5     half of the skill of being a trial lawyer is looking fresh at

6     the end of the day.

7              MR. POPLAWSKI:  I'll let others be the judge

8     of that.

9              THE COURT:  You look fine, Mr. Poplawski.

10             MR. POPLAWSKI:  Your Honor, I would like to

11    ask Ms. Denise McKenzie to conduct the examination.

12             THE COURT:  Ms. McKenzie, you may proceed.

13             CROSS-EXAMINATION BY MS. McKENZIE:

14        Q    Good afternoon, Mr. Lesartre, how are you?

15        A    Good afternoon, good, thank you.

16        Q    You testified about several patents where you

17    are the named inventor, was that correct?

18        A    That's correct.

19        Q    Now, out of all these patents, did you ever

20    patent the IRB?

21        A    I don't personally have a patent on -- well,

22    first of all, the overall IRB is a complex structure.  What

23    we patented was different attributes, different capabilities

24    of the IRB, not the overall IRB.

25        Q    So this new microarchitecture that you talked

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Gregg Lesartre - Cross by Ms. McKenzie                    221

1    about, you didn't get a patent for that, is that correct?

2             A    I don't personally have a patent for that, no.

3             Q    Now did you ever -- you testified about the

4    latch, is that correct?

5             A    We talked about a latch, yes.

6             Q    Did you get a patent for the latch?

7             A    No, the latch has been around for a long time.

8             Q    And you talked about something called a flag?

9             A    Yes.

10            Q    That indicates when you have a data

11   dependency, is that correct?

12            A    That's correct.

13            Q    Did you get a patent on that flag?

14            A    No, I did not get a patent on the notion of a

15   flag, that also has been around a long time.

16            Q    So did you get a patent on even the

17   combination of the latch and the flag?

18            A    No, I did not.

19            Q    Now you testified that the PA-8000 implements

20   register renaming, is that correct?

21            A     I testified that it implements something very

22   similar, our own particular implementation, but yes.

23            Q    Now, register renaming is a very old, old

24   technique, isn't that correct?

25            A    You're asking if it is a very old technique?

Gregg Lesartre - Cross by Ms. McKenzie                    222

1         Q    Yes.

2         A    Old in the computer industry, yes.

3         Q    So you didn't invent register renaming, did

4    you?

5         A    No, and I didn't claim to.

6         Q    Did Mr. Lotz invent register renaming?

7         A    No.

8         Q    Did anybody at HP invent register renaming?

9         A    No.

10         Q    So you talked about these things called slots.

11   Are slots the same thing as renamed registers?

12         A    When we refer to slots, we were referring to

13   entries in the IRB where we put the instructions.

14         Q    Could I put -- could we please go to DDX51.

15   Here at DDX51, these things that you're calling slots, are

16   these renamed registers?

17         A    So in that description, yes, those are

18   effectively the rename registers where we put our results.

19         Q    Now you said you're aware of Dr. Torng's '115

20   patent, is that correct?

21         A    I do not believe that's what I said.

22         Q    Are you aware of Dr. Torng's '115 patent?

23         A    I am now, yes.

24         Q    In 1996, were you aware of Dr. Torng's '115

25   patent?

Gregg Lesartre - Cross by Ms. McKenzie                223

1          A     Somewhere in that time frame, yes.

2          Q     Did you in fact study the '115 patent?

3          A     Not in detail.  I read through it briefly at

4    that time.

5          Q     Could I please have clip number 9104 of

6    Lesartre, it's page 154, starting at line 24.

7                (Video played.)

8          Q     So do you now recall studying the patent?

9          A     Well, so I did review it, and I did exactly

10   what I stated in that video, I reviewed it, I gave my initial

11   response, and that was the end of it at that time.

12         Q     Well, what was your initial response?

13         A     That we did not infringe.

14         Q     So when you reviewed the patent, about how

15   much time did you take to review the '115 patent?

16         A     I don't recall precisely, but I believe it was

17   on the order of probably half an hour or so.

18         Q     So you reviewed the patent a half an hour and

19   determined that the IRB didn't infringe the '115 patent?

20         A     I did not feel it infringed the '115 -- '151

21   patent or --

22         Q     '115.

23         A     '115, sorry.

24         Q     Did you review the file history of the '115

25   patent?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Gregg Lesartre - Cross by Ms. McKenzie                    224

1          A    At that time?

2          Q    Yes.

3          A    No.

4          Q    What did your analysis consist of when you

5     reviewed the '115 patent?

6          A    I looked at the description in the patent

7     writeup and I did not recognize that as what we had done and

8     that's what I told the person who was requesting me to give

9     my thoughts.

10          Q    Did you draft a writing or put your analysis,

11     make any notes about your conclusions with respect to the

12     '115 patent?

13          A    I do not believe I actually wrote anything

14     down, it was handled over the phone.

15          Q    Now, you talked about one of your patents, the

16     '934 patent, do you recall that?

17          A    '934.  Would it be possible to put that on the

18     screen just to be sure which you're referring to?

19          Q    Okay.  The '934 patent is D318.  So is this

20     patent, does this patent cover the IRB?

21          A    It does not cover the entire IRB, it covers

22     one aspect of the functionality that it implemented.

23          Q    And what aspect does it cover?

24          A    It covers specifically the mechanisms we

25     needed in place in order to ensure that given the precision

Gregg Lesartre - Cross by Ms. McKenzie

1    architecture's requirement to execute instructions that could

2    use either left or right path of floating point registers,

3    that it be able to do that and use the operand dependency

4    logic in such a way that it would still get the correct

5    answer.

6              Q    Now does this patent improve the performance

7    of the IRB?

8              A    It improves the performance of the IRB in the

9    sense that if our design was not capable of implementing this

10   functionality correctly, we would not be able to ship it as a

11   product.

12             Q    So it doesn't cause the IRB to speed up or

13   issue instructions in a quicker manner?

14             A    This particular patent does not.

15             Q    Could this particular patent even hurt the

16   performance of the IRB by slowing things down?

17             A    The patent itself does not hurt the

18   performance, no.

19             Q    But the invention described in the patent,

20   could it?

21             A    Could the -- no, I don't believe that states

22   the case.

23             Q    Could I have Exhibit D318, please.  Mr. Hoy.

24   Could I have it up?  So this patent discusses floating point,

25   issues with floating point numbers, right?

Gregg Lesartre - Cross by Ms. McKenzie                    226

1          A    Yes, isn't that the one we were just looking

2     at?

3          Q    Yes, this is the one we were just looking at.

4     Is that correct?

5          A    Yes.

6          Q    And is that a very small issue with respect to

7     the IRB?

8          A    I'm sorry, floating point performance?

9          Q    No, floating point issues.

10         A    No.  It's one of its primary benefits or one,

11    the major benefits of the design is its floating point

12    capability, and this was necessary to execute floating point

13    correctly.

14         Q    So could we go to figure 7 of D138, please.

15    And the signal called VALDEP?

16         A    Yes, I see it.

17         Q    Now is this the flag that you were testifying

18    about earlier?

19         A    VALDEP is the signal that conveys the status

20    of that flag to the central logic that considers launch, yes.

21         Q    And VALDEP can have a value of 1 or 0, is that

22    correct?

23         A    It indicates, yes, that it could have a

24    logical value of 1 or 0.

25         Q    Now in the patent with respect to VALDEP, did

1    you ever refer to VALDEP as a flag?

2          A    Well, again, VALDEP I would not consider to be

3    the flag, I would consider the flag to be the latch that's

4    also in that same schematic.

5          Q    So I thought you testified earlier -- so that

6    the latch itself is a flag, is that correct, is that what

7    you're saying?

8          A    The latch contains the flag, that contains the

9    status.

10         Q    So the latch contains a 1 or a 0, is that

11   correct?

12         A    Yes.

13         Q    So when there's an essential data dependency,

14   the latch contains a 1, is that correct?

15         A    When a dependency has been recognized, yes, it

16   contains a 1.

17         Q    And when there's no dependencies, the latch

18   contains a 0, is that correct?

19         A    That's correct.

20         Q    Okay.  So isn't a 1 and a 0 a value?

21         A    Yes.

22         Q    Now, with respect to the PA-8000, has HP ever

23   considered the mode of turning off the IRB?

24         A    Has it ever considered the mode?

25         Q    Yes.

Gregg Lesartre - Cross by Ms. McKenzie                    228

1          A    We have such a mode, we use for -- we use for

2     system turn on.

3          Q    And was that mode of turning off the IRB, it

4     wasn't desirable, right?

5          A    It had a purpose and it was desirable for that

6     purpose.

7          Q    Well, when you turn off the IRB, is the

8     performance less desirable than that of the PA-8000?

9          A    When you turn off or you use that mode, the

10    performance would be lower than with it turned -- with the

11    IRB not turned off.

12         Q    So turning off the IRB is not a desirable

13    mode, is that correct?

14         A    It's not a desirable mode for a shipping

15    system.

16         Q    Now, you have several patents, is that

17    correct?

18         A    Yes.

19         Q    And just because you're a named inventor on a

20    patent, that doesn't mean you can't infringe, HP can't

21    infringe the '115 patent, isn't that correct?

22         A    I'm not a patent lawyer, so I'm not the one to

23    make that judgment.

24         Q    But you have several patents, right, and

25    you're familiar with the patent process, isn't that correct?

Gregg Lesartre - Cross by Ms. McKenzie          229

1          A    I'm most familiar with the process for filing
2    patents, not for litigating patents.
3          Q    Okay.  So is it your understanding that if you
4    have several patents and HP has a number of patents, you
5    could still infringe the '115 patent?
6          A    It's my understanding that patents are
7    distinct from one another.
8                MS. McKENZIE:  Your Honor, I have about 30
9    more minutes to go and I don't know if this is a good time to
10   break or if I should keep going, or --
11               THE COURT:  I think if we put that to a vote,
12   you'd lose.  So we wouldn't want you to lose, but I want to
13   talk to them a minute, so thank you very much --
14               MS. McKENZIE:  Okay.
15               THE COURT:  -- Ms. McKenzie.  Remember, there
16   will be a time to deliberate about this case, and that time
17   is not yet.  We're all going to enjoy a weekend and eat hot
18   dogs and do all sorts of other horrible things to our bodies,
19   but please return at 8:30 on Tuesday morning.  And in the
20   interim, don't think about, don't talk about, don't do
21   anything about this case.  We must remember that our
22   obligation is to keep our minds solely on the evidence that
23   we'll be -- that has been and will be presented.  But I do
24   want to say I've really been very impressed with your
25   service, you've all been very attentive and I'm glad you're

1    working with us all on this case.  We'll see you Tuesday

2    morning, have a great weekend.

3                    THE CLERK:  Court is adjourned until Tuesday

4    at 8:30.

5                    (Jury Excused, 5:04 p.m.)

6                    THE COURT:  All right.  We have some more work

7    to do.  Exhibits for starters, right?

8                    THE WITNESS:  Excuse me, Judge, should I be

9    excused at this point?

10                   THE COURT:  Excuse me, you may step down.  Now

11   you'll be back Tuesday as well.

12                   THE WITNESS:  I guess I will be now.

13                   THE COURT:  Thank you.

14                   MS. KIM:  Your Honor, plaintiff would move

15   into evidence the following exhibits:  P457, P1407, P733,

16   P178, P441, P132, P440, P307, P1349, P135, P1148, P174, P236,

17   P1872, P463, P468, P170, P1501, P1657, P440, P466, P437,

18   P948, P960, P523, P1080, and P1441.

19                   Your Honor, also, we would like to move to

20   enter into evidence two deposition video testimony that we

21   played in our case in chief.  One is deposition testimony

22   from Wayne Johnson, and from Darius Tanksalvala.

23                   THE COURT:  Okay, thank you.  Ms. Penning, am

24   I looking to you for some kind of objection or approval?

25                   MS. PENNING:  Yes, you are, your Honor, I'm

1    sorry, there's just a couple we may have an objection to, I

2    just want to make sure before I take the court's time.  I'm

3    checking my list right now.

4                    THE COURT:  You can confer with Ms. Kim if

5    that would help.

6                    MS. PENNING:  That would help, thank you, your

7    Honor.

8                    THE COURT:  You two can look at it together.

9    While they're doing that, do we want to do the motions which

10   would occur at the end of Mr. Poplawski's case today or do we

11   want to do that tomorrow?

12                   MR. ALLCOCK:  I would -- I'm at the court's

13   pleasure.  I personally would vote for tomorrow.

14                   THE COURT:  Well, we'll probably all be

15   fresher tomorrow.  Mr. Poplawski, do you have a strong

16   feeling one way or another?

17                   MR. POPLAWSKI:  The only complication,

18   Mr. Anderson has a conflict because we have witnesses coming

19   in, so depending on what -- I'd like Mr. Anderson to be here.

20                   THE COURT:  Absolutely.

21                   MR. POPLAWSKI:  Depending on what time we do

22   it, we can do it tomorrow.

23                   THE COURT:  We can -- we can accommodate

24   Mr. Anderson's schedule certainly, we've -- I see us being

25   here a few minutes tomorrow.

1          MR. ANDERSON:  Your Honor, the witnesses we

2    have are substantial enough that we probably should go

3    forward now.

4          THE COURT:  What's that?

5          MR. ANDERSON:  I probably have enough

6    witnesses I'm meeting with tomorrow that are already

7    scheduled that we probably should go forward now if the court

8    would like to do so.  I have enough witnesses already

9    scheduled for tomorrow that I have to, that are coming in

10   to -- for meeting that we probably should proceed with

11   motions now if the court has the time to do so.

12         MR. ALLCOCK:  Okay.

13         THE COURT:  Sounds like that's appropriate.

14         MR. ALLCOCK:  Your Honor, I'll address, we'll

15   have motions as to infringement, Mr. Shelton will address

16   that.  Damages on the EMVR that I'll address but I'll address

17   briefly since we've already talked about a lot of it, and

18   then on willful infringement which I'll address myself and

19   I'll start now.

20         THE COURT:  Go.

21         MR. ALLCOCK:  Your Honor, they have not proven

22   willful infringement by clear and convincing evidence, I mean

23   they haven't.  They haven't proven the objective prong under

24   *Seagate* and they haven't proven subjective prong under

25   *Seagate*.  We have, if anything, perhaps the extremely solid

1    evidence of nonwillfulness by virtue of having a very prompt

2    opinion by an engineer that the court's heard, very capable

3    gentleman, a-two-and-a-half-year gap in activity from

4    Cornell, after Cornell was put on notice of the precise

5    positions that we're arguing to the court today, precise

6    positions.  I don't think I've ever, I've ever had a case

7    like that.  And then when the activity was resurrected by

8    Cornell two years and three months later, prompt opinion

9    letters, one after another, with again, the exact arguments

10   that we're arguing today, collectively.  And so your Honor, I

11   really think of the cases --

12              THE COURT:  What do you think objective

13   recklessness is?

14              MR. ALLCOCK:  I think it would be a

15   circumstance where objectively based upon the evidence that

16   was available to the party at the time of that determination,

17   it would have been, the party would have known that they were

18   seriously at risk of infringement or it would have been

19   obvious to that party that they would have been guilty of

20   infringement.  And I think here we have the exact opposite.

21   We have Mr. Worley looking at the situation, reading the

22   patent frankly the same way as we read it today, and in

23   fairly short order coming up to the conclusion of

24   noninfringement.  So you have exactly I think the opposite of

25   the objective recklessness issue.

1              And there's no timing problem whatsoever.  I

2       mean it's not a matter that there's any timing issue with

3       respect to us looking at it although I think that would go to

4       the subjective point more than to the objective point.

5              THE COURT:  Let me just hear briefly from

6       Mr. Poplawski on this point.

7              MR. POPLAWSKI:  Your Honor, I think that there

8       is an abundance of evidence of objective recklessness in the

9       evidence that --

10             THE COURT:  What is that objective reckless

11      standard first?  Not asking for the evidence, for what you

12      perceive to be the legal standard.

13             MR. POPLAWSKI:  And I, this will of course

14      develop under *Seagate*, objective recklessness it seems to me

15      is business conduct which is objectively reckless under the

16      circumstances, in reckless disregard of what a reasonable

17      business would have done under the circumstances.  And so I

18      think we have to look at the objective circumstances here,

19      starting in the 1990s, and that's -- well, if we go back to

20      1988, I know the patent hadn't issued yet but the first

21      instance that there was at least notice of a patent

22      application was the letter from Cornell to high-ranking

23      official, Mr. Birnbaum.  Now, we're not of course solely

24      relying on that.

25             THE COURT:  You think there's going to be

1    recklessness whenever there's just -- these are just thought

2    questions for the moment, do you think there's ever going to

3    be recklessness where there's any validity questions at all

4    early on?

5              MR. POPLAWSKI:  Well, your Honor, that kind of

6    takes us all away to 1996 --

7              THE COURT:  I'm trying to keep us away for a

8    moment from the facts of this case and I'm playing kind of,

9    you know, hypothetically, if -- and think of yourself now

10   being on the other side of the equation, you're defending

11   somebody, and as long as there's a question of validity and

12   we would call it a credible question of validity, wouldn't

13   there be, wouldn't it be hard to call them reckless to

14   proceed?

15             MR. POPLAWSKI:  I think it's about context,

16   your Honor, and I think the validity question is not

17   something that's to be viewed in isolation from the other

18   factual circumstances that are evolving.  So for example, as

19   applied to this particular case, even if we only take a

20   snapshot here of 1996, and that's when Mr. Worley came out

21   with this paper, and I'm going to for a moment exclude

22   everything that went on before that, what we have here

23   leading up to that is the Hunter Rawlings/Lew Platt meeting,

24   and then we've got the memo from Lew Platt to others in

25   management saying, don't do anything unless you find anything

1   good, and I know both sides can put their --

2                    THE COURT:  Spins.

3                    MR. POPLAWSKI:  -- spins on how that's to be

4   treated, and then we have the course of conduct that ensues

5   after that.  Mr. Worley gives what we view as a quick and

6   dirty analysis, consistent with what Mr. Platt basically

7   said, you know, don't take this seriously, and then we have

8   the followup communications from I believe Platt to Birnbaum,

9   and there's one more that escapes me that we've put in which

10  says this is all a bunch of academic arrogance, don't take

11  Cornell seriously.  Now before that, we've got a sequence

12  of --

13                   THE COURT:  But if they're, if they can show

14  us any concerns about validity, do we interpret that as

15  objective recklessness?

16                   MR. POPLAWSKI:  Well, a concern about --

17                   THE COURT:  If they really have some basis for

18  thinking it's invalid, then are they justified in saying

19  they're arrogant and we can proceed?

20                   MR. POPLAWSKI:  Well, some basis, your Honor,

21  is not necessarily a sufficient basis, viewed from the

22  context of an objective person under the circumstances.

23  Let's look at what the situation was here by 1996.

24  Dr. Tanksalvala had gotten the Johnson thesis, and both sides

25  have their interpretations --

1          THE COURT:  You've probably followed the law

2    and you kind of know probably where the willfulness needle

3    was before *Seagate*.

4          MR. POPLAWSKI:  Right.

5          THE COURT:  And you recognize that objective

6    recklessness has kicked that needle in a direction

7    unfavorable to plaintiffs.  How does that affect your

8    argument here?

9          MR. POPLAWSKI:  Well, your Honor, we believe

10   that there was copying here, and we don't have direct

11   evidence of it but it's something that the jury can infer

12   from the indirect evidence, including the PhD thesis that

13   Dr. Tanksalvala testified was disseminated by him and read to

14   the core members of his design team, Mr. Lotz and

15   Mr. Lesartre.  That thesis discussed the dispatch stack,

16   highlighted the Acosta, Torng paper, the jury --

17          THE COURT:  This is the Johnson --

18          MR. POPLAWSKI:  The Johnson thesis.

19          THE COURT:  -- becomes the superscalar book?

20          MR. POPLAWSKI:  Well, I haven't compared the

21   whole thing, your Honor, but there are aspects of that, sure.

22          THE COURT:  Okay.

23          MR. POPLAWSKI:  That turned into the

24   superscalar book, so let's move forward here.  You've got

25   Dr. Tanksalvala whose team reads this, the jury can infer

1      whether a reasonable engineer under those circumstances would

2      have picked up the Acosta, Torng paper, reviewed it, seen the

3      patent application, right, this convinced them, in any event

4      Tanksalvala, that multiple out-of-order issuance was the way

5      to go.  This was then taken up the chain to Mr. Wheeler.  You

6      thereafter have a sequence of events where HP proceeds with

7      the design, 1994, Cornell sends a letter to HP saying, we've

8      seen an article in the news, I think it was in something

9      called Microprocessor Reports, your processor is not yet

10     taped out, right, so we haven't seen it on the market,

11     there's nothing we can do, so we have this event in

12     confluence with what Dr. Tanksalvala took up the chain to

13     Mr. Wheeler.  Then we move forward here to 1995 to 1996,

14     we've got the communication coming out from Cornell, we've

15     got the Worley memo, and then after that, what at least how

16     we view the evidence is a sequence of events where Cornell is

17     being told one thing, namely that, oh, HP doesn't infringe,

18     we respect the patent, and another thing is going on

19     internally.  So that's basically our position.

20              THE COURT:  So give me what you would say is

21     your best evidence of willfulness.  If you were going to have

22     me look at two or three things, what are they going to be?

23              MR. POPLAWSKI:  Our best evidence of

24     willfulness I would say is at a minimum indirect evidence of

25     copying.

1            THE COURT:  Okay.

2            MR. POPLAWSKI:  Because no one got up and said

3   here's the paper that shows it or I did it.  Coupled with the

4   course of business conduct that occurred thereafter, all

5   right, including the Platt memo, the response to HP's

6   infringement -- or Cornell's infringement charge in 1996, the

7   internal communications which we only learned about after the

8   lawsuit.

9            THE COURT:  I've got those things, yeah.

10           MR. POPLAWSKI:  I think those are the

11  fundamental things, and then there's the sequence of events

12  from 1997 onward during which Cornell was still being told

13  one thing but HP was doing another thing internally.

14           THE COURT:  Okay, I've got that, too.  Now

15  balance that evidence against the Hewlett-Packard position

16  that they thought the patent was invalid from the outset, or

17  from very early.

18           MR. POPLAWSKI:  Let's look at that, your

19  Honor.  The jury can certainly infer from the evidence that

20  Dr. Worley's 1996 paper was a whitewash, I mean that HP will

21  put their spin on it, we're going to say Worley didn't

22  understand the invention, he just followed Flynn -- Platt's

23  instructions, don't do anything really seriously, et cetera.

24  All right.  The jury can make that inference.  And I'm sorry,

25  I lost my train of thought.  The court's question was?

1          THE COURT:  About how do we counter your

2    evidence --

3          MR. POPLAWSKI:  Yes, validity, yes.

4          THE COURT:  -- with their proof of validity.

5          MR. POPLAWSKI:  So at any rate let's move

6    forward from the Worley memo.  The next time that we really

7    see any discussion that I know about of validity or

8    infringement is in 1999, and in fact someone can get up and

9    correct me if I'm wrong, but I think the 1999 nonliability

10   opinion was just noninfringement, but I'm sure Mr. Allcock

11   will correct me if I'm wrong, but then we get into 2001 and

12   HP gets an opinion on invalidity and infringement in

13   October 2001, that's a few months before the lawsuit gets

14   filed.

15         THE COURT:  Okay.  I think I've got the

16   positions.  Anything else?

17         MR. ALLCOCK:  I can't resist, your Honor, just

18   two points.

19         THE COURT:  I'm counting.

20         MR. ALLCOCK:  Counsel mixed up the objective

21   and subjective parts of it in my judgment.

22         THE COURT:  That's point one.

23         MR. ALLCOCK:  This -- well, that's the main

24   point, that all of the facts that he recited as between

25   conducts between the parties or whatever have nothing to do

1      with the first threshold standard of objective recklessness

2      that the court asked me about, and there's no evidence of it.

3      I mean the Worley memo is the best they got, and it presents

4      the exact same defense we're presenting now.

5                      THE COURT:  I think I've got that.  Tell you

6      what, give me one second, I'll be right back and we'll

7      continue with the rest of your presentation, Mr. Allcock.

8      You can relax a little bit here for a minute.

9                      (Pause in Proceedings, 5:23 p.m. to 5:24 p.m.)

10                     THE COURT:  Did you want to say something

11     further on this point?

12                     MR. POPLAWSKI:  Yeah, I'd just like to make

13     one more point.  I think objectively, the Worley

14     December 1996 memo can be viewed as a result-driven analysis.

15     I mean as far as I know, the prior art that Mr. Worley was

16     looking at is not the subject of HP's invalidity defenses in

17     this litigation.  Mr. Worley wasn't a patent attorney, and I

18     think he did the job that he was asked to do, and the

19     question is whether under the circumstances that can be

20     viewed as part of this chain of objectively recklessness

21     conduct.

22                     THE COURT:  Thank you, Mr. Poplawski.

23                     MR. ALLCOCK:  Your Honor, Mr. Shelton --

24                     THE COURT:  Mr. Allcock, do you want to --

25                     MR. ALLCOCK:  On the noninfringement motion.

1               THE COURT:  Okay.

2               MR. SHELTON:  Good afternoon, your Honor, may

3       it please the court.

4               THE COURT:  Mr. Shelton.

5               MR. SHELTON:  Your Honor, the evidence of

6       infringement is so slight in this case, I literally wrote my

7       arguments down on a Post-it note.  There is no literal or

8       doctrine of equivalents infringement of the asserted claims,

9       namely 1, 6, 14, 15, and 18 because what's happened here is

10      that rather than the court's constructions having been

11      applied to the PA-8000, there's been a substitution of the

12      criteria.  In other words, the construction for what alpha is

13      which is central to the resolution of infringement was never

14      used in this case.  It wasn't used in expert reports, it

15      never appeared in Dr. Smith's expert report.  When asked at

16      his deposition what construction he used for that essential

17      dependence field in the court's construction of dispatch

18      stack, he made one up.  He said it's a piece of state that

19      tracks an essential dependency, and I said, why didn't you

20      use the court's construction, which the parties agreed to,

21      and the court endorsed, for alpha, and his answer was, it

22      doesn't appear explicitly in the claims.  The jury never

23      heard from Dr. Smith what that stipulated construction was.

24      Instead, they saw a lot about renaming, they saw a lot about

25      how a flag that counts from 1 to 0 or 0 to 1 somehow is

1    literally the same thing as the a(S1) or a(S2) counters in

2    the patent which have to count all of the dependencies.

3                    So instead of all, the line's been placed

4    through that and now it's become sufficient for literal

5    infringement to count to 1.

6                    THE COURT:  So your contention is that

7    Dr. Smith did not link the accused circuit to the claim

8    language.

9                    MR. SHELTON:  That is correct, your Honor.

10                   THE COURT:  But I recall very clearly

11   Dr. Smith putting up a plain language and putting a fancy

12   green check as he would discuss each aspect of --

13                   MR. SHELTON:  I remember those slides as well,

14   your Honor, but when, within the construction of dispatch

15   stack which is quite lengthy, it reads an essential

16   dependence field, i.e., a(Si), so in other words, that is

17   a(Si), a(Si) or alpha, a(S1), a(S2) were construed by this

18   court and those constructions were never applied because

19   those constructions made clear that what you have to count

20   for alpha as all the previous writers of an instruction

21   source operand.  Not 1, or 0, all of them.  And Dr. Smith

22   agreed on cross-examination yesterday that if you had a

23   dispatch stack with 28 rows and all of the writers of the

24   preceding instructions were F0, the count would be 27.  When

25   asked about the IRB which happens to have --

1        THE COURT:  I think he also pointed out,

2   however, that counting it as 1 is the same as, or in his

3   terminology was the same as flagging it as a dependency, did

4   he not?

5        MR. SHELTON:  That is his opinion, your Honor,

6   but the problem is that he admitted that --

7        THE COURT:  Well, but couldn't the jury credit

8   that?

9        MR. SHELTON:  Not for literal infringement

10  because for literal infringement, alpha has to count all of

11  the preceding writers, it's not a count of dependencies

12  because as we have heard in HP's case already, in Cornell's

13  case, there are more writers in the dispatch stack that write

14  to --

15       THE COURT:  Couldn't the jury consider

16  multiple flags as being the same as what you're construing

17  the court's counting function to be?

18       MR. SHELTON:  No, your Honor, because the

19  multiple flags are independent.  So there is an a(Si), a(S1)

20  counter for the S1 register, there's an a(S2) field for the

21  S2 register and so on.  So the fact that they're multiple

22  flags don't help you cobble together something that counts.

23  I just --

24       THE COURT:  Okay.  I think I have your point.

25  Anything else, Mr. Shelton?

1              MR. SHELTON:  Oh, yes, your Honor.  There was

2     no explicit opinions about function, way, result or

3     insubstantial differences in expert discovery in this case,

4     and what we saw from Dr. Smith is he provided in I believe

5     about two or three sentences opinions purporting to be on

6     doctrine of equivalents or just two parts of the dispatch

7     stack, the S1 and S2 field for the source registers and then

8     the alpha field.  He did not provide sufficient analysis and

9     by not considering the way, very, very considerable

10    differences in way and result between the dispatch stack and

11    the PA-8000, he's not provided the jury with sufficient

12    evidence of infringement under the doctrine of equivalents.

13             And there's another wrinkle here that frankly

14    surprised me.  Claims 1 and 14 are method, are claims that

15    have means plus function language, and as we all know, in

16    order to show infringement of a means plus function element,

17    you must take the court's construed function, find that

18    identical function in the claim, then look for the

19    corresponding structure literally, or its equivalent.  The

20    jury didn't hear a single word about that analysis.  There

21    was never any mention of the function of the IRB

22    corresponding to those elements, explicitly, and neither was

23    there any analysis or testimony about those structures.  And

24    in particular, the reservation circuit was found by the court

25    to be corresponding structure for the means for issuing step.

1     This is why Cornell wanted to get into that slide that said

2     the court defined reservation circuit as conventional

3     arbitration logic.  There was no construction why, because it

4     was corresponding structure, the court didn't need to define

5     what it was, because he had to go through the analysis and

6     show that the reservation circuit which is shown in figure 3

7     and described in column 6 at lines 14 to 21, that that

8     structure was literally or equivalently in the PA-8000 and

9     there wasn't a single word about that.

10                 So claims 1 and 14 must fall.  The analysis,

11    it's not a question of weighing the evidence, the analysis

12    wasn't done, it wasn't presented to the jury.  There's no way

13    that a jury, unless they had a copy of a patent law primer,

14    could somehow do the analysis for themselves, and that was

15    Cornell's burden.  So I submit that those two claims cannot

16    be infringed either literally or under the doctrine of

17    equivalents.

18                 Furthermore, there was no evidence presented

19    that anyone has practiced the method claims.  Not a single

20    word, as if the jury was to infer that someone out there

21    directly infringes these claims.

22                 My fourth point is intertwined with the claim

23    construction arguments that you'll hear tomorrow and so I

24    will keep it very brief and that is that this court already

25    found that as a matter of law, any claim in which the

1    dispatch stack was construed have a ß(D) field which tracks

2    the write-after-read dependency is not infringed as a matter

3    of law, literally and under the doctrine of equivalents.  So

4    to the extent the court might change the construction of

5    dispatch stack to include the ß(D) field, and its equivalent,

6    then all of the asserted claims for which that construction

7    applies would not be infringed.

8                     And my last point is that without any evidence

9    of direct infringement by others as a threshold, there can

10   certainly be no proof of indirect infringement.  But more

11   than that, indirect infringement of course doesn't lie merely

12   when someone else directly infringes the patent.  There has

13   to be proof of active inducement by HP, that's not in the

14   record.  And for contributory infringement there has to be

15   additional steps proved which the jury hasn't heard, so

16   there's neither direct infringement by HP literally or under

17   the doctrine of equivalents of the asserted claims, nor is HP

18   liable for contributory or inducement infringement.

19                   THE COURT:  Okay, thank you, Mr. Shelton.  Who

20   will respond?  Will you respond, Mr. Poplawski?

21                   MR. POPLAWSKI:  May I, your Honor?

22                   THE COURT:  Sure.

23                   MR. POPLAWSKI:  Your Honor, I guess what I

24   would like to do is to start from the back first with

25   Mr. Shelton's I guess last three points and then I'll --

 1                    THE COURT:  The indirect infringement?

 2                    MR. POPLAWSKI:  And then I'd like to get into

 3       the more technical stuff.

 4                    THE COURT:  Okay, sure.

 5                    MR. POPLAWSKI:  Now as to the last point, the

 6       contributory and induced infringement, well, we've put on

 7       what I think is a cornucopia of evidence.  We've got the

 8       press releases, the letters, the configuration guides, I

 9       mean, so I don't see that there's an issue there at all.

10                    Now on the ß(D), this is now I think HP's

11       fifth or sixth attempt to rewrite the court's claim

12       construction.  Here's what happened with ß(D).

13                    THE COURT:  And probably not the last.

14                    MR. POPLAWSKI:  Probably not, that's true.

15       The dependent claims, and I'm sure Mr. Shelton will get up

16       and correct me if I'm wrong, claims 7 through 12 and there

17       may have been one other, they have specific language in them

18       which called for the tracking of a particular type of

19       nonessential data dependency called a write-after-read, but

20       the bottom line, it was a particular type.  Judge Peebles in

21       his recommendation and report rejected Cornell's position

22       that the tracking of that particular type of nonessential

23       data dependency was equivalent to the tracking of another

24       type of nonessential data dependency called

25       write-after-write.  And as to that dependency, it was

1    Cornell's position and remains, although it's not an issue in

2    the case, is that the IRB does that, in fact the court may

3    recall, I asked Dr. Worley if he told me during our meeting

4    if the IRB detected write-after-write type data dependencies

5    in computer instructions and he said yes.  Now that's perhaps

6    an issue for another day.

7              Now, and so moreover, the patent covers two

8    types of nonessential data dependencies.  Column 8 or

9    something like that.  This is the subject of a three- or

10   four-day *Markman* hearing.  In fact there's testimony, live

11   testimony from Dr. Flynn and Dr. Smith in agreement with

12   that, which is reflected in Judge Mordue's opinion.

13             Lastly, the exemplary chart 1 that we've seen

14   a lot in this case, that just deals with one of those two

15   types of nonessential data dependencies, so it's not accurate

16   to say that ß(D) is one and only one type of nonessential

17   data dependency.

18             Now, let me turn to the third from the last

19   point that Mr. Shelton made, namely that there's no evidence

20   of the practicing of the method claims.  Well, the whole

21   point, the whole reason for our arriving at the stipulation

22   as to Boeing and Ford's use of the invention was so that we

23   didn't have to go out and depose HP's customers to profuse.

24   That's what we did.  There's no question that there's a

25   stipulated order that from 1996 on, at least Boeing and Ford

1    have used each and every one of the PA-8000 family processors

2    in servers and workstations.  Moreover, I'm sure that the

3    court is well familiar with the Federal Circuit precedent

4    that you don't need to identify each and every customer to

5    establish that there's use.  In fact, you can rely on

6    circumstantial evidence, too, under certain circumstances.

7    And so we know we have to prove that the claim elements are

8    met, but I don't think there's any issue that assuming we

9    prove the claim elements are met and that's from the jury,

10   the method's been practiced.

11              Okay.  A(S1) and a(S2).  Dr. Smith spent a lot

12   of time on this, your Honor, these essential data dependency

13   fields and also talking about the logic associated with them.

14   I know that the court said, yeah, he went through everything

15   and he checked it off, but before he did that, he laid out

16   how the instruction reorder buffer works.  We spent a lot of

17   time on the -- what they call the flags, what they call S1

18   and S2, D.  Dr. Smith talked about how they worked, he said

19   they were the names HP used.  We talked about the renamed and

20   unrenamed registers, we talked about how the source values

21   are stored, and then he got in the doctrine of equivalents.

22   I mean he applied function, way, and result, and I think the

23   court heard this multiple times.

24              Moreover, as to the claims 1 and 14, as I'm

25   sure the court's aware when we're talking about equivalents

1    on means plus function, it's literal infringement is

2    equivalents thereof.  So I mean Dr. Smith went through the

3    schematics, I think that -- I just don't think there's any

4    question here that we've put on a wealth of evidence.  Now

5    they may -- they disagree, they've got their own spin on

6    that.

7                    Reservation circuit.  He went through the

8    schematics, he talked about parts of the ERS, and when he

9    went through the schematics, he described how you have two

10   inputs to the reservation circuit, he showed you where in the

11   schematics that happens, he showed you what the output was,

12   so he said, okay, we've got an input, we've got this op

13   field, right, we've got another input and then we have an

14   output.  Now, they may disagree with Dr. Smith's

15   interpretation of those schematics, they may disagree with

16   Dr. Smith's interpretation of the ERS, and they could put on

17   expert testimony to do that.

18                    THE COURT:  Does the court require the

19   counting feature?

20                    MR. POPLAWSKI:  Does the court?

21                    THE COURT:  The court's claim construction.

22                    MR. POPLAWSKI:  Your Honor, I think that this

23   27 example that HP used is a red herring.  As I think the

24   court has observed, at the end of the day, you're going to

25   have, there's going to be one writer, all right, one

252

1    container that's going to supply the value to the source that

2    the instruction that's got the dependency needs.  And what's

3    happening here is the invention establishes a count, it's

4    representative of the number of data dependencies because in

5    that instance with renaming, there's ultimately going to be

6    one writer, right, that's going to supply the value that the

7    instruction is going to need to consume.

8                   Now they can, they can put on evidence as they

9    did today that, you know, you really got multiple containers

10   and slots going on here and things are different because of

11   renaming, but our position's pretty simple here.  If I've got

12   an instruction that's in format OP, S1, S2, D, and it's

13   originally a general register and it gets renamed, all right,

14   that -- the value's the same, that's going to get supplied.

15   Now we didn't get into this because they haven't raised it

16   yet, but you know, the value, there's only one value that's

17   going to be supplied no matter what, and if they disbelieve

18   that, they can put on evidence, but Dr. Smith clearly showed

19   how the 1 is representative of the dependency, he talked

20   about the sclat_04 latch that's representing the essential

21   dependency field, he described how it worked, he talked about

22   the logic that was associated with that, he went through

23   parts of the schematic that describe how it obtains the

24   initial value, decrements the value, determines when it's 0,

25   all of that, and then he checked it off.

1           THE COURT:  Okay, thank you.  Just a few

2    comments here, Mr. Shelton.

3           MR. SHELTON:  Yes, I'll be very brief here,

4    your Honor, just one point.  It's interesting to hear about a

5    value, of course there's only one value that will ever go to

6    another instruction but the patent doesn't talk about values.

7    The patent defines alpha specifically as such.  That alpha

8    represents the number of times that a particular register SI

9    is used as a destination register in preceding uncompleted

10   instructions.  There's nothing about renaming in this patent.

11   So Dr. Torng had to count all of the numbers, it's in the

12   patent, it's in the court's construction, and only by

13   completely ignoring that definition can you say that one is

14   sufficient when there are more than one.  Thank you, your

15   Honor.

16           THE COURT:  Okay.  Thank you.  Mr. Allcock,

17   are you --

18           MR. ALLCOCK:  Your Honor, I think, I think

19   we've said about all of the substance of what I want to say

20   on what is the overall EMVR point.  I mean, I still don't

21   believe, even with allowing them to drop down one level they

22   really have satisfied what needs to be done under the law to

23   have a legitimate damage case.  I mean, I've had that sheet

24   brought down to show that's what they would need to do, I

25   mean either they are entitled to the entire market value rule

1    which I don't believe they are, or they are under the pre,

2    under the non-entire market value rule in which they have to

3    apportion.  And so I don't think they're entitled to the

4    entire market value rule because they haven't proven that the

5    patented feature is the basis of consumer demand even on the

6    performance level, much less if you go to the next level, but

7    even on the performance level, they haven't proven that it's

8    the basis.

9                    THE COURT:  Doesn't that depend on some

10   factual findings that the jury's entitled to make?

11                   MR. ALLCOCK:  I think that list is undisputed.

12   I don't --

13                   THE COURT:  And if the jury determines that

14   the Torng invention dwarfs that and is the significant factor

15   responsible for the performance factual call that they're

16   entitled to make, doesn't your list here disappear and then

17   aren't they entitled to the entire market value rule and

18   hasn't Dr. Stewart made an effort to, in accordance with this

19   court's ruling, to tie the claimed invention more closely to

20   his royalty base, thus justifying their damages calculation?

21                   MR. ALLCOCK:  So what the court's saying is

22   dropping down the one level from the system to the CPU.

23                   THE COURT:  Made an effort in accordance with

24   this court's --

25                   MR. ALLCOCK:  I don't believe --

1               THE COURT:  -- economic desire for an economic

2    link, he's made an effort to more closely tie the claimed

3    invention to the entire market value he wishes to recover.

4               MR. ALLCOCK:  I would agree with the "more

5    closely", I wouldn't agree that he satisfied the requirement,

6    but if the court --

7               THE COURT:  With the "more closely" added to

8    the jury's prerogative to make the factual findings.

9               MR. ALLCOCK:  I don't think they've done it, I

10   really don't.

11              THE COURT:  You don't think they've done it,

12   okay.  I think I want to hear from Mr. Anderson on this

13   point.

14              MR. POPLAWSKI:  Yes, your Honor.  So with

15   respect to these factors, the testimony by Dr. Smith has been

16   that he ran his performance studies in order to take out all

17   the other factors, find what is the performance attributable

18   to the invention.  Now HP may dispute that, but it's an issue

19   the jury can weigh, based on the testimony provided.

20              THE COURT:  Okay, I think you've got that

21   point, go on.

22              MR. ANDERSON:  We've also established that

23   HP's marketing materials repeatedly recognize the

24   significance of out-of-order execution to performance in

25   touting it to customers.  Federal Circuit precedence allows

1       that when a accused infringer uses the invention in marketing

2       materials, touts it, that can be and is evidence of

3       attributable to market demand.  We have the press releases in

4       particular that tie the intelligent execution to being based

5       on out-of-order execution, and a order of finding an

6       established fact in this case that customers did in fact

7       receive those press releases and it was intended to convey to

8       them that intelligent execution was at least one of the

9       reasons they should purchase.

10                  Now we have the additional facts of multiple

11      documents, the survey data that's been put in, client quotes

12      that have been put in, P230.  Documents within HP that

13      recognize that the customers paid for performance, P178.  All

14      of those under the *Bowes* and *Heidelberger* case would support

15      the proposition that you don't have to have a customer

16      saying, I want to buy an IRB.  You have to have a customer

17      that says, I want to buy that performance.  And the evidence

18      that's been presented to the jury is sufficient, particularly

19      if we're going to go down to a brick or processor level, and

20      they have the basis right now in the record to do a royalty

21      on the smaller component.  Although that wasn't what was the

22      offered value by Dr. Stewart, they have those values, they

23      can look at the evidence and weigh it and come to their view

24      on what the appropriate module processor is, and look at the

25      facts and say yes, customers wanted that because of the

1    performance being delivered by out-of-order execution, at

2    least substantially so.

3                    THE COURT:  Okay.  Thank you, Mr. Anderson.

4    Have you adequately preserved your rights, Mr. Allcock?

5                    MR. ALLCOCK:  I've done my best, your Honor.

6                    THE COURT:  Okay.  And as the court will take

7    all this under advisement and will rule on it when the time's

8    most appropriate, having heard the remainder of the evidence.

9                    MR. ANDERSON:  Your Honor, we have one

10   request.

11                   THE COURT:  Yes.

12                   MR. ANDERSON:  With respect to Dr. Stewart, in

13   the event that we decide not to bring him back, he would only

14   like to put on the record that the conclusion that he would

15   have offered if permitted as our offer of proof.  I think

16   we've covered everything else but we aren't certain whether

17   he ever said, "In my opinion the royalty would be."

18                   THE COURT:  Would you like to, out of the

19   jury, put him back on and have him make a statement at this

20   point?

21                   MR. ANDERSON:  That's what I propose, your

22   Honor.

23                   THE COURT:  Let's do it right now.

24                   MR. ALLCOCK:  Your Honor, we can stipulate to

25   that.

Marion Stewart - Direct by Mr. Anderson                    258

1              MR. ANDERSON:  Would you?

2              THE COURT:  Let's bring him up, let him make

3    his statement, because -- if there's any further stipulations

4    necessary, I appreciate your offer.

5              Dr. Stewart, you remain under oath.

6              THE WITNESS:  Thank you, your Honor.

7

8              M A R I O N   S T E W A R T , recalled as a

9    witness and being previously duly sworn, testifies as

10   follows:

11             DIRECT EXAMINATION BY MR. ANDERSON:

12        Q    Dr. Stewart, would you please, you've

13   discussed the factors underlying your opinions with the jury

14   and with the court last night in the *Daubert* hearing.  I

15   would like you to summarize that opinion including the amount

16   of reasonable royalty that you find should be awarded in this

17   case.

18        A    Thank you.  As I expressed during my

19   discussions with the court, my opinion is, and I would have

20   testified to the jury that in my opinion, the royalty base

21   should be the revenue from servers and workstations, and the

22   appropriate royalty to compensate for any infringement that

23   is found should be a 2½, should be 2½ percent of that total

24   server and workstation revenue.  I apologize, I did not bring

25   a copy of the chart with me.

Marion Stewart - Direct by Mr. Anderson          259

1              THE COURT:  You can lead the witness if
2  necessary at this point.
3              MR. ANDERSON:  I will, your Honor.
4       Q    Would it be your opinion therefore that the
5  royalty base would be 36,178,667 -- $36,178,667,249?
6       A    Yes, sir, it would.
7       Q    And the royalty rate would be 2½ percent?
8       A    Yes.
9       Q    For a reasonable royalty of $904,446 -- I keep
10  doing that.  $904,446,681.
11      A    Yes, sir, that's correct.
12             MR. ANDERSON:  Thank you, Dr. Stewart.
13             THE COURT:  Is there anything else that
14  Dr. Stewart would want to put on the record?
15             MR. ANDERSON:  We've discussed it, your Honor,
16  we had some very thorough discussions, so long as what we
17  discussed last night in the *Daubert* is also part of the
18  record.
19             THE COURT:  That is part of the record
20  completely and we can, I think Mr. Allcock, if you could, I
21  think we could also allow all of the exhibits that would have
22  been offered by Dr. Stewart to be put in the record to
23  preserve their rights to raise those issues at a different
24  level.
25             MR. ALLCOCK:  Sure, no problem, your Honor.

1              MR. ANDERSON:  We'll put in the presentation

2    as it would have been put in, your Honor, for that record.

3              THE COURT:  That will be very good, and if at

4    any point Dr. Stewart needs to supplement his explanation, we

5    could allow him to do it in writing even if necessary so he

6    doesn't have to wait around.  Is that suitable, Mr. Allcock?

7              MR. ALLCOCK:  Absolutely, your Honor.

8              THE COURT:  Okay.  Thank you.

9              MR. ANDERSON:  Thank you, your Honor.

10             THE COURT:  Anything else, then?

11             MR. POPLAWSKI:  Not for plaintiffs, your

12   Honor.

13             THE COURT:  Thank you, Dr. Stewart, for

14   indulging us all here.

15             THE WITNESS:  Thank you, your Honor.

16             (Whereupon the witness was excused.)

17             THE COURT:  Now I think we have Ms. Kim had

18   made motions.

19             MS. KIM:  Your Honor, I have a question,

20   Ms. Penning kindly pointed out a mistake on my list,

21   Plaintiffs withdraw P1872.

22             THE COURT:  So the list you read to me earlier

23   is the same except you've withdrawn one?

24             MS. KIM:  Yes, your Honor.

25             THE COURT:  And is it all suitable,

1    Ms. Penning?

2              MS. PENNING:  No, your Honor, we have

3    objections to three exhibits.  They all relate to the nuclear

4    winter allegations and we object to these three on hearsay,

5    relevance, and 403 grounds.  I can read the numbers and we

6    can also pop them up on the screen, I'm not sure how your

7    Honor would like to rule on that.

8              THE COURT:  Let's make sure I know what I'm

9    talking about.

10              MS. PENNING:  Could you pull out P960, please.

11    Your Honor, this is the letter from Hunter Rawlings to Carly

12    Fiorina, it was on the screen with the witness for a brief

13    time but I believe the line of questioning was cut off before

14    it was ever discussed with the witness, and again, we would

15    object on hearsay, relevance, and 403 grounds.

16              THE COURT:  This was -- I'm sorry, Ms. Kim,

17    can you tell me which --

18              MR. ANDERSON:  This is the letter that Hunter

19    Rawlings sent to Carly Fiorina after the visit on site at

20    Cornell in which he discussed briefly in his testimony.

21              THE COURT:  He discussed it in his testimony?

22              MR. ANDERSON:  Correct.

23              THE COURT:  And your objection to it is?

24              MS. PENNING:  Hearsay, relevance, and 403,

25    your Honor.  And perhaps my recollection doesn't serve me

1   correctly, but I don't believe it was discussed with the

2   witness.  I believe it was put up on the screen and then your

3   Honor cut off that line of questioning.

4               MR. ANDERSON:  No, he was answering questions

5   about the beginning of the letter, and then your Honor

6   pressed the parties to move on and so he didn't answer

7   further questions, but my belief and recollection is, we

8   could check the transcript to be certain but that there was a

9   discussion of this letter.

10              MR. POPLAWSKI:  I'm sorry to interject, your

11  Honor, but at that point I believe that I was being

12  responsive to the side bar.

13              THE COURT:  I think you were too and I think

14  I'm not going to punish you for responding to my desire to

15  move more quickly so this will be admitted.  I don't perceive

16  that there's any grave prejudice or lack of relevance.

17              MS. PENNING:  Thank you, your Honor.  And my

18  apologies to the extent I misstated the record, it was

19  definitely not my intent to do so.

20              THE COURT:  No, I didn't perceive that you

21  were misstating anything, Ms. Penning.

22              MS. PENNING:  Thank you, your Honor.  The next

23  two are very similar.  The first one is P297 and these were

24  shown during the deposition of Wayne Johnson.  I -- again,

25  this is hearsay, relevance, and 403.  It is an e-mail in

1  which he recounts a conversation had with someone else in the

2  airport about impressions of the meeting that occurred on

3  April 15th, 2002.

4  　　　　　　THE COURT:  I hate e-mails but I'm not going

5  to take my personal detestation out on the parties.

6  　　　　　　MR. ANDERSON:  Document from a HP employee

7  concerning the meeting with Mr. Swieringa which he testified

8  to thus authenticating that the meeting actually occurred

9  providing a basis for its authentication.

10  　　　　　　THE COURT:  Just for my information, how much

11  do you suppose, this is not a fair question, you don't have

12  to answer if you don't want to, how much do you suppose the

13  parties spent on discovering e-mails?

14  　　　　　　MR. ANDERSON:  Your Honor, I have the

15  privilege of being on the electronic discovery task force in

16  my firm.

17  　　　　　　THE COURT:  How much do you suppose you both

18  spent on this?  Am I going overboard to say it was more than

19  a million dollars?

20  　　　　　　MR. ANDERSON:  I wouldn't be surprised, your

21  Honor.  Electronic discovery is certainly an issue.

22  　　　　　　THE COURT:  And how many documents do you

23  suppose we will have gotten out of it?  This is the only one

24  I recall right off the bat.  Are there any others?

25  　　　　　　MR. ANDERSON:  I think there are a few, I

1    think, I'm not certain.  But I understand, your Honor.

2                 THE COURT:  Could I ask another question.  You

3    would have gotten nuclear winter anyway, right?

4                 MR. ANDERSON:  Yes.

5                 THE COURT:  It would have come out in the

6    depositions and so forth.  Okay.  This is just for my

7    personal information, but I find sometime after we're through

8    with this, I'm going to, maybe I'll call you both on the

9    phone and ask you what would the chief judge of a circuit do

10   to put an end to e-mail discovery.

11                MR. ANDERSON:  You might as well consider

12   answering telephones as well, your Honor, at the same time.

13                THE COURT:  Well, I'd be really anxious to

14   know what we could do.  I understand the other side of it,

15   that now and then somebody discovers something that's really

16   important, but I wonder, even if we gauge all the economics

17   of that, if it's even those occasional discoveries are worth

18   the expense.  But I'll admit this as it was part of the

19   presentation.  Is that -- you had one other, Ms. Penning,

20   that you objected to?

21                MS. PENNING:  Your Honor, it's so similar,

22   I'll withdraw the objection.

23                THE COURT:  All right, fine.  So all of

24   Ms. Kim's proffered evidence is admitted?

25                MS. KIM:  Thank you, your Honor.  May I give

1    the videos.

2                    THE COURT:  You had the two demonstratives?

3                    MS. KIM:  Video.

4                    THE COURT:  Those were the video depositions,

5    Ms. Penning.

6                    MS. PENNING:  Will they go back to the jury,

7    your Honor, or are they just for the record?

8                    THE COURT:  They're for the record.

9                    MS. PENNING:  No objection, your Honor.

10                   THE COURT:  Okay, thank you, Ms. Penning.  You

11   have some things to read to me too?

12                   MS. PENNING:  I do, from yesterday.  With

13   Dr. Smith we have those DDX exhibits, the demonstratives,

14   they were DDX33 through 41 and DDX63 through 69, plaintiffs

15   have now been provided with a binder of all the DDX exhibits

16   and so hopefully there will be no objection to those.

17                   THE COURT:  Why don't you read through them

18   and then I'll ask Ms. Kim if she has any exhibits.

19                   MS. KIM:  Exhibits from yesterday, the

20   demonstrative exhibits from yesterday, we don't have any

21   objections.

22                   THE COURT:  They're admitted for the record.

23                   MS. PENNING:  Okay.  From today, we have, with

24   Mr. Stewart we have DDX44, DDX70, DDX72, DDX73, DDX74, we

25   have D478, D484.  With Mr. Rappaport we have P523.  With

1    Mr. Lesartre we have DDX17, DDX18, DDX47, DDX48, DDX50,

2    DDX45, DDX78, DDX51, and P436.  The rest that were used with

3    him were admitted previously, your Honor.

4                    THE COURT:  Ms. Kim, any objections?

5                    MS. KIM:  We have no objections, but one more

6    thing, your Honor.  Plaintiffs would like to submit into

7    evidence the slides used in its case in chief, both opening

8    slides and other presentations that we --

9                    THE COURT:  A slide that what?

10                   MS. KIM:  PowerPoint presentations that we

11   used.

12                   THE COURT:  Oh, in the opening statements.

13                   MS. KIM:  And also with the witnesses.

14   Unfortunately we don't have copies for the court now, and

15   we'll provide that as soon as possible.

16                   THE COURT:  Why don't the parties look at

17   those and see if there's anything there, that strikes me

18   there might be a few things that have been excluded.

19                   MS. KIM:  We will make sure.

20                   MR. POPLAWSKI:  That's correct, your Honor, we

21   did remove two slides from Dr. Smith's presentation that were

22   findings as to ordinary skill in the art so those of course

23   will not be presented.

24                   THE COURT:  Then in that case, I don't expect

25   I'll get any objection but why don't we give everybody a

1    chance to look at it, and meantime I did accept all of your

2    proffers for the record, didn't I, Ms. Penning?

3                    MS. PENNING:  Yes, thank you, your Honor.

4                    THE COURT:  Okay, fine.  Where we at?

5    Anything else?

6                    MR. ALLCOCK:  I think we're done for today.

7                    THE COURT:  Okay, then let's remind ourselves

8    we're going to meet tomorrow at 10, I think the doors don't

9    open until 9:30, is that right?

10                   COURT SECURITY OFFICER:  Correct.

11                   THE COURT:  But we'll meet here at around 10,

12   and our agenda is primarily to decide what we're going to

13   instruct the jury.  I'll indulge you whatever else you want

14   to talk about for as long as I can stand it.  And there's no

15   dress code, so you're welcome to come as comfortably as you'd

16   like.  Anything else tonight?  Thanks.

17                   MR. ALLCOCK:  Have a great night, your Honor.

18                   THE COURT:  Thank you.

19                   (6:05 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4              I, JODI L. HIBBARD, RPR, CRR, CSR, Official

5    Court Reporter in and for the United States District Court,

6    Northern District of New York, DO HEREBY CERTIFY that I

7    attended the foregoing proceedings, took stenographic notes

8    of the same, and that the foregoing is a true and correct

9    transcript thereof.

10

11

12

13

14

15

16

17                        _____

18                        JODI L. HIBBARD, RPR, CRR, CSR
                          Official U.S. Court Reporter
19

20

21

22

23

24

25