Edward G. Poplawski
Bryan K. Anderson
Denise L. McKenzie
Sandra S. Fujiyama
Olivia M. Kim
**SIDLEY AUSTIN LLP**
555 West Fifth Street
Los Angeles, CA  90013-1010
Telephone:  (213) 896-6601
Facsimile:  (213) 896-6600

Attorneys for Plaintiffs/Counterdefendants
    Cornell University and Cornell Research
    Foundation, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORNELL UNIVERSITY, a non-profit New York corporation, and CORNELL RESEARCH FOUNDATION, INC., a non-profit New York corporation,<br><br>                    *Plaintiffs,*<br><br>          v.<br><br>HEWLETT-PACKARD COMPANY, a Delaware corporation,<br><br>                    *Defendant.* | Civil Action No.:  01-CV-1974-RRR-DEP<br><br>**CORNELL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FEES AND COSTS UNDER 35 U.S.C. § 285** |
| HEWLETT-PACKARD COMPANY, a Delaware corporation,<br><br>                    *Counterclaimant,*<br>          v.<br><br>CORNELL UNIVERSITY, a non-profit New York corporation, and CORNELL RESEARCH FOUNDATION, INC., a non-profit New York corporation,<br><br>                    *Counterdefendants.* | Judge:         Hon. Randall R. Rader<br>Hearing:       TBD |

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.  INTRODUCTION. ...................................................................................................1

II. HP'S PERVASIVE PATTERN OF LITIGATION MISCONDUCT ..............................2

   A.  Stage 1:  HP's Nuclear Winter Visit To Cornell To Intimidate Cornell Into Dropping The Lawsuit. ...........................................................................2

      1.  HP Devised Its Nuclear Winter Meeting Days After The Lawsuit Was Filed. ..............................................................................3

      2.  HP Disguised Its April 15, 2002 Nuclear Winter Visit As A Meeting To Discuss HP's University Relations Program..........................3

      3.  HP's Actions After The Nuclear Winter Meeting Further Confirm Its Plan To Intimidate................................................................4

      4.  HP's Actions Failed To Accomplish Its Objective, But Nonetheless Caused Unrest And Hardship For Cornell. ...........................4

   B.  Stage 2:  Vexatious Litigation Tactics. ................................................5

      1.  HP's Improper Withholding of Schematics – Basic Infringement Discovery. ..............................................................................6

      2.  HP's Improper Withholding Of Financial Information – Basic Damages Discovery. .............................................................10

      3.  HP Withheld Customer Information – Basic Infringement And Damages Discovery. .............................................................12

      4.  HP Withheld Agreements With IBM And Intel – Basic Patent Exhaustion Discovery. ...........................................................14

         a.  IBM.................................................................................14

         b.  Intel. ..............................................................................15

   C.  HP's Nine Million Page Document Dump At The Close Of Discovery. .............17

   D.  HP Repeatedly Misled The Jury As To The Court's Claim Construction And The Test For Infringement ...............................................................18

III. CORNELL IS ENTITLED TO CERTAIN FEES AND COSTS UNDER 35 U.S.C. § 285.................................................................................................20

IV.    CORNELL IS ENTITLED TO EXPERT WITNESS FEES DUE TO HP'S
       LITIGATION MISCONDUCT. .......................................................................................25

V.     CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)............................................................................18

*Amsted Indus., Inc. v. Buckeye Steel Castings Co.*,
    23 F.3d 374 (Fed. Cir. 1994)............................................................................20

*Beckman Instruments, Inc. v. LKB Produkter AB*,
    892 F.2d 1547 (Fed. Cir. 1989)....................................................................2, 21

*Cargill, Inc. v. Sears Petroleum & Transport Corp.*,
    388 F. Supp. 2d 37 (N.D.N.Y. 2005)..................................................21, 22, 23, 24

*Central Soya Co. v. George A. Hormel & Co.*,
    723 F.2d 1573 (Fed. Cir. 1983)............................................................................20

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)............................................................................25

*Cornell Univ. v. Hewlett-Packard Co.*,
    313 F. Supp. 2d 114 (N.D.N.Y. 2004)..................................................16, 20

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    534 F. Supp. 2d 224 (D. Mass. 2008)..................................................24, 25

*FMT Corp. v. Nissei ASB Co.*,
    No. 1:90-CV-786-GET, 1993 U.S. Dist. LEXIS 19625 (N.D. Ga. Sept. 27, 1993)...............21

*Hodge v. Hodge*,
    269 F.3d 155 (2d Cir. 2001)............................................................................2

*Kloster Speedsteel AB v. Crucible Inc.*,
    793 F.2d 1565 (Fed. Cir. 1986), *overruled on other grounds by Knorr-Bremse*
    *Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) ...........21

*Mathis v. Spears*,
    857 F.2d 749 (Fed. Cir. 1988)............................................................................20

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems Gmbh*,
    No. 98-cv-01072-RPM, 2008 WL 410413 (D. Colo. Feb. 12, 2008)......................................23

*Nikko Materials USA, Inc. v. R.E. Serv. Co.*,
    No. C 03-2549 SBA, 2006 U.S. Dist LEXIS 3750 (N.D. Cal. Jan. 13, 2006) .......................20

LA1 1526109v.1

*Rohm & Haas Co. v. Crystal Chem. Co.,*
  736 F.2d 688 (Fed. Cir. 1984)...............................................................................21

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.,*
  549 F.3d 1381 (Fed. Cir. 2008)........................................................................20, 25

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.,*
  231 F.3d 1339 (Fed. Cir. 2000).............................................................................21

## STATUTES

28 U.S.C. § 1920..........................................................................................................20

28 U.S.C. § 1821(b)......................................................................................................20

35 U.S.C. § 285..................................................................................................... passim

## RULES

F.R.C.P. 54(d)..............................................................................................................20

LA1 1526109v.1

# I.    INTRODUCTION.

When Cornell commenced this litigation, it fully expected to incur substantial legal expenses to prosecute the action.  What Cornell did not anticipate is that Hewlett-Packard's ("HP") abusive litigation tactics would escalate these expenses many times over what would have otherwise been necessary to reach a just result.  HP's objective in this effort was clear – coerce Cornell to drop this patent suit, or at least enable HP to settle the claims significantly under value by exhausting Cornell's will to litigate.  As part of that effort, HP successfully delayed trial until after the patent expired (February 2006) and thereby avoided an injunction or other alteration to its plan for the litigation.  HP's conduct went far beyond zealous advocacy.  Cornell respectfully submits that HP crossed the line into vexatious abuse of the judicial process.

HP's abusive tactics began at the outset of this case.  In April 2002, HP made a visit to Cornell (*i.e.*, the "nuclear winter" visit) with the specific intent of driving Cornell into submission through intimidation tactics, threatening withdrawal of research funding and refusal to hire Cornell students (who are third parties with absolutely nothing to do with the litigation).

When that tactic failed, HP focused on hiding the ball during discovery and driving up litigation costs as much as possible.  Pretrial discovery and motion practice spanned more than six years since this litigation commenced in December of 2001.  Throughout this protracted litigation, HP engaged in a pattern of deliberate and repeated obstruction and obfuscation in transparent disregard of the judicial and discovery process.  HP's litigation tactics forced Cornell and the Court to engage in countless and unnecessary motions for basic discovery.[1]  Even after the Court issued numerous orders compelling HP to provide the requested discovery, HP defiantly violated several

---

[1] Such discovery should have been provided under HP's Rule 26 obligations and pursuant to legitimate discovery requests under Rule 33 and Rule 34.  In total, Cornell was driven to file more than two dozen motions, the vast majority of which were substantially granted in Cornell's favor.  (*See, e.g.*, Dkt. Nos. 36, 91, 145, 256, 336, 367, 369, 377, 378, 396, 402, 448, 597, 602 and 605.)  Additionally, Cornell had to oppose numerous unmeritorious motions for reconsideration and objections to the Court's orders filed by HP, which materially prolonged this litigation.  (*See* 01/09/04 Motion for Reconsideration (Dkt. No. 200); 10/11/05 Objections to 9/26/05 Order (Dkt. No. 453); 01/10/06 Motion for Clarification of 01/03/06 Order (Dkt. No. 548); 11/27/06 Request for Clarification of 11/13/06 Order (Dkt. No. 769); 5/31/07 Objections to 05/16/07 Order (Dkt. No. 802).)

of the Court's orders and was sanctioned by the Court.  In addition, just months before the close of fact discovery, HP dumped millions of pages of documents on Cornell.

HP's pattern of misconduct unnecessarily multiplied the costs of litigation and delayed trial in this matter for years.  When viewed in the totality of the circumstances, HP's litigation tactics were vexatious and amount to litigation misconduct.  Cornell has been harmed by HP's litigation misconduct on numerous levels ranging from the duress suffered by Cornell's deans and professors, to the unnecessary additional financial burden, and to the loss of an injunction remedy.  In view of HP's pervasive pattern of litigation misconduct and vexatious litigation tactics, Cornell respectfully requests a judicial determination[2] that this case constitutes an exceptional case under 35 U.S.C. § 285 and seeks an award, based thereon and based on the Court's inherent power, of partial attorney's fees, costs and expert fees.[3]

## II.    HP'S PERVASIVE PATTERN OF LITIGATION MISCONDUCT

### A.    Stage 1:  HP's Nuclear Winter Visit To Cornell To Intimidate Cornell Into Dropping The Lawsuit.

Shortly after Cornell filed the lawsuit, HP devised the first phase of its plan to coerce Cornell into dropping the lawsuit.  HP's plan involved making direct contact with Cornell deans and professors to discuss the lawsuit, even though these Cornell employees had no involvement with the lawsuit, and to threaten them with dire consequences akin to "nuclear winter" if Cornell did not drop the lawsuit.  HP moved forward with this plan, with the apparent knowledge and approval of its attorneys and with the full knowledge of a direct report to HP's CEO, knowing (1) that Cornell, on multiple occasions, had told HP that any communication related to the dispute be directed to

---

[2] Given Magistrate Judge Peebles' in-depth familiarity with the parties, the issues in dispute, and litigation tactics employed, which was obtained while overseeing this litigation for more than five years, the Court may find it helpful to refer Cornell's Motion for Partial Fees and Costs to Magistrate Judge Peebles for issuance of a report and recommendation.  *Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1552 & n. 1 (Fed. Cir. 1989) (deferring to the opinion of the judge "who was actively involved in the proceedings" and hence in the "best position" to monitor litigation strategy and find bad faith).

[3] On April 10, 2009, HP filed a notice of appeal from the Court's March 31, 2009 judgment.  (Dkt. No. 1100.)  This Court retains jurisdiction to determine the present motion.  *Hodge v. Hodge,* 269 F.3d 155, 157 n.4 (2d Cir. 2001) ("the filing of a notice of appeal does not divest the district court of jurisdiction to decide any of the postjudgment motions listed in *Fed. R. App. P. 4(a)(4)(A),* if timely filed.").

Cornell counsel, and, perhaps more disturbingly, (2) that such contact was inappropriate because the litigation had commenced with both sides being represented by outside counsel.

### 1. HP Devised Its Nuclear Winter Meeting Days After The Lawsuit Was Filed.

HP personnel involved in University Relations and Recruiting discussed precisely the prospect of a "nuclear winter" type meeting and memorialized that discussion in a January 8, 2002 email. (Ex. 1,[4] HP 264683-84.) Dan Marcek, who was copied on this email stream, testified that the first action he took in advance of the April 15, 2002 nuclear winter meeting was at the direction of counsel. (Ex. 2, 05/26/06 Marcek Dep. Tr. at 69:2-23.) This testimony directly from an HP official – undeniably demonstrating that HP pursued the "nuclear winter" strategy at the behest of counsel – rather clearly reveals that HP and its attorneys concocted the tactic in an effort to circumvent Cornell's counsel and short circuit the litigation.

### 2. HP Disguised Its April 15, 2002 Nuclear Winter Visit As A Meeting To Discuss HP's University Relations Program.

Wayne Johnson of HP went to Cornell on April 15, 2002, a few months after this lawsuit was filed, and threatened deans, professors, and students with "nuclear winter." (05/23/08 PM Trial Tr. (Dkt. No. 1037) at 121:21-122:2; *see also id.* at 132:15-147:3, testimony of Dr. Hunter Rawlings.) Mr. Johnson testified that HP's true intention at the April 2002 meeting – to intimidate and threaten Cornell – was approved by his immediate supervisor, Dick Lampman, who reported directly to HP's then CEO, Carly Fiorina. (*Id.* at 17:10-21; 17:22-18:11; 124:23-125:3.) He also confirmed use of the term "nuclear winter" in a discussion the following year with Mr. Severson (who was by that time no longer employed by CRF), and he told Mr. Severson that Ms. Fiorina had instructed him to make the visit to Cornell and threaten nuclear winter. (Ex. 3, 01/27/06 Severson Dep. Tr. at 158:6-160:12.)

Prior to the April 2002 meeting, HP did not inform Cornell of its intention to discuss the lawsuit. (Ex. 4, 01/24/06 Johnson Dep. Tr. at 74:14-18, 74:21.) Rather, HP's stated purpose was to "explain HP's emerging university relations program." (Ex. 8, HP 264689-690.) Cornell

---

[4] All exhibits are attached to the accompanying Declaration of Olivia M. Kim.

assembled representatives appropriate for the agenda, which did not include anyone in charge of the litigation, and proceeded in good faith with the meeting.  (Ex. 4, 01/24/06 Johnson Dep. Tr. 118:2-6, 118:9.)

### 3.  HP's Actions After The Nuclear Winter Meeting Further Confirm Its Plan To Intimidate.

An email from Jim Cooper to Mr. Johnson further confirmed that HP's purpose for the April 15, 2002 visit was to influence the outcome of the litigation by threatening a "nuclear winter" of consequences if the lawsuit did not go away – a blatant gambit to get Cornell's faculty to influence the lawsuit.  (P-297, HP 264675; *see also* 05/23/08 PM Trial Tr. (Dkt. No. 1037) at 127:3-130:6 (Swieringa).)   The email stated, "[Dean] Constable is the best champion we have, based on this trip."  (*Id.*)  In essence, Mr. Cooper confirms that HP was looking for Cornell faculty that it could use to influence the lawsuit with Cornell.   HP remained engaged in searching for additional "champions" after this meeting.  Mr. Lampman identified another potential individual to contact within Cornell, Vice Provost Robert Richardson.  Mr. Johnson informed Mr. Lampman that he was aware of Mr. Richardson from his discussion with Dean Constable during the April 15, 2002 visit – and that they both would be part of the core group that would play right into HP's hand by "recommend[ing] withdrawing from the current action."   (Ex. 5, HP 264695.)  The fact that HP devised this strategy at the direction of counsel makes the conduct all the more troubling, particularly given the fact that they attempted to influence management level representatives of the University, knowing that the University was represented by both outside and in-house counsel.

### 4.  HP's Actions Failed To Accomplish Its Objective, But Nonetheless Caused Unrest And Hardship For Cornell.

Although Cornell did not succumb to HP's threats, HP's visit negatively impacted Cornell's personnel.  For example, Mr. Komanecky, Cornell's Director of University Corporate Relations, sent out an email to the attendees after the meetings noting that, unbeknownst to him, HP's "objective or ploy if you will, was to encourage you and me to influence the lawsuit or experience a loss of a relationship with HP" and apologizing for any discomfort it may have caused.  (Ex. 6, CR 0315469.)  Tony Ingraffea, Chair of the Faculty Committee on Minority Education and attendee of

one of the nuclear winter meetings, sent a memo to the President of Cornell, Hunter Rawlings, conveying HP's "nuclear winter" message and questioning the President on whether the University "properly weighed the risks of lost income and lost opportunity."  (Ex. 7, CR 0315470.)

Not only were HP's actions inappropriate and offensive in and of themselves, but also because HP made the decision to pursue the strategy during the pendency of the litigation and after having been told on numerous occasions that communications should proceed between the attorneys.

### B.    Stage 2:  Vexatious Litigation Tactics.

Failing to succeed with its nuclear winter strategy, HP embarked on a different strategy – the use of abusive and vexatious litigation tactics that foreseeably would and in fact did increase fees, delay the litigation, and obstruct Cornell's efforts to prove its case.  Beginning as early as 2002, HP denied Cornell access to fundamental and necessary discovery related to infringement, damages and HP's defense of patent exhaustion claiming alternatively and inconsistently that HP does not have the information, the information was irrelevant, or that it cost too much to obtain the requested information.[5]  And, as a result of HP's ever-shifting positions, Cornell was driven to file numerous motions and expend significant fees and costs in unnecessary proceedings for over four years in Cornell's legitimate effort to obtain highly relevant information.  In some cases, even after HP was ordered to provide crucial and fundamental discovery, HP knowingly disobeyed the Court's orders or delayed compliance by filing meritless motions for reconsideration.  Finally, after several years of discovery, on the eve of the completion of fact discovery, and after it could delay and withhold no longer, HP and its counsel made one last stab at obfuscation – by dumping nine million pages of

---

[5] The Court noted in its November 13, 2006 Discovery Order that:  "To be sure, discovery in this case has been arduous, and HP's compliance with discovery plaintiffs' requests and positions taken in the case have been checkered, and to some degree contradictory [*e.g.*, HP's position on whether it sells processors]."  (Dkt. 743 at 75.)  The Court also noted that it was through Cornell's and the Court's efforts that the extent and nature of the financial information maintained by HP was revealed.  (*Id.* at 36 ("The question of the extent and nature of financial information maintained by HP regarding the same of products consisting of or including within them the accused processors has haunted this action.  Ever so slowly, with persistent prodding by plaintiffs and the court, a clearer picture has evolved with respect to HP's capabilities in this regard.").)

documents on Cornell after key depositions of record custodians and fact witnesses alike had been concluded.

As set forth in detail below, HP employed these litigation tactics repeatedly with respect to basic and fundamental discovery such as (1) the schematics – fundamental to the issue of infringement, (2) financial information – fundamental to the issue of damages, (3) customer information – fundamental to both infringement and damages, and (4) manufacturing agreements – fundamental to patent exhaustion and implied license.  The basic nature of the discovery withheld and the number of different areas that were impacted demonstrate a pattern of vexatious litigation conduct driven by HP's desire to increase fees and costs and delay the case.  This pattern cannot be explained away as zealous advocacy, or even simple inadvertence, because it affected key issues in the case to which much litigant time as well as judicial time was devoted.

### 1.     HP's Improper Withholding of Schematics – Basic Infringement Discovery.

From 2002 through 2005, HP deliberately withheld schematics and thwarted Cornell's analysis of them, although as early as December 9, 2003 Magistrate Judge Peebles noted that the schematics are "critical to the issue of infringement"[6] and that Cornell's request for them was "not challenged per se by HP."  (Dkt. No. 198.)   HP knew that ultimately relatively few of the voluminous schematics were important and that its searchable electronic files were a key to identifying them.   HP also knew which schematics dealt with the dependency detection and reservation circuit features of the above processors.  Yet, from 2002, HP withheld the searchable electronics copies of these schematics and declined to work with Cornell to narrow down the schematics to a sufficiently representative list.  (Ex. 9, 11/07/02 ltr. to J. Allcock from D. McKenzie & 04/29/03 ltr. to S. Fujiyama from S. Brown.)  Rather, HP forced Cornell to (1) engage in a "needle in the hay stack" exercise analyzing voluminous hard copies of schematics (a number of which were incomplete and illegible), (2) obtain multiple Court orders directing HP to produce schematics and deponents and comply with earlier orders, (3) repeat discovery and redo prior

---

[6] HP's technical expert, Dr. Swartzlander, testified at trial that they were very important.  (05/27/08 PM Trial Tr. (Dkt. No. 1041) at 211:8-12.)

analysis by Cornell's expert, Dr. Smith, and (4) incur additional cross-country travel by Dr. Smith and counsel after the Court granted Cornell further access to the schematics.

HP has a separate set of schematics for each PA-8000 family of processors.[7]  (Ex. 10, Dkt. No. 396, 07/28/05 ltr. to J. Peebles from E. Poplawski.)  Each set of schematics also contains revised schematics that reflect different versions or revisions (*e.g.*, Revision 1.3 is one such revised set for the PA-8000) made to that family member.[8]  (*Id.*)

In 2002, Cornell requested access to the electronic files of the schematics.  (Ex. 9, 11/07/02 ltr. to J. Allcock from D. McKenzie.)  Yet, unlike what other accused infringers typically do, HP declined to make available to Cornell its searchable electronic schematic files and to narrow down the schematics to a representative list.  Instead, HP told Cornell that hard copies were sufficient and produced nearly 6,000 hard copy schematic pages to Cornell.  (*See* Ex. 18, 01/18/05 ltr. to D. McKenzie from L. Vaughn.)  HP maintained that no documentation existed for the schematics – no written schematic descriptions, no glossary of schematic terms, and no history of changes.  (Ex. 9, 11/07/02 ltr. to J. Allcock from D. McKenzie & 11/08/02 ltr. to D. McKenzie from S. Brown.)  Cornell and Dr. Smith spent the time-consuming task of reviewing the hard copies of the schematics, only to find that key parts of many of the schematics were indecipherable and incomplete.  (*Id.*, 12/10/02 ltr. to L. Vaughn from D. McKenzie & 12/30/02 ltr. to L. Vaughn from D. McKenzie.)  For example, when viewing the schematics, it was difficult to decipher signal names and logic block names.  (*Id.*)  In some cases, these names were actually printed on top of other print and the identifying descriptions for the electronic circuitry had inexplicably been over-printed within the circuitry.  (*Id.*)  Consequently, Cornell expended an extensive amount of time and effort deposing HP's engineers about these unsatisfactory substitutes for the electronic files.

---

[7] The PA-8000 family of processors consists of the PA-8000 and its subsequent members, such as the PA-8200, PA-8500, PA-8600, PA-8700, PA-8750, PA-8800 and the PA-8900.

[8] It is noted that Cornell requested a complete set of schematics, including all revisions and versions, because each separate set of schematics contains written notes and comments concerning the hardware and there were no assurances that even the latest version of the schematics captured all those notes and comments contained in earlier versions.  (Ex. 9, 01/25/05 ltr. to J. Allcock from D. McKenzie.)  Cornell also requested a complete set of schematics because HP's engineers (Lotz and Hunt) had testified that hardware may differ among the accused processors.  (*Id.*)

7

Thus, Cornell again requested access to the electronic files of the schematics in order to perform a thorough and complete analysis of the schematics.  (*Id.*; *see also* Dkt. No. 91.)  Cornell also expected that the electronic files would permit it to identify the critical schematics, confirm that the hard copy schematics contained the entire contents of the files, and to ascertain whether the electronic files contained helpful comments and annotations regarding the schematics.  (*Id.*)

HP continued to block Cornell's access to the electronic files of the schematics.  (Ex. 9, 04/29/03 ltr. to S. Fujiyama from S. Brown.)  HP contended that Cornell's access to the electronic files "would be over someone's dead body or an order of the Court."  (Ex. 11, Dkt. No. 115, 05/14/03 Hrg. Tr. at 129:5-10.)  Cornell did obtain such an order, a Court Order directing HP to allow Cornell and Dr. Smith eight hours of access to HP's electronic schematic files.  (Dkt. No. 198, 12/09/03 Order.)  HP's disregard of that order drove Cornell to obtain yet another order, the October 21, 2004 Order directing HP to allow Cornell additional access to the electronic files and a further deposition of Mr. Lotz.  (Dkt. No. 326.)  The second order also made it clear that HP **"shall be required to produce all schematics"** for PA-8000 family processors.  (*Id.* at 15.)

Yet, even this second order from the Court did not deter HP's cavalier manipulation of the discovery process.  On November 29, 2004 (the very eve of the date on which Plaintiffs' counsel and their expert were scheduled to inspect the electronic files in Colorado),[9] HP dumped on Cornell six (6) boxes of schematics (over 4,700) that it had not previously produced.  (Ex. 9, 11/29/04 ltr. to S. Fujiyama from E. Cuevas.)  HP revealed to Cornell that even with this document dump HP had still not produced all of the schematics, despite the Court's October 21, 2004 Order to do so.  (*Id.*)  HP also gave Cornell no assurance that these dumped schematics were captured in the electronic files that Dr. Smith had reviewed earlier.  Finally, HP revealed in 2005 that it had actually destroyed the latest version (Revision 3.1) of the schematics for the PA-8000 processor (*i.e.*, the first family member) and equivocated as to the "availability" of other versions of schematics for PA-8000 family members.  (Ex. 10, Dkt. No. 396, 07/28/05 ltr. to J. Peebles from E. Poplawski.)  HP's

---

[9] Dr. Smith explained at trial how his review of the electronic schematic files at HP helped him "to see everything that was important" and selectively print out copies of schematics while on site at HP.  (05/22/08 PM Trial Tr. (Dkt. No. 1035) at 189:7-190:2.)

surprising revelations came over a year and a half after HP had told Cornell and the Court that it had given Cornell **all** of the schematics and after Cornell had already conducted depositions and a detailed analysis of thousands of hard copy schematics pages.  At this late date in discovery, Dr. Smith was again required to review and analyze schematics, this time the newly produced hard copies of schematics that should have been produced in 2003 had HP complied with its discovery obligations and after Cornell already deposed HP's engineers, Messrs. Lotz and Lesarte, on the schematics.  Cornell then obtained a third Court order (Dkt. No. 446, 09/26/05 Order at 3-4) directing HP to produce various schematics and allowing Cornell to depose these engineers again (which Cornell did).

A brief summary of HP's resistance to producing all of the schematics that were critical to the issue of infringement is detailed below:

- On April 5, 2002, Cornell requests documents concerning technical specifications, drawings and schematics, specifically electronic files.  (Kim Decl. at ¶ 3.)

- On November 8, 2002, HP produces over 6,000 schematics in hard copy form and falsely represents that it produced all schematics.  (Ex. 9, 11/08/02 ltr. to D. McKenzie from L. Vaughn.)

- On March 14, 2003, Cornell is forced to file a motion to compel to obtain relevant schematics.  (Dkt. No. 91.)

- As of April 29, 2003, HP continues to block Cornell's access to the electronic files of the schematics.  (Ex. 9, 04/29/03 ltr. to S. Fujiyama from S. Brown at p. 6.)

- On May 9, 2003, Cornell is forced to file another motion to compel in light of HP's obstruction of discovery relating to schematics.  (Dkt. No. 185.)

- On December 9, 2003, Court orders HP to make available electronic files of schematics and other technical data.  (Dkt. No. 198.)

- On October 21, 2004, Court orders HP to produce all schematics.  (Dkt. No. 326.)

- On November 29, 2004, on the eve of the mutually agreed production date of December 1, 2004 for Cornell's second review of HP's electronic files, HP produces over 4,700 schematics with a letter stating that it has not yet produced all of the schematics.  (Ex. 9, 11/29/04 ltr. to S. Fujiyama from E. Cuevas.)

- On January 18, 2005, HP reveals that it in fact destroyed at least one revision of the schematics.  (Ex. 9, 01/18/05 ltr. to D. McKenzie from L. Vaughn.)

- On September 26, 2005, the Court orders HP to produce various schematics and its engineers for further depositions on schematics. (Cornell takes depositions of Messrs. Lotz and Lesarte on December 21, 2005 and December 22, 2005.)

9

- Cornell's expert, Dr. James E. Smith, spent a significant fraction of the 1,100 hours working on this case reviewing schematics produced by HP.  (05/22/08 AM Trial Tr. (Dkt. No. 1034) at 18:8-18:17.)

As a direct result of HP's tactics in obstructing electronic access and misrepresenting its hard copy production for nearly three years, Cornell was forced to expend a tremendous amount of unnecessary fees and costs evaluating inadequate/incomplete hard copies of schematics and the proceedings in the case were unnecessarily delayed for years.

> **2.     HP's Improper Withholding Of Financial Information – Basic Damages Discovery.**

HP also forced Cornell to engage in a long and expensive discovery battle to obtain HP's financial information, particularly HP's revenues associated with its sale of accused products.  Had HP been forthcoming from the beginning, Cornell and the Court would not have been required to expend the substantial costs and efforts required to obtain fundamental financial information.  As with the schematics, Cornell's efforts began in 2002.  To summarize briefly,

- <u>December 4, 2002</u>:  HP provides a one-line chart with "Net Income on HP PA-8XXX" processors, even though HP at the time claimed that it does not sell processors.  Despite written discovery seeking this information, HP provides no explanation for how the net income numbers were calculated and no documents that were used in arriving at those artificial net income numbers.  (Ex. 12, HP's Fourth Supp. Response to CRF Rog 6 at p. 7.)

- <u>February 12, 2003</u>:  HP revises its chart to reflect purported "HP PA-8XXX Revenue," but still fails to provide an explanation and supporting documentation.  (Ex. 13, HP's Sixth Supp. Response to CRF Rog 6 at 7-8.)

- <u>March 14, 2003</u>:  Cornell files a Motion to Compel the production of this basic financial information.  (Dkt. No. 91.)

- <u>May 14, 2003</u>:  At the hearing on Cornell's Motion to Compel, HP's counsel admits that HP does not sell processors, but refuses to acknowledge that the revenue information provided in HP's charts are derived from server and workstation revenue and cost information.  (Ex. 11, Dkt. No. 115, 05/14/03 Tr. at 46:18-47:19, 67:13-69:23.)  The Court suggests that a 30(b)(6) deposition be taken to obtain an explanation on how the artificial processor revenue information was concocted.

- <u>August 30, 2003</u>:  Cornell takes a 30(b)(6) deposition, pursuant to the Court's suggestion.  HP's designee, Mr. Gonzales, testifies that the information in the charts are in fact derived from server revenue and cost information, completely undermining the position taken by HP during the discovery hearing.  However, HP continues to refuse to produce the server revenue and cost information on which HP's calculations are based.  (Ex. 14, 08/20/03 Gonzales Dep. Tr. at 123:10-13; 126:18-128:9.)

10

- September 23, 2003:  At an in-person hearing, HP again represents that it does not sell processors and as a result HP does not have revenue information reasonably attributable to the processors (*i.e.*, ostensibly admitting that the artificial processor revenue information that HP previously produced was unreliable).  (Ex. 15, 09/23/03 Hrg. Tr. at 57:7-10.)  After Cornell raises the issue with the Court, HP's counsel agrees to produce the server financial documents on which the calculations are based.  (*Id.* at 58:1-60:13.)

- September 26, 2003:  HP produces two pages of what appear to be P&Ls for its UNIX server line for fiscal years 1997-2002.

- December 9, 2003: The Court issued an Order granting Cornell's Motion to Compel and rejecting HP's disingenuous excuses for refusing to produce basic financial information, finding that:

> [HP] clearly must have readily available to it, and therefore could easily provide to CRF, information which could be used to assist the plaintiffs in verifying or discounting the information already provided by HP and, if necessary, to make their own calculations based upon the actual sales by HP of product containing the accused processors.

(Dkt. No. 198, 12/09/03 Order at 21.)

Even though the Court ordered HP to produce basic financial information (Dkt. No. 198, 12/09/03 Order at 13-30), HP continued to resist providing the information by filing a motion for reconsideration.[10]  Further, any information HP did provide was incomplete and demonstrably fabricated, eventually forcing Cornell to file more discovery motions.  (*See, e.g.*, Dkt. Nos. 247, 256, 369, 377, 535, 597, 602, 605 and 627.)  In addition, the Court eventually ordered an evidentiary hearing to allow Cornell to cross-examine HP personnel in court with judicial supervision on the availability of basic financial information.  This, of course, further delayed discovery and necessitated another expensive cross-country trip by counsel for Cornell.

As a result of the evidentiary hearing on December 16, 2004, Cornell learned about various electronic databases (*e.g.*, Xpress2) and documents (*e.g.*, the Order and Configuration Guides) that contained HP's basic financial information (Dkt. No. 333).  The Court issued an additional order on

---

[10] In many of its submissions, HP has pressed arguments previously made and rejected by the court, often on more than one prior occasion.  For example, HP has filed no less than five motions for reconsideration and/or objections to the Court's orders, all of which have been denied.  (*See* 01/09/04 Motion for Reconsideration (Dkt. No. 200); 10/11/05 Objections to 9/26/05 Order (Dkt. 453); 01/10/06 Motion for Clarification of 01/03/06 Order (Dkt. No. 548); 11/27/06 Request for Clarification of 11/13/06 Order (Dkt. No. 768); 5/31/07 Objections to 05/16/07 Order (Dkt. No. 804).)

October 11, 2005 (Dkt. No. 448) compelling HP once again to produce financial information as maintained in the ordinary course of its business in these electronic databases and based on the information from the Order and Configuration Guides.  It is this information that served as the basis for the damages computations put forth by HP's expert, yet HP blocked Cornell's access to it for more than three years.

Subsequently on November 13, 2006, as a result of HP's apparent failure to comply with the Court's previous orders, the Court further ordered HP to certify that it had complied with such orders.  (Dkt. No. 743 at 31-36.)  Incredibly, HP then produced more financial documents before certifying pursuant to the Order.

But for HP's conduct, clearly designed to obstruct Cornell's discovery of highly relevant financial information, to delay trial in this matter, and to escalate the costs of litigation in a further attempt to exhaust Cornell's will to prosecute this action, Cornell would not have incurred such substantial fees and costs in prosecuting this patent suit for more than six years.  Moreover, the resulting delay effectively denied Cornell's statutory right to obtain injunctive relief for HP's continued infringement of the '115 patent prior to its expiration in 2006.  Indeed, countenancing such behavior now would send a clear message to HP (and others) – abusive litigation tactics designed to delay and frustrate the prosecution of a claim in fact work and can be pursued with impunity.

> **3.      HP Withheld Customer Information – Basic Infringement And Damages Discovery.**

Cornell went through the same procedure to obtain basic discovery on HP's customers.  For instance, after a series of unsuccessful "meet and confer" sessions from Fall 2002 to early 2003, Cornell was driven to file numerous motions and expend significant fees and costs in unnecessary proceedings for over two years in Cornell's legitimate effort to obtain highly relevant information relating to HP's customers.  (Dkt. No. 367.)

- On March 27, 2002, Cornell requests customer discovery.  (Kim Decl. at ¶ 2.)

- On March 14, 2003, due to HP's refusal to provide the requested discovery voluntarily, Cornell is forced to file motion to compel.  (Dkt. No. 91.)

- On May 9, 2003, due to HP's refusal to provide customer and other damages discovery, Cornell is forced to file another motion to compel.  (Dkt. No. 185.)

- On December 9, 2003, the Court orders HP to produce the requested customer and other damages related documents and information.  (Dkt. No. 198, 12/09/03 Order at 25-26.)

- On January 9, 2004, HP files a Motion for Reconsideration asserting it cannot provide the ordered discovery.  (Dkt. No. 200.)

- On August 27, 2004, due to HP's refusal to provide the Court-ordered discovery, Cornell is forced to file yet another motion and a request for sanctions.  (Dkt. No. 279.)

- On October 21, 2004, the Court orders HP once again to provide customer related information to Cornell.  (Dkt. No. 326, 10/21/04 Order at 8-9.)

- In July 2005, despite two prior Court orders compelling HP to provide the requested customer related information, Cornell is forced again to file more motions to compel and a contempt motion.  (Dkt. Nos. 367-375.)

- On September 26, 2005, as a result of HP's continued and repeated violations of the Court's prior discovery orders relating to HP's customer related information, Magistrate Judge Peebles issued a certification of facts and referral to District Judge Mordue for a finding that HP be held in contempt, awarded costs to Cornell, and further sanctioned HP by issuing the following preclusion order:

  (1)     Defendant shall be precluded from maintaining, either on motion or at trial, that any evidence introduced by plaintiffs concerning customer demand/customer preference is deficient or defective because of lack of testimony or other information from customers.

  (2)     It is established that, at least as of 1996, HP's customers for servers and workstations had received HP's press releases of March 6, 1995 (HP 049580-049583), November 2, 1995 (HP 049588-049591) and April 3, 1996 (HP 041234-041235).  Those press releases were intended to convey to HP's customers that the "Intelligent Execution" feature discussed in them was at least one of the reasons why they should buy HP servers and workstations containing PA-8000 family processors.

  (Dkt. No. 446, 09/26/05 Order at 6-11; affirmed at Dkt. No. 592.)

Even with the preclusion order and contempt referral, Cornell was substantially prejudiced by the undue delay resulting from HP's failure to produce this highly relevant information pertaining to HP's customers in timely fashion and by the significant and unnecessary fees and costs expended as a result of HP's flagrant and repeated discovery misconduct.

**4.      HP Withheld Agreements With IBM And Intel – Basic Patent Exhaustion Discovery.**

Despite HP's asserted patent exhaustion defense based upon its purported license from IBM and purported manufacture and sales from Intel to HP, for at least three years since 2002, HP constantly blocked Cornell from obtaining relevant information concerning IBM and Intel.   In addition to refusing to produce its own documents and information concerning patent exhaustion, HP adamantly sought to prevent Cornell from obtaining information directly from IBM and Intel. (Dkt. No. 131; *see also* Ex. 16 (HP's Oppositions to Cornell's motions to compel IBM and Intel to produce documents and information).)

**a.  IBM.**

First, in 2002, HP failed to respond to Cornell's written discovery served on HP seeking information about HP's relationship with IBM.  (Dkt. No. 84.)  Then, when Cornell was forced to seek such discovery from IBM directly, HP took extreme measures to prevent such discovery. Specifically, in 2003, HP made representations to the Court and to Cornell, denying HP's cooperation or other dealings with IBM.  (Ex. 11, Dkt. No. 114, 05/14/03 Hrg. Tr. at 104:12-23.) Two years later, in connection with its Motion for Protective Order seeking to block Cornell from obtaining this discovery directly from IBM, HP claimed for the first time that it had an agreement with IBM in connection with this litigation, that it had been working closely with IBM to respond to the subpoena to IBM, and that the relationship between HP and IBM was so close that a common interest privilege should apply.  (Dkt. No. 482.)  In fact, HP had entered into a written agreement with IBM in September of 2003 addressing pretrial discovery and exchange of information in this action.  (P-1382.)  HP unquestionably knew of such agreement when it responded to the Court's December 9, 2003 Order, and yet failed to disclose this agreement to the Court.

By concealing the existence of its relationship and agreement with IBM for more than two years, HP blatantly violated the Court's December 9, 2003 Order requiring production of documents and responses to interrogatories relating to IBM.  (Dkt. No. 198.)  Moreover, HP's response to Cornell's Interrogatory No. 3, which was served after the understandings were reached and agreement was signed between HP and IBM, failed to identify the understandings and agreement.

14

Furthermore, these revelations showed that HP's subsequent certification filed with the Court certifying compliance with the December 9, 2003 Order contained patently false statements regarding the completeness of HP's production.  (Dkt. No. 198.)[11]

As a result of HP's long history of discovery abuse and litigation misconduct, Cornell moved for, and the Court issued, the following preclusion orders:

> For purposes of the trial in this action it will be established that despite a thorough search neither Cornell Research Foundation, Cornell University, Hewlett-Packard Company nor IBM has been able to locate a document specifically denominated as a license agreement between CRF and/or anyone on its behalf and IBM under the '115 patent.

(Dkt. No. 743, 11/13/06 Order at 24.)

> [The Court] will preclude any party from offering in evidence any document or information regarding the issue of patent exhaustion, implied license, and specifically the question of whether IBM was licensed under the '115 patent, that has not as of this date been disclosed to the opposing party.

(*Id.*)

HP's actions further confirm its pattern of litigation misconduct to further its objective of coercing Cornell to drop the lawsuit by delaying the litigation and increasing Cornell's costs.

### b.  Intel.

Early in this litigation, HP represented to the Court and Cornell that a certain "Guidelines" document was the only operative agreement between HP and Intel concerning PA-8000 family of processors:

---

[11] Notably, HP's counsel, Ms. Vaughn, the same person that signed HP's certification of compliance which failed to identify these responsive understandings and agreements, submitted a declaration in support of HP's Motion for Protective Order wherein she attests to her personal involvement in "numerous" communications with IBM and Intel, her belief that such communications were privileged, and states that she signed the purported written agreement between HP and IBM.  (Dkt. No. 483.)  Although Ms. Vaughn was apparently aware of such understandings and agreements at the time that she signed and submitted HP's Certification due to her personal involvement, she failed to identify them to Cornell and the Court at that time.

Moreover, HP's efforts to conceal and deny information relating to IBM is particularly troublesome given that HP's own testifying expert, Mr. Osterndorf, oversaw IBM's licensing activities during the relevant time herein and yet admitted that he was unaware of any IBM license to the '115 patent.  (*See* 05/28/08 Trial Tr. (Dkt. No. 1041) at 130:4-9, 147:6-23; *see also* 09/09/06 Osterndorf Dep. Tr. (Dkt. No. 1077, Ex. 14) at 24:13-41:1, 130:22-131:17; 10/03/07 McQueeny Dep. Tr. (Dkt. No. 936) at 137:4-139:18.)

> Your Honor, this [the Guidelines] is the only agreement that relates to manufacturing of the eight thousand series between H.P. and Intel.  You know, legally binding or not, it's what they're operating under.  And we'll certify to it.

(Ex. 11, Dkt. No. 115, 05/14/03 Hrg. Tr. at 88:24-89:10; *see also id.* at 95:20-98:11.)  Only after Cornell was driven to bring motions to compel both before this Court and the United States District Court for the Northern District of California did HP admit the existence of the controlling alliance agreements.  *Cornell Univ. v. Hewlett-Packard Co.*, U.S.D.C., N.D. Cal. (San Jose), Case No. 5:03-mc-0716-JF (Dkt. No. 1).  Such lack of candor, if not blatant misrepresentations, caused substantial undue expenditures and unnecessary proceedings before this Court and before the Northern District of California.[12]

In addition, in December 2005, contrary to its prior representations denying its dealings with Intel, and in what can only be construed as another attempt to block Cornell from obtaining documents concerning IBM and Intel, HP admitted that it had common interest and joint defense agreements with both IBM and Intel since 2003, and only then did HP reveal that it had worked closely with Intel in responding to Cornell's efforts to obtaining relevant and pertinent discovery from Intel.  (P-1382; Dkt. No. 489, 12/16/05 Letter Brief.)

---

[12] This reflects another HP litigation tactic that HP repeatedly employed throughout the litigation, namely claiming that information does not exist and then changing positions only after Cornell discovers through its own independent investigation that HP's representations were untrue.

In addition to the examples provided herein, another blatant example of this tactic is when HP misrepresented to the Court and Cornell the number of opinions of outside counsel relating to the '115 patent that were in HP's possession.  At a hearing before the Court on May 14, 2003, HP's counsel, Stewart Brown, emphatically asserted that HP had only one opinion of counsel relating to the '115 patent.  (Ex. 11, Dkt. No. 115, 05/14/03 Hrg. Tr. at 112:10-21.)  Subsequently, after subpoenaing the law firm of Fulbright & Jaworski, Cornell discovered directly from Fulbright & Jaworski that there were in fact three opinions of counsel and that HP had in its possession all three of these opinions months before the May 14, 2003 hearing.  Cornell's counsel had to travel to Texas for depositions of Fulbright & Jaworski to unearth facts relating to these previously undisclosed opinions of counsel.  In defense of its prior representation, HP's counsel, Mr. Brown, unbelievably stated that the opinions of counsel had been delivered in a box to his office where they sat unopened for months, that he had not looked at them before making his certification in court, notwithstanding the fact that he knew he was traveling to New York to attend a hearing one subject of which would be the opinion(s) of outside counsel, and that he was working under the assumption that there was only one opinion when he was at the May 14, 2003 hearing.  (Dkt. No. 177.)  He did not disclose how such a delivery could be made to his office without being opened and logged in by office staff in the ordinary course of business or why he would have made such a certification without looking in the box or confirming with his client, HP.

16

Such obfuscation, misrepresentations, and litigation misconduct by HP have unnecessarily multiplied judicial proceedings and required undue expenditures of resources by the Court and Cornell.

**C.      HP's Nine Million Page Document Dump At The Close Of Discovery.**

Not only did HP engage in abusive and vexatious litigation tactics to obstruct Cornell's access to basic discovery for a number of years, HP also shamelessly employed the tactic of making a colossal document dump shortly before the close of fact discovery.

After fighting disclosure and refusing to produce pertinent documents responsive to Cornell's discovery requests for some four years of discovery, HP produced more than 180 boxes of documents and more than 38 gigabytes of electronic data in or after October of 2005, totaling *more than nine million pages of unorganized, unindexed material*.  Of these, more than 100 boxes of hard copy documents and more than 38 gigabytes of electronic documents were produced *only two months* prior to discovery cut-off and well after depositions of key HP fact witnesses had been completed.

When Cornell raised this outrageous abuse of the discovery process with the Court, the Court expressly acknowledged that HP's tactic may be a basis for an "exceptional case" finding:

> **The court will also encourage the trial judge**, in the event of a finding of liability, **to consider whether this tactic employed by HP is a factor to be weighed when deciding whether to declare this an exceptional case** for purposes of awarding costs and attorneys' fees, should plaintiffs prevail on their infringement claims.

(Dkt. No. 743, 11/15/06 Order at 49-50, emphasis added.)  Even if the Court were to consider this unconscionable behavior in isolation, it is difficult to imagine how HP could explain it as anything other than a litigation tactic designed to frustrate discovery, impose on Cornell's attorneys a massive burden to review the unorganized and un-indexed materials to attempt to determine HP's compliance with its discovery obligations, and clearly it increased Cornell's costs of litigation. However, when considered in the context of HP's other discovery abuses, Cornell respectfully submits that it can be viewed only as a gross abuse of the legal process, and thus constitutes litigation misconduct under the law.

17

**D.     HP Repeatedly Misled The Jury As To The Court's Claim Construction And The Test For Infringement .**

HP also tried to mislead the jury into disregarding the Court's claim construction and improperly using the preferred embodiment to determine infringement.  (*See* 05/30/08 Trial Tr. (Dkt. No. 1044) at 69:14-69:18 (HP's Closing Argument); 05/27/08 AM Trial Tr. (Dkt. No. 1039) at 116:12-117:10 (Redirect Exam. of Mr. Lotz).)   HP further distorted the Court's claim construction rulings throughout this case, even after previously representing to the Court that it would not do so. (*Id.*)

At trial, the jury determined that HP infringed all five of the asserted claims (1, 6, 14, 15, and 18) and that all of these claims were not invalid, including on grounds of anticipation.  The dispatch stack is recited in all of these claims and was a central focus of the infringement and validity issues.  The Court's claim construction for dispatch stack explicitly recites that the dispatch stack (1) needs only have one or more essential data dependency fields (*e.g.*, α(S1)), and (2) each such essential dependency field has accompanying logic that "decrements a value > 0 in the essential dependence (sic) field." (Dkt. No. 225).   Thus, in the construed claims, the essential dependency field(s) need only decrement a value greater than zero (0), not greater than one (1) or, for that matter, six (6) or 27.  Moreover, in the construed claims, the dispatch stack need not include a field (*i.e.*, β(D)) for detecting whether instructions are free of non-essential data dependencies.  The preferred embodiment of the '115 patent included an exemplary dispatch stack which, in light of the properties of the sample instructions, included α(S1) and α(S2) fields that decremented values ranging from two (2) to zero (0) and also included a β(D).

During the trial, HP repeatedly tried to mislead and confuse the jury into believing that (1) it should determine infringement by comparing the exemplary dispatch stack set forth in the '115 patent's preferred embodiment (P-1, Chart I),[13] and (2) the Court's claim construction required that

---

[13] It is, of course, a cardinal principle that, in order to determine infringement, the accused device must be compared with the claims, rather than with the preferred embodiment.  *See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003) (finding as "legal error insofar as the infringement analysis is not tied to the asserted claims" where district "court eschewed the cardinal principle that the accused device must be compared to the claims rather than to a preferred or commercial embodiment").

the essential dependency fields in the dispatch stack "decrement a value greater than one (1), as opposed to greater than zero (0). (05/27/08 PM Tr. (Dkt. No. 1040) 182:9-183:14 and DDX 151-153; 143:10-144:4 and DDX 151; and 239:25-241:1 and P-G9, slide 10.) Moreover, HP's counsel elicited this testimony through leading questions that were calculated to mislead and confuse the jury. (*Id.*; *see also* 05/22/08 PM Trial Tr. (Dkt. No. 1035) at 163-65 (Cross-Exam. of Dr. Smith); 05/29/08 PM Trial Tr. (Dkt. No. 1043) at 136:5-139:22 and 171:19-173:5 (Redirect Exam. of Dr. Alpert).)

Specifically, HP's infringement expert, Dr. Swartzlander, in opining that the IRB in HP's PA-8000 family processor, lacked the dependency fields in the dispatch stack, compared the dispatch stack shown in the preferred embodiment with the IRB. (05/27/08 PM Trial Tr. (Dkt. No. 1040) at 182:9-183:14 and DDX 151-153.) In fact, HP presented the jury with a specific slide (DDX 153) showing this comparison. This misleading testimony was also earlier set up by testimony from Dr. Swartzlander, apparently designed to create the impression that the dispatch stack in the construed claims had to detect both essential and non-essential data dependencies. (*Id.* at 143:10-144:4 and DDX 151.) This deception was amplified on redirect of Dr. Swartzlander where Dr. Swartzlander was shown one of Cornell's slides (*id.* at 239:25-241:1 and P-G9, slide 10) which compared the dispatch stack with the IRB and indicated that $\alpha(S1)$ and $\alpha(S2)$ fields were the same as the S1D and S2D flags in the IRB. Dr. Swartzlander misleadingly and incorrectly told the jury that $\alpha(S1)$ and $\alpha(S2)$ fields required a count of 27, whereas the flags in the IRB only counted to one, again designed to mislead the jury into believing that flags had to decrement a count of 27, rather than a count > 0. (*See* 05/30/08 Trial Tr. (Dkt. No. 1044) at 69:14-69:18 (HP's Closing Argument) ("You'd have 27, that would be 27. By the way alpha is defined. Alpha is defined that way in the grant deed. ***So the Torng invention requires counting all of those. That is what the patent office gave him, that's what the claim construction requires***.") (emphasis added); *see also* 05/27/08 Trial Tr. (Dkt. No. 1040) at 116:12-117:10 (Redirect Exam. of Mr. Lotz).)

HP's prior false statements to the Court that it would not assail the Court's claim construction make HP's conduct especially egregious. Specifically, HP's arguments relating to

19

"β(D)" were addressed and rejected at the Court's *Markman* hearing where it was one of two central disputes.  *Cornell Univ. v. Hewlett-Packard Co.*, 313 F. Supp. 2d 114, 127 (N.D.N.Y. 2004). Nonetheless, HP attempted to reargue claim construction in connection with summary judgment motions before Judge Peebles.  (*See* Dkt. No. 780.)  During the proceedings before Judge Peebles, HP expressly acknowledged that the Court's claim construction is "the law of the case" and at the pre-trial conference promised to this Court that it would not challenge the Court's claim construction.  (*Id.* at 233:22-234:4; *see also* Dkt. No. 1077; Ex. 17, 05/06/08 Pre-Trial Hrg. Tr. at 119:11-120:9.) Yet, HP raised this "β(D)" claim construction issue again during the Charge Conference (05/24/08 Trial Tr. (Dkt. No. 1038) at 29:3-59:14) which then resulted in more briefing and another decision by the Court rejecting HP's position.  (Dkt. 1025.)

HP's litigation tactics, when viewed in the totality of the circumstances, amount to litigation misconduct and support an exceptional case finding.

## III.   CORNELL IS ENTITLED TO CERTAIN FEES AND COSTS UNDER 35 U.S.C. § 285.

Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  Moreover, the Federal Circuit has explicitly interpreted "attorney fees" under § 285 to "include those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit."  *Central Soya Co. v. George A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983) (citations omitted);[14] *see also, Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (affirming award of over $16 million dollars in attorney fees, expenses, and witness fees) (citing *Mathis v. Spears*, 857 F.2d 749, 759 (Fed. Cir. 1988)).   "The purpose of § 285 when applied to accused infringers is

---

[14] "Such fees include all expenses that are not covered by the attorneys' hourly rates, routinely paid by counsel and billed to the client, and that are not expenses incurred for the convenience of counsel." *Nikko Materials USA, Inc. v. R.E. Serv. Co.*, No. C 03-2549 SBA, 2006 U.S. Dist LEXIS 3750, at *16-17 (N.D. Cal. Jan. 13, 2006) (citation omitted).  "These expenses may include costs ordinarily not recoverable under 28 U.S.C. § 1920 and Rule 54(d) of the Federal Rules of Civil Procedure, fees associated with non-attorneys such as paralegals, law clerks, and secretaries, and lodging expenses of counsel and witnesses." *Id.* (citation omitted).  However, expert witness fees beyond the amount set by 28 U.S.C. §§ 1920 and 1821(b) are not recoverable under § 285, but are recoverable only under the Court's inherent power to sanction misconduct. *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374 (Fed. Cir. 1994).

generally said to be two-fold: one, it discourages infringement by penalizing the infringer; and two, it prevents 'gross injustice' when the accused infringer has litigated in bad faith." *Beckman,* 892 F.2d at 1552 (citations omitted).

The totality of the circumstances must be considered when making the determination of whether a case is exceptional. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1347 (Fed. Cir. 2000); *see also Beckman*, 892 F.2d at 1552 (finding an "exceptional case" not on discreet events but rather on "a *strategy* of vexatious activity") (emphasis added).   Courts may find that a case is an "exceptional case" within the meaning of 35 U.S.C. § 285 and award fees where the non-prevailing party engaged in litigation misconduct such as "offensive litigation tactics, including vexatious or unjustified litigation or frivolous filings" and any bad-faith litigation on the part of the losing party.  *Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1580 (Fed. Cir. 1986) (providing that "bad-faith displayed in pretrial and trial stages, by counsel or party, may render the case exceptional under § 285), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004); *see also Rohm & Haas Co. v. Crystal Chem. Co.*, 736 F.2d 688, 691 (Fed. Cir. 1984) (noting that "cases awarding attorney [sic] fees to successful patentees have typically found 'exceptional' circumstances in willful and deliberate infringement . . . *or in the prolongation of litigation in bad faith*") (emphasis added); *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 388 F. Supp. 2d 37, 76-78 (N.D.N.Y. 2005) (awarding fees under § 285 without a finding of willful infringement, where "[t]hroughout the course of this proceeding Cargill has engaged in a strategy designed to drive up litigation expenses which, given its relative size, it is in a much better position to absorb than the Sears parties," and where Cargill lacked the "level of candor and responsiveness … in its response to requests for the production of documents" thereby requiring Sears "to enlist the aid of the court in obtaining highly relevant documents regarding Cargill's ongoing sales of ClearLane Treated Salt for use in supporting its request for damages"); *FMT Corp. v. Nissei ASB Co.*, No. 1:90-CV-786-GET, 1993 U.S. Dist. LEXIS 19625, at *8-9 (N.D. Ga. Sept. 27, 1993) (finding case to be "an exceptional case" despite lack of willful infringement where, *inter alia*, the "court twice imposed

21

sanctions on Nissei for discovery abuses" and there were a "multitude of unwarranted motions filed throughout this litigation" as a result of Nissei's conduct).

In *Cargill*, as in the present case, the accused infringer, Cargill, was a large multi-national corporation with substantial resources (in contrast to the patentee who had limited resources), Cargill necessitated dozens of motions virtually all of which were substantially ruled against Cargill, and "at every turn Cargill pressed and reiterated every conceivable argument in its favor, often with little or no legal or factual support." *Cargill*, 388 F. Supp. 2d at 79. The District Court for the Northern District of New York, in an opinion by Magistrate Judge David E. Peebles, held that Cargill's conduct "can be fairly characterized as 'a blatant attempt by a giant corporation to coerce a small company with few resources to abandon its patent suit,'" which "provides an adequate basis, indeed compelling justification, for declaring this an exceptional case." *Id.* (citations omitted). The Court explained that the Sears parties were required to expend millions of dollars to obtain a jury verdict "[d]riven largely by the necessity of defending against unnecessary and extensive tactics by Cargill, a major corporation," and that "it would be a grave injustice to allow this result and condone the efforts of Cargill" to "increas[e] the cost of litigation to a point where they could not be endured" by the Sears parties. *Id.* (citations omitted).

In addition to the facts that both *Cargill* and the present case were or are pending in the Northern District of New York and that Judge Peebles was or is the magistrate judge in both *Cargill* and the present case, the relevant material facts in the present case are substantially similar to the facts in *Cargill*. Specifically, as in *Cargill*, HP has had a long history of obfuscation, delay, and discovery misconduct in this case, including in relation to: (1) HP's infamous "nuclear winter" visit to Cornell – behind the back of Cornell's counsel and senior management - for the purpose of intimidating Cornell to withdraw this patent suit; (2) withholding of basic infringement information – the schematics, basic financial information and customer and other damages related information, and information related to HP's patent exhaustion defense based upon IBM and Intel; (3) a nine million page document dump just before discovery cutoff, and (4) numerous attempts to reargue and disregard the Court's claim construction.

22

As in *Cargill*, HP lacked the "level of candor and responsiveness … in its response to requests for the production of documents" thereby requiring Cornell to repeatedly "enlist the aid of the court in obtaining highly relevant documents."  *Id.* at 78.  Cornell also had to oppose numerous unmeritorious motions for reconsideration by HP.  HP engaged in such conduct with the specific intent and effect of delaying the trial of this case for more than 6 years after filing of suit and significantly escalating the costs of this litigation for Cornell, which HP from its dealings knew to be an institution with limited resources relative to HP.  These facts are virtually identical to those in *Cargill* where "[t]hroughout the course of proceeding Cargill has engaged in a strategy designed to drive up litigation expenses which, given its relative size, it is in a much better position to absorb than the Sears parties."  *Id.* at 77.

Additionally, HP has repeatedly pressed arguments previously made and rejected by the court.  For instance, Cornell expended a significant amount of unnecessary fees and costs to respond to and address HP's numerous improper attempts to disregard and/or distort the Court's claim construction rulings.  (*See* 05/30/08 Trial Tr. (Dkt. No. 1044) at 69:14-69:18 (HP's Closing Argument); 05/27/08 PM Trial Tr. (Dkt. No. 1040) at 116:12-117:10 (Redirect Exam. of Mr. Lotz).)  In fact, contrary to HP's express acknowledgement that the Court's claim construction is "the law of the case" and its prior promise to the Court that it would not challenge the Court's claim construction, HP argued an alternative claim construction at the Charge Conference, and, for the third time, sought to reargue claim construction part of its Motion for JMOL.  (*See* Dkt. No. 1050.)

Such rehashing of the same arguments and unnecessary prolonging of litigation is a proper basis for an exceptional case finding under § 285.  Indeed, this is precisely the type of conduct held to be improper and to warrant an award of fees under 35 U.S.C. § 285 in *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems Gmbh*, No. 98-cv-01072-RPM, 2008 WL 410413, at *5-6 (D. Colo. Feb. 12, 2008) (finding Medtronic's "litigation misconduct" supported award of fees under 35 U.S.C. § 285 where "[a]fter receiving the Court's claims construction ruling, … Medtronic and the MWE lawyers … were obliged to accept those rulings as the law of the case" but "[r]ather than accept that the claims construction rulings stripped the merits from this case, counsel chose to

pursue a strategy of distorting those rulings, misdirecting the jury to a different reading of the claim language, and blatantly presenting the jury with a product to product comparison contrary to established law and the Court's cautionary instructions"); *see also Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 534 F. Supp. 2d 224, 225-27 (D. Mass. 2008) (awarding cost-shifting sanctions where the accused infringers repeatedly "demonstrated a failure to accept the claim construction governing th[e] case" and their "litigation tactics imposed a needless cost upon the plaintiffs").

At the hearings before this Court and in the numerous orders of this Court, Magistrate Judge Peebles has acknowledged HP's litigation misconduct and culpability.   Judge Peebles even expressly indicated in the Court's November 15, 2006 Order that HP's litigation misconduct may be a basis for an "*exceptional case*" finding under § 285 "*for purposes of awarding costs and attorneys' fees, should plaintiffs prevail on their infringement claims*."  (Dkt. No. 743, 11/15/06 Order at 49-50.)  Notably, Judge Peebles' characterization of the conduct in *Cargill* as "a blatant attempt by a giant corporation to coerce a small company with few resources to abandon its patent suit" fittingly describes HP's litigation misconduct in this action.  *Cargill*, 388 F. Supp. 2d at 79.

Accordingly, an award of non-taxable costs and attorney's fees to Cornell under 35 U.S.C. § 285 is both just and proper.  Cornell is seeking an award of $12 million in attorney's fees and $1.3 million in non-taxable costs, which represents only a portion of Cornell's total fees and costs.[15]   In Cornell's view, if HP had abided by its obligations as a litigant, this case would have went to trial in 2-3 years.  Instead, it took seven years to get to trial.  During those four extra years, Cornell endured HP's threat of nuclear winter, was kept busy dealing with HP's refusal to provide fundamental discovery, HP's delay tactics and repeating discovery efforts caused by HP's tactics, and HP's attempt to mislead the jury on claim construction and repeated attempts at rearguing claim construction.  The amount Cornell is seeking reflects these unnecessary years of litigation that resulted from HP's litigation misconduct and the litigation tactics Cornell endured.

---

[15] Upon the Court's finding that Cornell is entitled to these fees, Cornell will submit a declaration in support thereof.

## IV.   CORNELL IS ENTITLED TO EXPERT WITNESS FEES DUE TO HP'S LITIGATION MISCONDUCT.

Although expert fees are not recoverable under 35 U.S.C. § 285, the Court can, in its discretion, award expert fees pursuant to its inherent powers.  *Takeda Chem.,* 549 F.3d at 1391 (affirming award of expert fees) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).  The Federal Circuit has allowed such an award for conduct that constituted bad faith and vexatious litigation conduct.  *Id.*; *see also Depuy Spine*, 534 F. Supp. 2d at 227 (utilizing the court's inherent power to sanction Medtronic for $10 million due to litigation misconduct).

As set forth herein, HP engaged in bad faith and abusive litigation tactics from this lawsuit's inception in an attempt to accomplish its objective of coercing Cornell to drop the lawsuit.  It started with HP's "nuclear winter" visit and continued with HP's pattern of vexatious litigation tactics, which included concealing various categories of basic information, like the schematics and financial information, advancing frivolous arguments to further the concealment, and rearguing and disregarding the Court's claim construction order, in order to delay the litigation, increase costs and confuse issues at trial.  In view of HP's bad faith and vexatious litigation tactics, Cornell is entitled to an award of a portion of its expert witness fees for Dr. Smith and Cornell's damages experts, NERA (Dr. Stewart) and Mr. Rappaport in the amount of $750,000.

## V.   CONCLUSION

Based upon the foregoing, Cornell respectfully requests a judicial determination that this case constitutes an exceptional case under 35 U.S.C. § 285 based upon HP's pervasive pattern of litigation misconduct and a partial award of attorney's fees and costs in the amount of $13.3 million be awarded to Cornell.  Cornell further requests a partial award of expert witness fees in the amount of $750,000 be awarded to Cornell pursuant to the Court's inherent powers.

LA1 1526109v.1

Respectfully Submitted,

DATED:  April 14, 2009          By:    *s/ Olivia M. Kim*
                                       _____
                                       Edward G. Poplawski
                                       Bryan K. Anderson
                                       Denise L. McKenzie
                                       Sandra S. Fujiyama
                                       Olivia M. Kim

                                       **SIDLEY AUSTIN LLP**
                                       555 West Fifth Street
                                       Los Angeles, CA  90013-1010
                                       Telephone:  (213) 896-6601
                                       Facsimile:  (213) 896-6600

                                       James J. Mingle
                                       Nelson E. Roth
                                       Valerie Cross Dorn
                                       OFFICE OF UNIVERSITY COUNSEL
                                       Cornell University
                                       300 CCC Building, Garden Avenue
                                       Ithaca, NY 14853-2601
                                       Telephone:  (607) 255-5124

                                       Attorneys for Plaintiffs Cornell University and
                                          Cornell Research Foundation, Inc.

LA1 1526109v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this day of April 14, 2009, I electronically filed the foregoing document with the Clerk of Court using CM/ECF system which will send notification to the following counsel for HP:

John Allcock     john.allcock@dlapiper.com, lwatts@graycary.com

Jerauld E. Brydges     jbrydges@hselaw.com, hculbertson@hselaw.com, jallison@hselaw.com, litigation@hselaw.com

Sean C. Cunningham     sean.cunningham@dlapiper.com, sally.jones@dlapiper.com

Brian M. Fogarty     brian.fogarty@dlapiper.com

Erin P. Penning     erin.penning@dlapiper.com, judith.frank@dlapiper.com

Barry K. Shelton     shelton@fr.com, pickett@fr.com, tipton@fr.com, zamen@fr.com

Licia E. Vaughn     licia.vaughn@dlapiper.com

Executed on April 14, 2009, at Los Angeles, California.

*s/ Olivia M. Kim*
Olivia M. Kim